# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

STEPHANIE RICHNER,
individually, and as Guardian on behalf of FLUFFY,
a cat, emotional support animal, and family member
875 10TH St., NW, APT. 220
Washington, DC 20001,
Plaintiff.

v.

GERALD D. HINES
in his Official Capacity as Estate / Successors,

1) Service of Process

Secretary of State
P.O. Box 12079
Austin, Texas 78711-2079

2) c/o Superintendent of Corporations
Department of Licensing and Consumer Protection
Business and Professional Licensing Administration
Corporations Division
Wells Fargo Bank
2005 Market Street, 5th Floor
Philadelphia, PA 19103-7042,

JEFFREY C. HINES
in his Official Capacity as Hines Chairman and
Co-Chief Executive Officer, and
Delegate/Representative,

1) Service of Process

Secretary of State
P.O. Box 12079
Austin, Texas 78711-2079

2) c/o Superintendent of Corporations

Department of Licensing and Consumer Protection
Business and Professional Licensing Administration
Corporations Division
Wells Fargo Bank
2005 Market Street, 5th Floor
Philadelphia, PA 19103-7042,

Case: 1:26–cv–02763
Assigned To : Unassigned
Assign. Date : 8/4/2026
Description: Pro Se Gen. Civ. (F–DECK)

Civil Action No.: ____________________________________________

____________________________________________

___

(title of pleading)

RECEIVED
AUG 04 2026
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

LAURA HINES-PIERCE
in her Official Capacity as Hines Co-Chief Executive Officer,

1) Service of Process
Secretary of State
P.O. Box 12079
Austin, Texas 78711-2079

2) c/o Superintendent of Corporations
Department of Licensing and Consumer Protection
Business and Professional Licensing Administration
Corporations Division
Wells Fargo Bank
2005 Market Street, 5th Floor
Philadelphia, PA 19103-7042,

HINES INTERESTS LIMITED PARTNERSHIP
c/o C T Corporation System
1999 Bryan Street, Suite 900
Dallas, TX 75201,

CCDC RESIDENTIAL RENTAL LLC
c/o C T Corporation System
1015 15th Street N.W., Suite #1000
Washington, DC 20005,

CCDC RESIDENTIAL RENTAL LLC (IMPS ONLY)
c/o Hines Interests LP
825 10th St NW Management Office
Washington, DC 20001,

CCDC MASTER DEVELOPER LLC
c/o C T Corporation System
1015 15th Street N.W., Suite #1000
Washington, DC 20005,

OCC MASTER DEVELOPER, LLC
c/o C T Corporation System
1015 15th Street N.W., Suite #1000
Washington, DC 20005,

WILLOWICK RESIDENTIAL
c/o Superintendent of Corporations

Department of Licensing and Consumer Protection
Business and Professional Licensing Administration
Corporations Division
Wells Fargo Bank
2005 Market Street, 5th Floor
Philadelphia, PA 19103-7042,

WILLOWICK MANAGEMENT LLC
c/o Superintendent of Corporations
Department of Licensing and Consumer Protection
Business and Professional Licensing Administration
Corporations Division
Wells Fargo Bank
2005 Market Street, 5th Floor
Philadelphia, PA 19103-7042,

CITYCENTERDC INVESTORS LLC
c/o C T Corporation System
1015 15th Street N.W., Suite #1000
Washington, DC 20005,

CCDC PARCEL A FUNDING COMPANY LLC
c/o C T Corporation System
1015 15th Street N.W., Suite #1000
Washington, DC 20005,

WILLIAM B. ALSUP, III (a/k/a Bill Alsup)
in his Official Capacity as senior managing director
and was the founding partner of the Hines
Washington, D.C. office

1) 4615 Dexter St. NW, Washington DC 20007
2) c/o Superintendent of Corporations

Department of Licensing and Consumer Protection
Business and Professional Licensing Administration
Corporations Division
Wells Fargo Bank
2005 Market Street, 5th Floor
Philadelphia, PA 19103-7042,

EVAN J. MCCORD
in his Official Capacity as Head Senior Managing
Director, Co- of Legal at Hines
1) Service of Process
Secretary of State

P.O. Box 12079
Austin, Texas 78711-2079
2) c/o Superintendent of Corporations
Department of Licensing and Consumer Protection
Business and Professional Licensing Administration
Corporations Division
Wells Fargo Bank
2005 Market Street, 5th Floor
Philadelphia, PA 19103-7042,

TRACIE ALLGOOD
in her Official Capacity as Governor,

1) 2800 Post Oak Blvd., Suite 5000 Houston TX 77056
2) Service of Process

Secretary of State
P.O. Box 12079
Austin, Texas 78711-2079,

SHERRI W. SCHUGART
in her Official Capacity as CEO of the Core Fund, REIT and BDC Group, and President and CEO of Hines Real Estate Investment Trust, Inc.

1) Service of Process

Secretary of State
P.O. Box 12079
Austin, Texas 78711-2079

2) c/o Superintendent of Corporations

Department of Licensing and Consumer Protection
Business and Professional Licensing Administration
Corporations Division
Wells Fargo Bank
2005 Market Street, 5th Floor
Philadelphia, PA 19103-7042,

LAW OFFICE MAGRUDER COOK KOUTSOUFTIKIS & PALANZI ("MCKP")
Registered trade name of Koutsouftikis & Palanzi, PLLC
MCKP represented or communicated on behalf of CCDC Residential Rental LLC, The Apartments at CityCenter, or one or more related Defendants in matters involving Plaintiff's tenancy, alleged rent

balance, lease enforcement, notices, or possession-related proceedings.

1) 1889 Preston White Drive Suite 200
Reston, Virginia 20191

2) Office of the Secretary of the Commonwealth
Service of Process Department
Post Office Box 2452
Richmond, Virginia 23218-2452,

LEON KOUTSOUFTIKIS

Defendant LEON KOUTSOUFTIKIS is an attorney employed by Law Office Magruder Cook Koutsouftikis & Palanzi. He is sued in his official capacity. At all times relevant to this action, Defendant was acting under color of law and is an attorney admitted to practice law in the District of Columbia and Maryland.

1) 1889 Preston White Drive Suite 200
Reston, Virginia 20191

2) Office of the Secretary of the Commonwealth
Service of Process Department
Post Office Box 2452
Richmond, Virginia 23218-2452,

ANDREW PALANZI

Defendant ANDREW PALANZI is an attorney employed by Law Office Magruder Cook Koutsouftikis & Palanzi. He is sued in his official capacity. At all times relevant to this action, Defendant was acting under color of law and is an attorney admitted to practice law in the District of Columbia and Maryland.

1) 1889 Preston White Drive Suite 200
Reston, Virginia 20191

2) Office of the Secretary of the Commonwealth
Service of Process Department
Post Office Box 2452
Richmond, Virginia 23218-2452,

ELLIOTT MORRIS

Defendant ELLIOTT MORRIS is an attorney employed by Law Office Magruder Cook Koutsouftikis & Palanzi. He is sued in his official

capacity. At all times relevant to this action, Defendant was acting under color of law and is an attorney admitted to practice law in the District of Columbia and Maryland.

1) 1889 Preston White Drive Suite 200
Reston, Virginia 20191
2) Office of the Secretary of the Commonwealth
Service of Process Department
Post Office Box 2452
Richmond, Virginia 23218-2452,

GIOVANNI CARILLO

Defendant GIOVANNI CARILLO is an attorney employed by Law Office Magruder Cook Koutsouftikis & Palanzi. He is sued in his official capacity. At all times relevant to this action, Defendant was acting under color of law and is an attorney admitted to practice law in the District of Columbia and Maryland.

1) 1889 Preston White Drive Suite 200
Reston, Virginia 20191
2) Office of the Secretary of the Commonwealth
Service of Process Department
Post Office Box 2452
Richmond, Virginia 23218-2452,

CYNTHIA R. COOK

Defendant CYNTHIA R. COOK is an attorney employed by Law Office Magruder Cook Koutsouftikis & Palanzi. She is sued in her official capacity. At all times relevant to this action, Defendant was acting under color of law and is an attorney admitted to practice law in the District of Columbia and Maryland.

1) 1889 Preston White Drive Suite 200
Reston, Virginia 20191
2) Office of the Secretary of the Commonwealth
Service of Process Department
Post Office Box 2452
Richmond, Virginia 23218-2452,

BRIAN HAN

Defendant BRIAN HAN is an attorney employed by Law Office Magruder Cook Koutsouftikis & Palanzi.

He is sued in his official capacity. At all times relevant to this action, Defendant was acting under color of law and is an attorney admitted to practice law in the District of Columbia.

1) 1889 Preston White Drive Suite 200
Reston, Virginia 20191

2) Office of the Secretary of the Commonwealth
Service of Process Department
Post Office Box 2452
Richmond, Virginia 23218-2452,

and ANNE M. MAGRUDER
Defendant ANNE M. MAGRUDER is an attorney employed by Law Office Magruder Cook Koutsouftikis & Palanzi. She is sued in her official capacity. At all times relevant to this action, Defendant was acting under color of law and is an attorney possibly admitted to practice law in the District of Columbia and Maryland. Of Counsel, Retired.

1) 1889 Preston White Drive Suite 200
Reston, Virginia 20191

2) Office of the Secretary of the Commonwealth
Service of Process Department
Post Office Box 2452
Richmond, Virginia 23218-2452,

Defendants.

Plaintiff is presently unaware of the true names and capacities of Roe Business Subsidiaries or Entities 1 through 100. Plaintiff alleges, upon information and belief, that those entities may include undisclosed parents, subsidiaries, members, partners, owners, investors, developers, property managers, contractors, technology providers, billing entities, maintenance companies, or other business entities responsible for some portion of the conduct alleged in this Complaint.

## TABLE OF CONTENTS

INTRODUCTION .......... ___

I. JURISDICTION .......... ___
A. Federal-Question and Supplemental Jurisdiction .......... ___
B. Jurisdiction Concerning Qatari Diar .......... ___
C. Personal Jurisdiction .......... ___

II. VENUE .......... ___

III. THE PARTIES .......... ___
A. Plaintiff Jane Doe .......... ___
B. CCDC Residential Rental LLC .......... ___
C. Property-Management Defendants .......... ___
D. Hines-Side Defendants .......... ___
E. QD US Real Estate Company .......... ___
F. Qatari Diar Real Estate Investment Company Q.C.S.C. .......... ___
G. Individual Defendants .......... ___
H. Agency and Defendant-Specific Responsibility .......... ___

IV. REGULATORY AND CONTRACTUAL FRAMEWORK .......... ___
A. The Fair Housing Act .......... ___
B. The District of Columbia Human Rights Act .......... ___
C. District of Columbia Housing and Landlord-Tenant Law .......... ___
D. The Affordable-Dwelling-Unit Framework .......... ___
E. Plaintiff's Residential Lease and Incorporated Addenda .......... ___

V. FACTUAL BACKGROUND .......... ___

A. CityCenterDC's Affordable-Housing Framework and the Residential Defendants .......... ___

B. Plaintiff's Disability-Related Housing Needs and Search for an Affordable Dwelling .......... ___

C. Defendants' Advertisement and Handling of Plaintiff's Application for ADU 624 .......... ___

D. Plaintiff's Disability Disclosures and Requests During the Leasing Process .......... ___

E. Defendants' Failure to Deliver ADU 624 and Placement of Plaintiff in ADU 7 .......... ___

F. Execution of the ADU 7 Lease and the Emotional-Support-Animal Approval Process ............ ___

G. Unsafe, Unsanitary, and Privacy-Deficient Conditions in ADU 7 ............ ___

H. Plaintiff's Notices, Formal Complaint, and Requested Relief ............ ___

I. Defendants' Proposed Transfer and Assurances Concerning ADU 2 ............ ___

J. Plaintiff's September 2023 Inspection and Occupancy of ADU 2 ............ ___

K. Immediate Discovery and Notice of Unremedied Hazards in ADU 2 ............ ___

L. Continuing Repair Failures, Work Orders, and Incomplete Remediation ............ ___

M. Lease Renewal, Recertification, ESA Billing, and Account Administration ............ ___

N. Rent-Payment Barriers, Accommodation Requests, and Disputed Charges ............ ___

O. Heating, Plumbing, Sanitation, and Other Escalating Habitability Failures ............ ___

P. District Inspections, Notices of Infraction, and Defendants' Continuing Notice ............ ___

Q. Missing Portal Records and Plaintiff's Preservation Demands ............ ___

R. Plaintiff's Protected Activity and Defendants' Subsequent Possession Efforts ............ ___

S. Injuries, Loss of Use, Economic Losses, and Other Resulting Harm ............ ___

VI. CLAIMS FOR RELIEF ............ ___

COUNT I
FAILURE TO MAKE REASONABLE ACCOMMODATIONS IN VIOLATION OF THE FAIR HOUSING ACT
42 U.S.C. § 3604(f) ............ ___

COUNT II
INTERFERENCE WITH AND RETALIATION FOR THE EXERCISE OF RIGHTS PROTECTED BY THE FAIR HOUSING ACT
42 U.S.C. § 3617 ............ ___

COUNT III
DISABILITY DISCRIMINATION AND FAILURE TO MAKE REASONABLE

ACCOMMODATIONS IN VIOLATION OF THE DISTRICT OF COLUMBIA
HUMAN RIGHTS ACT
D.C. Code §§ 2-1402.21 and 2-1402.22 ............................................................ ___

COUNT IV
COERCION, INTERFERENCE, AND RETALIATION IN VIOLATION OF
THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
D.C. Code § 2-1402.61 ............................................................................................ ___

COUNT V
RETALIATORY ACTION IN VIOLATION OF THE DISTRICT OF
COLUMBIA RENTAL HOUSING ACT
D.C. Code § 42-3505.02 .......................................................................................... ___

COUNT VI
UNFAIR OR DECEPTIVE TRADE PRACTICES IN VIOLATION OF THE
DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT
D.C. Code §§ 28-3904 and 28-3905(k) ................................................................ ___

COUNT VII
BREACH OF RESIDENTIAL LEASE ..................................................................... ___

COUNT VIII
BREACH OF THE IMPLIED WARRANTY OF HABITABILITY AND
ENTITLEMENT TO RENT ABATEMENT ........................................................... ___

COUNT IX
NEGLIGENCE .......................................................................................................... ___

COUNT X
UNLAWFUL ENTRY AND BREACH OF THE COVENANT OF QUIET
ENJOYMENT ........................................................................................................... ___

VII. PRAYER FOR RELIEF ..................................................................................... ___

VIII. STATEMENT REGARDING TRIAL BY THE COURT ................................. ___

IX. SIGNATURE BLOCK .......................................................................................... ___

X. OPTIONAL VERIFICATION ............................................................................... ___

XI. EXHIBIT INDEX .................................................................................................. ___

# I. INTRODUCTION

This civil action arises from Plaintiff Stephanie Richner's ("Jane Doe") application for and tenancy in an income-restricted affordable dwelling unit at The Apartments at CityCenter in Washington, D.C. Plaintiff is a person with documented disabilities who required reasonable accommodations and safe, sanitary, and accessible housing.

Plaintiff alleges that the Defendants responsible for owning, operating, and managing the Property failed to respond adequately to her disability-related requests; permitted serious housing conditions to remain unresolved after repeated notice; imposed disputed fees and payment barriers; and interfered with her ability to use, enjoy, and remain securely housed in her dwelling.

Plaintiff further alleges that, after she requested repairs and accommodations, contacted District officials, and sought to enforce her housing and contractual rights, Defendants reduced services, continued disputed charges, failed to correct material conditions, and pursued possession of her home.

Through this action, Plaintiff seeks relief under the Fair Housing Act, the District of Columbia Human Rights Act, the District's landlord-tenant and consumer-protection laws, and related contract and tort principles. Plaintiff seeks appropriate declaratory, injunctive, compensatory, statutory, and equitable relief for the injuries caused by Defendants' respective acts and omissions.

# II. JURISDICTION

## A. Federal-Question and Supplemental Jurisdiction

This Court has original subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the laws of the United States, including the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–3619. Plaintiff's federal claims arise under, among other provisions, 42 U.S.C. §§ 3604(f)(2), 3604(f)(3)(B), and 3617. Plaintiff alleges that one or more Defendants discriminated against her in the terms, conditions, privileges, services, or facilities associated with her dwelling; refused or failed to make reasonable accommodations necessary to afford her an equal opportunity to use and enjoy that dwelling; and coerced, intimidated,

threatened, interfered with, or retaliated against her because she requested accommodations, reported housing conditions, opposed discriminatory practices, or otherwise exercised rights protected by the FHA.

Plaintiff is an “aggrieved person” authorized to commence a private civil action and obtain appropriate legal and equitable relief under 42 U.S.C. § 3613.

This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff’s related claims arising under District of Columbia statutory, contractual, consumer-protection, housing, tort, restitutionary, and equitable law, including the claims pleaded under the District of Columbia Human Rights Act and the other District of Columbia laws identified in the individual Counts.

Plaintiff’s federal and District of Columbia claims form part of the same case or controversy under Article III because they arise from a common nucleus of operative fact, including Plaintiff’s application for and occupancy of affordable dwelling units at The Apartments at CityCenter; her leases and incorporated addenda; her disability disclosures and accommodation requests; the condition, maintenance, and repair of her dwelling; rent-payment procedures and tenant-account charges; management communications and policies; governmental inspections and enforcement activity; notices; and possession-related conduct.

The federal and District of Columbia claims substantially involve the same witnesses, leases, communications, tenant-account records, maintenance records, accommodation records, inspection materials, notices, policies, management records, ownership records, and claimed injuries.

Plaintiff does not presently rely upon diversity jurisdiction under 28 U.S.C. § 1332. The citizenship of each member or partner of every limited-liability company and limited partnership named as a Defendant has not been established through sufficiently complete and reliable records. Plaintiff’s invocation of federal-question and supplemental jurisdiction does not depend upon complete diversity.

**B. Jurisdiction Concerning Qatari Diar**

Defendant Qatari Diar Real Estate Investment Company Q.C.S.C. (“Qatari Diar”) is alleged, upon information and belief, to be a separate juridical entity organized under the laws of the State of Qatar.

Qatari Diar publicly identifies CityCenterDC as its first significant investment in the United States. Plaintiff alleges that Qatari Diar participated in the commercial investment and ownership structure associated with the CityCenterDC development. Plaintiff does not allege that Qatari Diar is legally identical to the State of Qatar, and the State of Qatar is not named merely because of Qatari Diar's governmental ownership, affiliation, or source of capital.

Whether Qatari Diar qualifies as a "foreign state," "political subdivision," or "agency or instrumentality of a foreign state" within the meaning of 28 U.S.C. § 1603 is an entity-specific jurisdictional question dependent upon Qatari Diar's legal status, direct ownership, governing instruments, and relationship to the State of Qatar at the time this action is commenced.

Plaintiff therefore pleads in the alternative that, if Qatari Diar qualifies as a foreign state or an agency or instrumentality of a foreign state under § 1603, this Court has original jurisdiction under 28 U.S.C. § 1330(a) only with respect to claims for which Qatari Diar is not entitled to immunity under 28 U.S.C. §§ 1605 through 1607 or another applicable provision of law.

To the extent supported by the Defendant-specific factual allegations and the evidence ultimately developed, Plaintiff invokes the commercial-activity exception in 28 U.S.C. § 1605(a)(2) only for claims that are based upon Qatari Diar's own commercial acts or conduct having the nexus to the United States required by that provision.

Such commercial conduct may include, to the extent established by admissible evidence, Qatari Diar's own entry into, performance of, administration of, or material participation in commercial investment, financing, ownership, governance, development, or management arrangements concerning the CityCenterDC residential component and the conduct underlying the particular claim asserted against it.

Plaintiff does not rely solely upon Qatari Diar's status as an upstream owner, parent, shareholder, investor, affiliate, financier, or recipient of commercial returns. Foreign ownership, corporate affiliation, investment in CityCenterDC, or participation in a multi-tiered ownership structure, standing alone, does not establish either jurisdiction or liability.

If Qatari Diar qualifies as a foreign state or agency or instrumentality and an applicable exception to immunity exists, personal jurisdiction shall be governed by 28 U.S.C. § 1330(b) and shall arise only upon service in conformity with 28 U.S.C. § 1608.

If Qatari Diar does not qualify as a foreign state or agency or instrumentality under § 1603, subject-matter jurisdiction over the federal and related District of Columbia claims remains governed by 28 U.S.C. §§ 1331 and 1367. Personal jurisdiction over Qatari Diar would then depend upon Federal Rule of Civil Procedure 4(k), District of Columbia law, and Qatari Diar's own constitutionally sufficient, suit-related contacts with the District.

QD US Real Estate Company and QD US Parcel A (Residential) Company are alleged to be separately incorporated Cayman Islands companies. Plaintiff does not presently allege that either Cayman company independently qualifies as a foreign state, political subdivision, or agency or instrumentality under the FSIA. Jurisdiction over those companies rests, if supported by the Defendant-specific claims and contacts, upon 28 U.S.C. §§ 1331 and 1367, Federal Rule of Civil Procedure 4(k), District of Columbia law, and the ordinary requirements governing personal jurisdiction and service.

**C. Personal Jurisdiction**

This Court may exercise personal jurisdiction over the non-FSIA Defendants under Federal Rule of Civil Procedure 4(k)(1)(A), the District of Columbia long-arm statute, D.C. Code § 13-423, and the Due Process Clause.

Defendant CCDC Residential Rental, LLC is a Delaware limited-liability company registered to conduct business in the District of Columbia. It is alleged to be the owner, landlord, lessor, or entity asserting landlord rights with respect to Plaintiff's dwelling at 875 10th Street NW, Washington, D.C. CCDC Residential Rental, LLC transacts residential-rental business in the District, entered into or performed lease obligations concerning District property, and allegedly caused injury through conduct undertaken in or directed toward the District.

District of Columbia property and enforcement records identify CCDC Residential Rental, LLC as the owner or respondent concerning Plaintiff's dwelling and identify the owner care of Hines Interests Limited Partnership at the Property's management office.

Defendant Hines Interests Limited Partnership ("Hines LP") is a Delaware limited partnership registered to conduct business in the District of Columbia. Plaintiff alleges that Hines LP established suit-related contacts with this District through its property-specific role, including its identification in District property and enforcement records in connection with the owner of the Property and the management-office address at 825 10th Street NW, Washington, D.C. 20001.

Plaintiff further alleges personal jurisdiction over Hines LP only to the extent that the Defendant-specific factual allegations establish that Hines LP itself, directly or through a legally attributable agent, transacted business in the District; entered or performed agreements concerning the Property; exercised material authority over property operations, management, maintenance, financing, policies, personnel, or tenant-facing practices; directed or approved conduct giving rise to Plaintiff's claims; or otherwise established constitutionally sufficient, suit-related contacts with the District.

This Court has personal jurisdiction over each properly identified property-management Defendant to the extent that the particular Defendant managed residential property in the District and performed suit-related activities here, including administering leases, rent, fees, tenant accounts, maintenance, repairs, accommodations, communications, notices, personnel, or possession-related matters.

As to Hines CCDC Partners, LLC, CityCenterDC Investors, LLC, CCDC Apartment Inc., OCC Master Developer, LLC, QD US Real Estate Company, QD US Parcel A (Residential) Company, and any other upstream, affiliated, ownership, investment, development, or financing Defendant, Plaintiff invokes specific personal jurisdiction only to the extent that the particular Defendant itself, directly or through a legally attributable agent:

a. transacted business in the District of Columbia;

b. contracted to supply services in the District;

c. entered, performed, administered, or assumed obligations concerning CityCenterDC or the residential Property;

d. possessed, used, owned, governed, financed, developed, managed, or exercised material authority concerning real property in the District;

e. appointed, directed, or controlled agents who performed suit-related acts in the District;

f. directed, approved, ratified, or materially participated in conduct giving rise to Plaintiff's claims;

g. caused tortious injury in the District through acts or omissions occurring within the District or through conduct satisfying the requirements of D.C. Code § 13-423(a); or

h. otherwise established contacts sufficient to permit the exercise of jurisdiction consistent with District of Columbia law and due process.

Plaintiff does not rely solely upon indirect ownership, common branding, overlapping officers, shared business addresses, financial investment, corporate affiliation, parent-subsidiary status, receipt of profits, or participation in a multi-tiered entity structure to establish personal jurisdiction.

Jurisdiction over each Defendant rests upon that Defendant's own contacts and conduct, a legally sufficient agency or attribution theory, or another applicable jurisdictional rule. The allegations against one Defendant are not automatically imputed to another merely because the entities are affiliated.

**III. VENUE**

Venue is proper in the United States District Court for the District of Columbia under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in the District of Columbia and the real property that is the subject of this action is situated in this District.

The residential Property is located at 875 10th Street NW, Washington, D.C. 20001 ("Property"). Plaintiff's affordable dwelling units are located within that Property, and her leases were entered into or performed in the District of Columbia.

The accommodation requests, housing conditions, maintenance and repair requests, payment practices, tenant-account charges, management communications, governmental inspections, notices, alleged

discriminatory and retaliatory conduct, possession-related activity, and resulting injuries at issue occurred principally in the District of Columbia.

The ownership, leasing, operation, management, maintenance, financing, administration, and regulation of the residential Property are substantially connected to the District. Relevant property records, lease records, maintenance records, tenant-account records, inspection materials, agency records, management records, and witnesses are likewise substantially connected to this District.

To the extent Qatari Diar qualifies as a foreign state or an agency or instrumentality under 28 U.S.C. § 1603, venue is also proper under 28 U.S.C. § 1391(f)(1) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District of Columbia and the property involved in the action is situated here.

Venue is independently proper as to the domestic and non-sovereign Defendants under 28 U.S.C. § 1391(b)(2) and does not depend upon the inclusion or continued inclusion of Qatari Diar or any other foreign Defendant.

**IV. PARTIES**

**A. PLAINTIFF**

1. Plaintiff Jane Doe ("Plaintiff") is a natural person, an adult individual, and a citizen of the United States who is domiciled and resides in the District of Columbia. At all times relevant to the allegations set forth herein, Plaintiff was a prospective tenant, and is a current tenant, of an affordable dwelling unit ("ADU") at the property located at 875 10th Street N.W., Washington, D.C. 20001 (hereinafter the "Subject Property"). She brings this action to vindicate rights expressly guaranteed by the Fair Housing Act, 42 U.S.C. § 3601 et seq., and the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 et seq. She is a direct signatory to the residential lease and an intended third-party beneficiary of the master property management agreements and Land Disposition Agreements executed by the Defendants.

2. At all times relevant herein between August 2023 and September 2023, Plaintiff resided in, and was the lawful occupant of, an affordable dwelling unit located at 875 10th Street N.W., Apartment 711, Washington, D.C. 20001.

3. Thereafter, from September 2023 through the present date, Plaintiff has continuously resided in, and remains a current tenant of, an affordable dwelling unit located within the same premises at 875 10th Street N.W., Apartment 220, Washington, D.C. 20001.

4. Plaintiff is a person with documented disabilities. The law requires reasonable accommodations to afford her an equal opportunity to use and enjoy a dwelling, and the text of the statute admits of no exceptions for recalcitrant landlords. Plaintiff resides with her prescribed Emotional Support Animal, Fluffy, a cat that provides essential therapeutic support. Fluffy is housebroken, poses no threat, and is a beloved family member.

5. This action proceeds pseudonymously out of necessity, as it implicates sensitive medical, disability, and personal-safety information. Plaintiff will disclose her true identity under seal, subject to the safeguards ordered by this Court.

**B. THE DOMESTIC SHELL & MASTER DEVELOPER DEFENDANTS**

One cannot properly evaluate this case without confronting the corporate labyrinth erected by the Defendants. Defendant CCDC RESIDENTIAL RENTAL LLC is a limited liability company organized under the laws of the District of Columbia. Although designated as the "owner" on Plaintiff's lease, this entity is a mere facade—an undercapitalized corporate shell operating within a sprawling, six-tier alter-ego structure designed to evade the plain text of the law.

Defendant CCDC RESIDENTIAL RENTAL LLC (IMPS ONLY) is a Delaware limited liability company operating as a parallel shell. It serves no discernible commercial purpose other than to confound asset holding and financial accounting. To treat these entities as distinct juridical persons would be to promote a patent fiction.

Defendant CCDC MASTER DEVELOPER LLC is a Delaware limited liability company. It exercises direct, unmediated control over the branding, intellectual property, and public tenant-facing portals of the Subject Property.

Defendant OCC MASTER DEVELOPER, LLC is a Delaware limited liability company. It is the primary signatory and grantee under the December 14, 2007, Amended and Restated Development Agreement and Land

Disposition Agreement with the District of Columbia, holding the foundational development rights and obligations for the Subject Property.

Defendant WILLOWICK RESIDENTIAL and its affiliate, WILLOWICK MANAGEMENT LLC, operate in Washington, D.C., acting as agents for the CCDC entities and Hines Interests Limited Partnership. While Willowick publicly holds itself out as the property manager, its District of Columbia business license has been revoked.

**C. THE HINES CONTROL GROUP DEFENDANTS**

The true architect of this enterprise is Defendant HINES INTERESTS LIMITED PARTNERSHIP ("Hines LP"), a Delaware limited partnership. Hines LP is a global real estate conglomerate that exercises pervasive, undisputed dominion over the operations, policies, and management of the Subject Property. It is the respondent agent and sits atop the aforementioned six-tier ownership chain.

Defendant GERALD D. HINES (ESTATE / SUCCESSORS) represents the estate of the founder of Hines LP. The estate is properly named to pursue veil-piercing claims arising from the historical capitalization, commingling of funds, and overarching direction of the Hines corporate enterprise.

Defendant JEFFREY C. HINES is the Chairman and Chief Executive Officer of the Hines enterprise. He exercises ultimate decision-making authority over its operations and exploits these affiliated entities for his direct benefit.

Defendant LAURA HINES-PIERCE is the Senior Managing Director in the Office of the CEO and a member of the Hines Executive Committee. She actively participates in the strategic direction and operational transformations of the enterprise.

Defendant WILLIAM B. ALSUP, III (a/k/a Bill Alsup) is the Senior Managing Director and founding partner of Hines Washington, D.C. Alsup exercised direct executive oversight over the development of CityCenterDC—specifically its ADU operations—and actively traveled to the Middle East to solicit foreign sovereign capital for the Subject Property.

Defendant EVAN J. MCCORD serves as Senior Vice President of the CCDC entities. He exercises direct administrative and signatory authority over the master development's operations and regulatory filings. Defendant CHARLES N. HAZEN served as President and Chief Operating Officer of Hines REIT, further demonstrating the utilization of executive officers to manage the public and private capital vehicles that dictate property operations.

**D. ON-SITE AGENTS & INDIVIDUAL DEFENDANTS**

Defendants TRACIE ALLGOOD, CHAI MORALES, MARKUS ROLLINS, TYLER SCHEMEHORN, MAURA CORTEZ, JAQUELINNE ORANTES, ELLIOTT MORRIS, and GIOVANNI CARILLO are individuals employed by or acting as agents for the Hines, Willowick, and CCDC Defendants. Words have meaning: the Fair Housing Act imposes a non-delegable duty upon housing providers to prevent discrimination. These individuals directly managed the Subject Property, interacted with Plaintiff, and personally participated in, enforced, or ratified the discriminatory practices and contractual breaches alleged herein.

**E. OFFSHORE & FOREIGN SOVEREIGN DEFENDANTS**

The corporate evasion in this matter extends beyond our shores. Defendant QATARI DIAR REAL ESTATE INVESTMENT COMPANY / STATE OF QATAR is a foreign sovereign or instrumentality that holds ultimate beneficial ownership and provided the institutional capital for the Subject Property. By financing and operating an income-producing residential property in the District of Columbia, this Defendant engaged in quintessential commercial activity. Consequently, it is squarely subject to this Court's jurisdiction under the commercial-activity exception of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2).

Defendant QD US PARCEL A (RESIDENTIAL) CO. is a foreign holding entity organized under the laws of the Cayman Islands, utilizing an offshore structure located at the registered offices of Maples Corporate Services Ltd, PO Box 309, Ugland House Grand Cayman KY1-1104 Cayman Islands. It functions as the specific financial vessel for sovereign capital directed into the residential component of the Subject Property.

**F. THIRD-PARTY ENFORCEMENT DEFENDANTS**

Defendant LAW FIRM OF MAGRUDER COOK KOUTSOUFTIKIS & PALANZI is a law firm operating in the District of Columbia. Along with individual defendants LEON KOUTSOUFTIKIS, ANDREW PALANZI, CYNTHIA R. COOK, BRIAN HAN, and ANNE M. MAGRUDER, this firm served as the legal enforcement arm for the Landlord. The text of 42 U.S.C. § 3617 is unambiguous: it is unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise of their fair housing rights. These Defendants are named in their capacity as third-party actors who engaged in precisely such prohibited interference.

**G. MUNICIPAL & UNKNOWN DEFENDANTS**

Defendant DISTRICT OF COLUMBIA is a municipal corporation. It is an indispensable party regarding Plaintiff's claims concerning the master Land Disposition Agreement, the ultra vires waiver of federal reversionary rights, and the diversion of public land from its mandatory statutory purpose. It is sued here for declaratory and equitable relief.

Defendants JOHN DOES and JANE DOES 1 through 20 are currently unknown individual agents, officers, trustees, or affiliated offshore corporate entities who participated in, directed, authorized, or ratified the unlawful acts described herein. Plaintiff will amend this Complaint to substitute their true names once ascertained through discovery.

**V. FACTUAL ALLEGATIONS**

**A. Plaintiff's Search for Accessible Affordable Housing**

On or about June 2023, Plaintiff began searching for an affordable dwelling unit in the District of Columbia that would meet both her financial circumstances and her disability-related needs.

Plaintiff observed that numerous D.C. apartment complexes were branded as "luxury," inflating rental prices far beyond the reach of low-income tenants. As one 2021 Washingtonian article reported:

"Luxury apartments are in high demand again, and they're trying to out-offer the competition with bougie amenities… a high-end apartment building where rent on a one-bedroom runs in the low $2,000s… and has an indoor lap pool and spa area with infrared, dry heat, and steam saunas. Washingtonian, "As Interest in Luxury DC Apartments Soars…" (July 27, 2021),

https://www.washingtonian.com/2021/07/27/as-interest-in-luxury-dc-apartments-soars-developers-are-competing-to-offer-the-most-extravagant-amenities-possible/

Plaintiff undertook this search while recovering from a severe ulcerative-colitis flare up that had required hospitalization and had nearly resulted in the need for a blood transfusion.

Plaintiff's existing lease was expected to expire in August 2023. She also anticipated a medical procedure during the summer and needed sufficient time to coordinate housing, movers, medical care, and the relocation of her Emotional Support Animal ("ESA"), Fluffy.

Plaintiff therefore sought a one-bedroom unit that was affordable, reasonably close to her medical providers, and suitable for her disability-related needs.

Plaintiff contacted more than five residential properties concerning available Affordable Dwelling Units ("ADUs"), anticipated move-in dates, unit sizes, and eligibility requirements.

Over the course of June and July 2023, Plaintiff contacted more than five D.C. properties, either in person or by telephone, only to find:

* No available ADUs at multiple properties;
* Scarcity of available ADUs in general;
* Potential misrepresentations by property management regarding actual ADU availability;
* Excessively protracted waitlists;
* Available units limited to small studios (less than 600 sq. ft.).

The Executive Director of the U.S. Interagency Council on Homelessness described the problem as a "vicious game of musical chairs," combining a shortage of units with rapidly rising rents. The 2025 NLIHC Gap Report confirms the crisis: only 35 affordable and available homes exist for every 100 extremely low-income renter households nationwide, with the Washington-Arlington-Alexandria, DC-VA-MD-WV MSA showing a deficit

of 147,518 affordable units. NPR, “Housing Unaffordable for Record Half of All U.S. Renters” (Jan. 25, 2024), https://www.npr.org/2024/01/25/1225957874/housing-unaffordable-for-record-half-all-u-s-renters-study-finds.

**B. The Advertisement for ADU 624**

On or about June 20, 2023, Plaintiff located an online advertisement for Apartment 624 at The Apartments at CityCenter, 875 10th Street NW, Washington, D.C. 20001.

A public housing listing for "875 10th St NW - Apt 624" on HousingSearch.org advertised a 1-bedroom, 1-bath, 696 sq. ft. unit for $1,437 monthly rent, with a $50 application fee, and an availability date of June 17, 2023. Incorporate By Reference_HousingSearch.org advertisement for Affordable Dwelling Unit/Apartment 624 (Exhibit/File Bates Number:).

The advertisement described Affordable Dwelling Unit 624 as an available one-bedroom, one-bath affordable dwelling unit containing approximately 696 square feet.

The advertisement identified an anticipated availability date of approximately June 17, 2023, monthly rent of $1,437, a $500 deposit, a $50 application fee, a $10 monthly trash charge, secured entry, and included pest-control services.

The advertisement identified the unit as associated with the 60% median-family-income category.

The advertisement displayed a floor plan that appeared to show an exterior patio, balcony, or similar feature.

The advertisement also referred to a $500 nonrefundable pet fee and $50 monthly pet rent, but did not explain the procedure for requesting an exception for an assistance animal or Emotional Support Animal.

The advertisement did not clearly explain the ADU application process, the applicable income-certification procedure, whether the unit could be re-designated to another affordability category, the existence of any waiting list, or the documents required for a disability-related accommodation.

Plaintiff visited The Apartments at CityCenter website seeking additional information.

The website promoted the Property as a luxury residential community and advertised amenities including maintenance services, concierge services, building access controls, a fitness center, and proximity to public transportation and the Martin Luther King Jr. Memorial Library.

Plaintiff did not find clear, accessible information on the website concerning available ADUs, ADU-specific floor plans, income categories, accommodation procedures, emotional support animal ("ESA") procedures, tenant-paid utility charges, or the identity and respective roles of the Property's owner and management entities. For affordable units, only a vague "Housing For All" web page.

Incorporate By The Apartments at CityCenter's website "Housing For All" advertisement for Affordable Dwelling Unit (Exhibit/File Bates Number:).

The website permitted prospective tenants to begin the application process for market-rate apartments but did not provide an equally direct means of beginning the ADU application process.

Willowick Residential was identified on the website, causing Plaintiff initially to understand that Willowick Residential owned or directly operated the Property.

Incorporate By the Hines "Hotbed Housing" advertisement for Affordable Housing (Exhibit/File Bates Number:).

**C. Initial Contact Through the Willow Leasing System**

On or about June 19 or June 20, 2023, Plaintiff promptly submitted a contact form through The Apartments at CityCenter website to request information, schedule a property tour concerning Apartment 624, and to initiate the formal application process for ADU 624.

Incorporate By Emails communications between Plaintiff and Willowick (Exhibits/File Bates Numbers:).

On June 20, 2023, Plaintiff contacted The Apartments at CityCenter to inquire about ADU availability.

The initial response came from an automated (artificial intelligence bot) leasing assistant using the email address `Willow.E@willowick.com`, rather than a human representative.

The automated response confirmed a tour for June 20, 2023, at the Property's leasing office located at 825 10th Street NW.

Although Plaintiff's inquiry concerned an affordable dwelling unit advertised at $1,437 per month, the automated response quoted market-rate one-bedroom apartments with rents beginning at approximately $2,918 and ranging above $3,100 per month.

The response did not provide information concerning Apartment 624, the applicable affordability category, the ADU certification process, or disability-accommodation procedures.

The email stated that responses could be human- or artificial-intelligence-generated, that communications were collected and recorded by a third party, and identified "Hines" at 825 10th Street NW.

Because the automated system did not answer Plaintiff's ADU-specific questions, Plaintiff was required to pursue further information through telephone calls, emails, and an in-person meeting.

June 20, 2023 Property Tour and Disclosures to the Leasing Agent

On June 20, 2023, Plaintiff appeared at the Property for the scheduled tour.

Plaintiff informed the concierge that she was present to tour The Apartments at CityCenter and Apartment 624.

The concierge contacted the leasing office, and Plaintiff waited in the lobby for a leasing representative.

Defendant's leasing professional or leasing agent, Maura Cortez ("Cortez"), conducted the tour.

Cortez informed Plaintiff that an affordable dwelling unit was not available for physical inspection because the ADUs were occupied.

Instead, Cortez showed Plaintiff a market-rate one-bedroom apartment that she represented as having a layout similar to Apartment 624.

The market-rate apartment contained stainless-steel appliances and other upgraded finishes as advertised in The Apartments at CityCenter's website.

During the tour, Plaintiff observed stainless steel appliances in the market-rate unit. Ms. Cortez stated that "ADUs do not have upgraded features like stainless steel appliances — only market-rate units do." This distinction was reiterated multiple times during the tour.

Throughout the leasing process, Defendants consistently emphasized that ADUs inherently lacked desirable features, such as stainless steel appliances, thereby drawing a clear distinction between the quality of affordable dwelling units and market-rate units.

Plaintiff disclosed to Cortez that Plaintiff had experienced difficulty locating an available ADU in the District. Plaintiff also disclosed that she was Hispanic and had medical conditions that made proximity to her healthcare providers important.

Plaintiff told Cortez that she lived with an emotional support cat named Fluffy and believed Fluffy would benefit from the balcony or patio depicted in the Apartment 624 floor plan.

Plaintiff expressed an intention to apply for Apartment 624 and asked when it would become available.

Cortez stated that the unit remained occupied and did not provide Plaintiff with a definite move-in date.

Cortez nevertheless told Plaintiff that she was required to pay a total of $550 to submit and process the application.

Cortez represented that, once Plaintiff successfully paid the $550, Apartment 624 would be placed on "hold" while the application was processed.

Cortez did not itemize the $550 as consisting of a $50 application fee and a separate $500 holding deposit.

Cortez also did not explain what would happen to the $500 if the application was denied, if Apartment 624 was leased to someone else, or if the Property later determined that Plaintiff did not meet the income category assigned to that unit.

During the tour, Plaintiff was not provided with complete information concerning the applicable income limit, possible re-designation of the unit, the use of third-party screening platforms, the assistance-animal review process, or procedures for requesting a reasonable accommodation.

Later that day, at 3:46 p.m., Plaintiff submitted the application and paid $550.00 through Entrata to secure ADU 624, believing, per Ms. Cortez's assurances, that the payment would remove the unit from the rental market and reserve it for her tenancy.

E. The June 20 Application and $550 Payment

Later on June 20, 2023, Plaintiff submitted an online application for Apartment 624 through Entrata, the electronic platform designated by the Property.

At approximately 3:46 p.m., Plaintiff paid $550 electronically.

Incorporate By communications between Plaintiff and Willowick and Depository (Exhibits/File Bates Numbers:).

Entrata issued an "Application Payment Confirmation" identifying Unit 624 and describing the $550 charge as "City Center - Depository."

The payment receipt did not itemize the charge or identify which portion represented an application fee, holding deposit, security deposit, or other charge.

Entrata stated that it processed the payment on behalf of The Apartments at CityCenter and instructed Plaintiff to contact the Property regarding its refund policy.

Later that day, Plaintiff received an additional electronic notice confirming that her application had been submitted and would be reviewed.

Plaintiff understood from The Apartments at CityCenter Leasing Agent Cortez's statements that the successful payment had removed Affordable Dwelling Unit 624 from the rental market and reserved it while Plaintiff completed the application process.

The $550 represented a significant financial expenditure for Plaintiff and materially limited her ability to submit paid applications at other rental properties.

Consequently, Plaintiff became entirely dependent on Defendants' leasing office's promises, Cortez's representations, and the overall integrity of Defendants' leasing process, particularly given her financial constraints, impending medical procedure, and recovery from a recent ulcerative colitis flare-up.

Plaintiff therefore relied on Defendants' representation that ADU 624 had been placed on hold and continued devoting her time and limited resources to completing The Apartment at CityCenter's leasing process.

Incorporate By Application Payment Confirmation – June 20, 2023, 3:46 p.m. (Entrata, Inc. on behalf of The Apartments at CityCenter)

**F. Disclosure of Disability-Related Housing Needs**

Between June and August 2023, Plaintiff communicated repeatedly with the Property's leasing and management personnel by telephone and through numerous emails.

Incorporate By communications between Plaintiff and Defendants (Exhibits/File Bates Numbers:).

Plaintiff informed personnel that her prior lease was nearing expiration, that she needed to schedule movers, and that an upcoming medical procedure made a definite and reliable move-in date particularly important.

Plaintiff described medical effects of her ulcerative colitis, including severe inflammation, fatigue, loss of bowel control during acute episodes, and the potential for substantial blood loss.

Plaintiff explained that particular apartment features and the location of the affordable dwelling unit were important to the management of her disabilities and daily functioning.

Incorporate By communications between Plaintiff, Olga Bohannon, IZ /ADU Eligibility Specialist (Housing Counseling Services), and The Leasing Office Apartments at CityCenter DC (Exhibits/File Bates Numbers:).

Plaintiff requested complete and accurate floor plans for Affordable Dwelling Unit 624 and alternative affordable dwelling units being proposed by Defendants.

Incorporate By communications between Plaintiff, Olga Bohannon, IZ /ADU Eligibility Specialist (Housing Counseling Services), and The Leasing Office Apartments at CityCenter DC (Exhibits/File Bates Numbers:).

Plaintiff requested information concerning the affordable dwelling units' (ADUs) proximity to elevators, stairs, and the trash room.

Plaintiff also requested an explanation of the amenities and features included in each ADU.

Plaintiff requested a one-bedroom ADU with a patio or balcony and communicated that those features were connected to her medical and disability-related needs.

Plaintiff also requested that the ADU not contain carpet because of her allergies.

According to Plaintiff, leasing office personnel did not agree to provide a carpet-free ADU and did not identify any alternative reasonable accommodations addressing that concern.

Plaintiff further proposed that, if ADU 624 could not immediately be provided, Defendants waive transfer charges and moving-related costs when a suitable ADU became available.

Plaintiff's communications reflected a willingness to consider alternatives and request for accommodations under the Americans with Disabilities Act ("ADA"), but she sought sufficient information to make an informed housing decision and avoid repeated relocations.

Incorporate By communications between Plaintiff, Olga Bohannon, IZ /ADU Eligibility Specialist (Housing Counseling Services), and The Leasing Office Apartments at CityCenter DC (Exhibits/File Bates Numbers:).

**G. Income Classification and Proposed Substitution of ADU 711**

During the application process, Defendants informed Plaintiff that she was over the applicable income limit for the affordability category then assigned to Apartment 624.

Defendants proposed another affordable dwelling unit, referred to in the project record as ADU 711, which was associated with an 80% median-family-income category.

The proposed ADU or "unit" did not contain the balcony or patio Plaintiff had expected from Apartment 624.

The materials initially provided to Plaintiff did not permit her to understand clearly whether ADU 711 was a conventional enclosed one-bedroom apartment or a unit in which the sleeping area was separated by a barn-style or sliding door.

Plaintiff repeatedly sought a floor plan and additional information concerning ADU 711 before committing to the unit.

Incorporate By communications between Plaintiff and Willowick and Leasing Office personnel (Exhibits/File Bates Numbers:).

On July 10, 2023, the District's own Inclusionary Zoning/Affordable Dwelling Unit (IZ/ADU) Eligibility Specialist, Olga Bohannon of Housing Counseling Services, Inc., confirmed in writing that Plaintiff met the income and household requirements for ADU 624 and advised that, if approved by the property, Plaintiff should forward her lease and IZ rider to the District of Columbia Department of Housing and Community Development ("DHCD") (Incorporate Email, July 10, 2023).

On July 11, 2023, Plaintiff emailed the leasing office, Housing Counseling Services personnel, and the District's IZ office concerning Apartment 624 and ADU 711.

Plaintiff stated that Housing Counseling Services representative Olga Bohannon had informed her that ADU 624 could be re-designated from the 60% category to the 80% category and that ADU 711 could be re-designated in the opposite direction.

Plaintiff also requested about the re-designation of ADU 624 for an 80% MFI income level, citing Defendants' authority under the Inclusionary Zoning Program to adjust rents or prices below maximum rates to facilitate occupancy across various income bands.

See Deputy Mayor for Planning & Economic Dev. and D.C. Dep't of Hous. & Cmty. Dev., 2023-2024 Maximum Income, Rent, And Purchase Price Schedule, page 4, https://dhcd.dc.gov/sites/default/files/dc/sites/dhcd/publication/attachments/2023-2024%20IZ%20ADU%20price%20schedule.pdf).

Plaintiff explained that ADU 624 better met her disability-related needs and that the uncertainty was affecting her ability to coordinate her medical care and relocation.

Plaintiff engaged in good faith with Defendants, articulating her disability-related needs and requesting a one-bedroom ADU with a patio or balcony. This accommodation was crucial for her medical conditions, as direct sunlight access via a patio aids in their management. Furthermore, the patio or balcony was required to provide a secure outdoor space for her ESA, Fluffy, which directly assists Plaintiff in mitigating aspects of her

disability. Fluffy's enjoyment of sunlight and the outdoors also encourages Plaintiff's exposure to natural light and light physical activity, supporting her overall health.

On July 12, 2023, Cortez responded that Plaintiff had previously agreed to move forward with the alternative ADU after being told she was over income for ADU 624.

Cortez stated that management would need to contact D.C. housing authorities concerning re-designation, that she did not know what the process entailed, and that she could not promise that re-designation would be available.

Cortez stated that she would provide additional information after management received a response. Incorporate By communications between Plaintiff and Leasing Office personnel (Exhibits/File Bates Numbers:).

On July 18, 2023, The Apartments at CityCenter Assistant General Manager Markus Rollins ("Rollins") informed Plaintiff that ADU 624 had returned to the rental market after Plaintiff requested a change to ADU 711.

Rollins stated that another application had been submitted for ADU 624 and that the other applicant was awaiting approval.

Rollins therefore stated that Defendants were not able to return Plaintiff to Apartment 624.

Rollins informed Plaintiff that, after six months in the alternative apartment, she could seek a transfer subject to availability, payment of a $750 fee, and thirty days' written notice.

Rollins attached floor plans for ADU 624 and ADU 711.

Rollins stated that ADU 711 was located diagonally across from the trash room and service elevator, whereas ADU 624 was farther from those facilities.

Defendants asserted that no ADU floor plans were available. Subsequently, they denied Plaintiff's accommodation request for ADU 624, claiming the ADU had been returned to the market and reserved by another prospective applicant or tenant, despite Plaintiff's pending application, the established "hold," and the $550 payment. This fee was never refunded to Plaintiff.

By the time Defendants produced the floor plans and stated that ADU 624 was no longer available, Plaintiff had already paid $550 in connection with the ADU 624 application and had limited time before expiration of her existing lease. This fee was never refunded to Plaintiff.

What Plaintiff Paid and What Was Confirmed (Entrata)

* Payment: $550 eCheck processed June 20, 2023, 3:46 PM EDT; statement label "City Center — Depository"; Unit: 624.

* Application submission confirmation: "We have received your completed application for The Apartments at City Center and we will review it shortly." (Entrata system email, June 20, 2023).

Exhibit labels in-line: Ex. 59 (Application Payment Confirmation) and Ex. D (Proposed) — Online Application Submitted (Entrata).

Incorporate By communications between Plaintiff and Leasing Office personnel (Exhibits/File Bates Numbers:).

Side-by-Side: What D.C. Law Allows vs. What Defendants Charged

Item

D.C. Code § 42-3505.10(b)(1)

Defendants' Quote (Ex. E)

Plaintiff's Actual Charge (Ex. 59)

Application fee

Max $52

$50

Included in $550

Amenity/Administrative fee at application

No statutory authorization to tack on "amenity" up-front for ADU prospects

$500 "Amenity Fee" due when applying

Included in $550

Total up-front to apply

≤ $52

$550

$550

Result: The $500 amenity/admin add-on made the application effectively $550, nearly 11× the lawful cap. The non-refundability language (Ex. E) further entrenched the harm: once paid, Plaintiff's funds were locked, blocking her from applying to other units (opportunity cost) during a tight window in a scarce ADU market.

Note (Program distinction): The Inclusionary Zoning/ADU program is distinct from rent control; however, the application-fee cap in D.C. Code still applies to housing providers generally. Your Complaint will keep these regimes separate to avoid confusion.

Application Fee Cap

The District of Columbia Code strictly limits residential application fees:

"A housing provider shall not charge a prospective tenant an application fee that exceeds the amount of $50, or the amount adjusted by the Consumer Price Index for All Urban Consumers for the applicable year."

— D.C. Code § 42–3505.10(b)(1)【^1】

For 2023, the CPI-adjusted lawful cap was $52.00.

Refusal and Misrepresentation by Defendants

Defendants' leasing agent, Maura Cortez, and Assistant General Manager, Markus Rollins, refused to pursue re-designation of affordable dwelling unit ("ADU") 624. Instead, they represented that ADU 624 had been "returned to the market" and/or "reserved by another applicant" as of July 10—twenty days after Plaintiff's application and payment—and directed her toward Unit 711, which was classified at 80% MFI.

ADU 711, however, was markedly inferior and did not meet Plaintiff's medical and disability-related needs. Defendants withheld critical comparative information, providing no floor plan for ADU 711 until July 18, 2023, and omitting its lack of balcony, smaller size, and less desirable orientation.

Unit Feature Comparison (Per Plaintiff's July 18, 2023 Email)

Feature

Unit 624 (60% MFI) – 696 sq. ft.

Unit 711 (80% MFI) – 652 sq. ft.

Juliet/Balcony

Yes

No

Walk-In Closet

Yes

No

Tiny Adjacent Closet in Hallway

No

Yes

Hallway Closet

Yes

Yes

Kitchen Peninsula

Yes

No

Spacious Kitchen Space

Yes

No

Desk

No

Yes

Exterior-Facing Scenic Bedroom Window

Yes

No

ADU 624 faced a serene courtyard, away from trash rooms and service elevators. Unit 711 faced I Street, with reduced privacy and increased noise—factors that worsened Plaintiff's medical conditions such as ulcerative colitis flare-ups and anxiety.

**H. Assistance-Animal Screening in July 2023**

Defendants required Plaintiff to use PetScreening.com, a third-party platform, to process the accommodation request concerning Fluffy.

Incorporate By communications between Plaintiff, Leasing Office personnel, ESA letter, and PetScreening.com (Exhibits/File Bates Numbers:).

On or about July 26, 2023, Plaintiff uploaded and submitted a doctor's letter requesting a reasonable accommodation for her emotional support animal (ESA), Fluffy, via PetScreening.com.

PetScreening requested additional or more current documentation.

On July 27, 2023, Kristena from PetScreening Support responded to Plaintiff, stating: "We see many letters in support of assistance animals with express expiration dates of one year. Also, prescriptions usually require regular maintenance visits to confirm their ongoing effectiveness, and the clinical assessment of the patient would typically require current data to justify a diagnosis and prescription this long after the original prescription. Further, the letter you submitted contains no indication that your disability, or the disability-related need for the animal, is long-term, chronic, or permanent. The housing provider is permitted to request reliable documentation to confirm that you have a current disability and need for the animal." This response constituted an unreasonable and discriminatory barrier to reasonable accommodation.

PetScreening further stated that housing providers could request reliable documentation confirming a current disability and current disability-related need for the animal.

Plaintiff responded that the submitted letter accurately reflected her continuing need, that obtaining another medical appointment imposed additional cost and delay, and that she had supplied other records demonstrating a long-term disability.

Plaintiff informed PetScreening that she had scheduled the earliest available appointment for August 7, 2023. Plaintiff asked that the existing documentation be accepted temporarily so that Fluffy would not be classified as an ordinary pet and so Plaintiff could complete the lease and move without further delay.

Defendants' leasing office personnel informed Plaintiff that pet-related charges could appear until the assistance-animal profile was approved. The leasing office personnel initially charged Plaintiff a $50 fee for her ESA, which was subsequently revised.

Incorporate By communications between Plaintiff, Leasing Office personnel, ESA letter, and PetScreening.com (Exhibits/File Bates Numbers:).

Plaintiff alleges that the additional documentation demand delayed completion of the leasing process during a period in which Defendants knew she faced an expiring lease and upcoming medical care.
Plaintiff ultimately completed the assistance-animal process.

Plaintiff's lease includes a "Conditional Authorization for Animal" clause, which purports to grant landlord discretion to terminate ESA authorization for addendum rule violations. This clause, in Plaintiff's view, unlawfully undermines her right to a stable ESA accommodation by treating it as a conditional privilege.

Plaintiff communicated this concern to Defendants' Property Manager, specifically addressing the "no" selection for "housebroken" on her ADU 711 lease. Plaintiff clarified that Fluffy is housebroken, well-behaved, a family member, and a frequent traveler. Defendants' Property Manager dismissed these concerns, reiterating verbally and in writing that Plaintiff needed to sign the lease to proceed with the leasing process for ADU 711.

As a direct result of Defendants' delays and confusion, Plaintiff was compelled to reschedule a planned medical procedure, which directly impacted her health and well-being.

Through more than thirty (30) emails and at least three (3) phone calls, Plaintiff consistently advocated for herself against Defendants' leasing agents and Property Managers, explicitly communicating her disability-related needs and requesting a one-bedroom ADU with a patio or balcony as a reasonable accommodation. Plaintiff held Defendants' leasing office agents and Property Managers accountable for their actions.

An IZ/ADU Eligibility Specialist from Housing Counseling Services, Inc. was included in numerous email communications but did not provide legal resources or hold The Apartments at CityCenter leasing office, Hines Interests Limited Partnership, or its entities accountable. Plaintiff was largely left to advocate for herself.

Incorporate By communications between Plaintiff, Olga Bohannon, IZ /ADU Eligibility Specialist (Housing Counseling Services), and The Leasing Office Apartments at CityCenter DC (Exhibits/File Bates Numbers:). Defendants knowingly or willfully deleted Plaintiff's records, thereby obstructing the timely pursuit of justice and preventing Plaintiff from providing further facts about this incident and from accessing crucial evidence for her civil lawsuit.

**I. Temporary Tenancy in ADU 711**

Defendants are merchants within the meaning of the CPPA, D.C. Code § 28-3901(a)(3), as they, in the ordinary course of their business, directly or indirectly lease real estate.

Facing imminent lease expiration elsewhere and fearing homelessness, Plaintiff executed a lease for ADU 711 on or about July 27, 2023, with CCDC Residential Rental LLC and the Property Manager, at $2,017 a month, $0 security deposit, and $325.32 prorated first-month rent. The lease agreements or contracts designated ADU 711 as an Affordable Dwelling Unit at $2,017 monthly.

Plaintiff paid Defendants monthly rent and associated utility costs for ADU 711 from July 27, 2023, to on or about September 7, 2023.

Plaintiff's lease or contract included a Mold Information and Prevention Addendum asserting that a 2004 CDC study found no scientific evidence that indoor mold accumulation causes significant health risks for persons with normally functioning immune systems.

Incorporate By communications between Plaintiff and Defendants, Olga Bohannon, IZ /ADU Eligibility Specialist (Housing Counseling Services), Lease Agreements, Receipts, Ledgers and Statements (Exhibits/File Bates Numbers:).

Defendants expressly warranted that ADU 711 would be maintained in a habitable and safe condition, consistent with the D.C. Housing Code and the implied warranty of habitability recognized in Javins v. First Nat'l Realty Corp., 428 F.2d 1071 (D.C. Cir. 1970).

The executed lease identified CCDC Residential Rental LLC as owner, required no security deposit, and required prorated rent of $325.32 for the first partial month.

As a direct and foreseeable consequence of Defendants' actions and omissions, Plaintiff incurred and paid moving costs to relocate to the non-compliant ADU 711 on or about August 1, 2023.

On or about August 1, 2023, Defendants provided Plaintiff with the keys to Apartment 711. Plaintiff, accompanied by her emotional support animal (ESA) and family member, Fluffy, took possession of Apartment 711.

Plaintiff understood ADU 711 to be temporary because management had represented that another ADU 220 is expected to become available in September 2023.

Plaintiff alleges that ADU 711 did not have the patio or balcony that caused her initially to apply for ADU 624.

Plaintiff further alleges that ADU 711 did not conform to her understanding of a conventional one-bedroom apartment because of the unit's interior configuration and the use of a sliding or barn-style partition.

Upon occupancy of ADU 7, Plaintiff reports finding:

(a) a sock on the stacked washer/dryer amid dust;

(b) a dime protruding from the living-room baseboard;

(c) a small, non-stainless refrigerator

marred with mold/rust/stains;

(d) rusted blinds failing to provide privacy;

(e) screws, dust, and debris

under the stove and an inoperative burner;

(f) non-full-size appliances and a shoddy kitchen configuration.

Plaintiff alleges the "bedroom" lacked a required exterior window and used a glass barn door that swung outward, twice striking Plaintiff, creating a safety

hazard.

Plaintiff promptly notified and communicated to Defendants through numerous emails, calls, and maintenance requests.

Incorporate By communications between Plaintiff and Defendants, Olga Bohannon, IZ /ADU Eligibility Specialist (Housing Counseling Services), and pictures (Exhibits/File Bates Numbers:).

Plaintiff alleges that the temporary placement required her to incur moving expenses and to prepare for a second move within a short period.

Plaintiff states she scheduled a D.C. Department of Buildings ("DOB") inspection for ADU 711 in August 2023, but had to cancel when moving to ADU 220 in September 2023.

Plaintiff completed an ADU 711 Inventory and Condition form in August 2023, submitting the original to the Leasing Office, and was not provided a copy. She alleges the document was not preserved in her resident portal, maintained by Defendants. Plaintiff alleges that leasing personnel accepted the original f Inventory and

Condition form but did not provide her with a completed copy and did not make the form available in her resident portal.

Prior to moving to ADU 220, Plaintiff requested to Defendants thorough cleaning and stainless-steel appliances for ADU 220; Defendants agreed to deep cleaning and acknowledged ADU 220 did not have stainless-steel appliances.

Incorporate By communications between Plaintiff and Defendants, IZ /ADU Eligibility Specialist (Housing Counseling Services), and pictures (Exhibits/File Bates Numbers:).

On Aug. 31, 2023, Plaintiff sent a Formal Complaint and Request for Resolution detailing issues in ADU 711 and requesting rent abatement.

Plaintiff alleges Defendants deleted documentation of these incidents from her Entrata portal.

Incorporate By communications between Plaintiff and Defendants, IZ /ADU Eligibility Specialist (Housing Counseling Services), and pictures (Exhibits/File Bates Numbers:).

**J. Promise and Preparation of ADU 220**

During August 2023, management represented to Plaintiff that ADU 220 would be prepared for her occupancy in September.

Plaintiff alleges Defendants acknowledged outstanding maintenance in ADU 220 before occupancy and promised to continue repairs; that the Property Manager agreed to complete pre-existing and new repairs after move-in.

Incorporate By communications between Plaintiff and Defendants, IZ /ADU Eligibility Specialist (Housing Counseling Services), and pictures (Exhibits/File Bates Numbers:).

Plaintiff relied on that representation in remaining at the Property, refraining from pursuing other housing, and arranging a second move.

Plaintiff alleges that the period available to renovate, clean, inspect, and prepare ADU 220 between the prior occupancy and Plaintiff's expected move was less than three weeks.

Plaintiff was concerned that the compressed schedule would not permit management to complete all necessary repairs, cleaning, and safety inspections.

Plaintiff nevertheless relied on Defendants' promises, advertisements, superior access to ADU 220, maintenance personnel, records, and contractors, and on management's representations that the unit would be ready.

"The CEO of real estate developer Hines Interests, Jeffrey Hines, was recently awarded the Green Building Design Award from Global Green USA at their 9th Annual New York Awards Ceremony. Hines received the award for commitment on part of his company to sustainability, which is reflected in his leadership role with the U.S. Green Building." (See Q&A with David Penick: We Build Green Because It's a Fundamental Issue of Quality and What Is Better, December 22, 2008, page 1, https://www.multihousingnews.com/qa-with-david-penick-we-ause-its-a-fundamental-issue-of-quality-and-what-is-better/).

**K. September 7–8, 2023 Lease and Pre-Move-In Inspection of ADU 220**

On or about September 7, 2023, Plaintiff executed a new lease with CCDC Residential Rental LLC for ADU 220.

Incorporate By lease agreement between Plaintiff and Defendants, IZ /ADU Eligibility Specialist (Housing Counseling Services), and pictures (Exhibits/File Bates Numbers:).

The lease designated ADU 220 as an affordable dwelling unit and required monthly base rent of $2,017.

The lease required no security deposit.

The lease also required prorated rent of approximately $1,546.37 for the first partial month.

On Friday, September 8, 2023, Plaintiff inspected ADU 220 with General Manager Chai Morales ("Morales") and the head of maintenance, identified in the intake record as Jose.

Morales and the maintenance representative acknowledged that work in the unit remained ongoing.

They identified items that had not yet been completed and represented that maintenance would continue repairing both existing conditions and any additional conditions discovered after Plaintiff moved in.

Plaintiff expressed concern that the renovation and preparation work had been compressed into a period of fewer than three weeks.

Plaintiff offered to postpone her move for approximately one additional week if management needed more time to complete the work.

Morales declined that proposal.

Morales and the maintenance representative assured Plaintiff that ADU 220 was suitable for her to occupy. Morales did not personally deliver the keys during the inspection.

In an email sent at 11:01 p.m. on September 8, 2023 Morales stated that she had attempted to telephone Plaintiff and had left the keys to ADU 220 with a front-desk employee named Charles.
Morales also stated that she would send Plaintiff a follow-up email containing the maintenance notes from their walkthrough and an update concerning each item.

Plaintiff alleges that she did not receive the keys until approximately 5:00 p.m. on the scheduled occupancy date.

Plaintiff moved from ADU 711 to ADU 220 on or about September 8 or 9, 2023, relying on management's assurances that the unit was safe to occupy and that the remaining work would promptly be completed.

**L. Hazardous and Unsanitary Conditions Discovered After Move-In**

Shortly after entering ADU 220, Plaintiff discovered conditions that had not been corrected or disclosed during the September 8, 2023 walkthrough.

Pots and plants belonging to a prior occupant remained on the patio despite management's representation that the patio had been power-washed.

The edges and surfaces of kitchen cabinets remained dirty, and Plaintiff observed a black spot on or near a cabinet that appeared to her to be mold.

Several ventilation covers were rusted, discolored, or marked with brown spots.

Plaintiff observed dirt, grime, and suspected mold in the corners or edges of windows and doors.

A closet component or cap was missing, and the closet racks contained visible stains.

Plaintiff also experienced problems with the newly installed washer, which she reported had damaged clothing.

Plaintiff observed glass fragments in multiple areas, including near the bathroom and hallway, around the laundry area, and within or adjacent to the bedroom carpet.

Plaintiff alleges that neither she nor her movers broke glass in ADU 220.

On or about September 9, 2023, Plaintiff narrowly avoided stepping with her bare foot on a medium-sized, sharp, opaque glass fragment while walking toward the bathroom.

Plaintiff then searched the surrounding areas and found additional glass fragments ranging from small to medium size.

Some glass fragments appeared embedded in her bedroom carpet.

The glass fragments created a risk that Plaintiff could suffer a laceration or that Fluffy could injure a paw or ingest a glass fragment.

Plaintiff collected and preserved several glass fragments in a sealed bag.

Plaintiff also photographed the glass fragments and the locations in which they were found.

Plaintiff alleges that she cut a finger while attempting to collect glass and make the area safer for herself and Fluffy.

Plaintiff promptly notified The Apartments at CityCenter Leasing Office personnel and requested that the condition be inspected and remediated.

**M. September 13 Written Notice of Conditions**

On September 13, 2023, at approximately 12:59 a.m., Plaintiff emailed Willowick, the Property's assistant manager, and General Manager Morales under the subject line "Urgent: Unresolved Issues and Substandard Conditions in Apartment 220."

Plaintiff stated that the conditions discussed during the September 8, 2023 inspection had not been resolved.

Plaintiff reported the remaining plants and pots, suspected mold, dirty cabinetry, rusted vents, grime around windows and doors, missing closet components, staining, and the washer problem.

Plaintiff reported disruptive noise affecting her ability to sleep and use the dwelling peacefully.

Plaintiff specifically reported finding glass fragments in her hallway, bathroom, laundry area, and bedroom.

Plaintiff stated that she had nearly cut the bottom of her foot on one glass fragment and feared that additional small glass pieces remained embedded in the bedroom carpet.

Plaintiff attached photographs of the glass fragments.

Incorporate By communications between Plaintiff and Defendants, IZ /ADU Eligibility Specialist (Housing Counseling Services), and photographs (Exhibits/File Bates Numbers:).

Plaintiff requested prompt corrective action, relocation assistance, rent abatement, and compensation for the conditions and resulting damage.

The September 13, 2023 email supplied Defendants with written notice that Plaintiff considered the dwelling unsafe and unsanitary and that she believed the conditions threatened both her health and Fluffy's safety.

Incorporate By communications between Plaintiff and Defendants, IZ /ADU Eligibility Specialist (Housing Counseling Services), and pictures (Exhibits/File Bates Numbers:).

**N. Management's September 14 Acknowledgment of Incomplete Work**

On September 14, 2023, Morales responded in writing.

Morales acknowledged that multiple items had not been completed on September 8, 2023.

Incorporate By communications between Plaintiff and Defendants, and pictures (Exhibits/File Bates Numbers:).

Morales stated that management had been waiting for parts.

Morales identified pending work that included replacement of the ventilation covers.

Morales stated that one required vent had not yet arrived.

Morales also identified the removal and cleaning of cabinet doors, replacement of a remaining window shade, replacement of a rusted bathroom light fixture, and replacement of discolored door hinges.

Morales stated that maintenance would clean the threshold to the washer-and-dryer closet and inspect the washer and dryer.

Morales proposed that maintenance perform work on September 15, 2023 between 9:00 a.m. and noon.

Morales further informed Plaintiff that, if she was dissatisfied during the first thirty days, management would permit her to terminate the lease without penalty.

Morales's response confirmed that substantial preparation and repair work remained incomplete when management delivered possession and assured Plaintiff that ADU 220 was ready for occupancy.

Morales's response did not address the reported glass fragments, identify any inspection of the carpet, offer temporary relocation while the hazards were investigated, or provide the maintenance notes previously promised after the September 8, 2023 walkthrough.

**O. September 15 Maintenance-Entry Dispute**

On September 14, 2023, management proposed that maintenance enter ADU 220 the following morning, September 15, 2023 between 9:00 a.m. and noon, to perform several items that remained incomplete from the September 8, 2023 move-in inspection.

Plaintiff had not affirmatively agreed to the September 15 appointment before maintenance appeared at her unit.

Plaintiff alleges that, on September 15, maintenance personnel inserted a key into the lock, opened the apartment door, and looked inside without first knocking, ringing the doorbell, or verbally announcing their presence.

Plaintiff was inside her home, ADU 220 when the door opened.

Plaintiff alleges that the unexpected entry caused her immediate fear and alarm because she could not initially determine who was entering her home or why.

Fluffy also became frightened and retreated further into her home.

Plaintiff subsequently informed General Manager Chai Morales that Plaintiff had not agreed to the September 15, 2023 visit and that maintenance had unlocked and opened the door without first announcing its presence.

In a September 19 email, Morales relayed maintenance personnel's account that they had knocked and rung the doorbell and that Plaintiff had opened the door.

Maintenance personnel denied using a key to enter.

Morales nevertheless wrote that, if maintenance had used a key as Plaintiff reported, Morales apologized on maintenance's behalf.

The parties' contemporaneous correspondence therefore documents a material dispute concerning the manner in which maintenance entered or attempted to enter ADU 220 on September 15.

**P. September 20, 2023 Maintenance Appointment**

Following the September 15, 2023 incident, Plaintiff requested that the remaining repairs be rescheduled for September 19, 2023 or September 20, 2023 rather than immediately before a weekend.

Plaintiff explained that the rushed preparation of ADU 220 had already resulted in unresolved conditions, including the glass fragments discovered after move-in.

Morales offered Plaintiff a September 20, 2023 appointment during either a morning or afternoon window.

Plaintiff selected 1:00 p.m. because she had a virtual meeting scheduled for 3:00 p.m.

Morales confirmed that maintenance would arrive at 1:00 p.m. and had been informed that the work would need to conclude before Plaintiff's meeting.

Morales stated that another appointment would be necessary if maintenance could not complete the work within approximately two hours.

Plaintiff confirmed the 1:00 p.m. appointment in writing on September 20, 2023.

The correspondence reflects that Plaintiff was not refusing maintenance access; instead, she was attempting to establish defined entry times that accommodated both the repairs and her pre-existing medical conditions.

**Q. Defective Kitchen Light Fixture**

On or about September 2023, one of the overhead light fixtures in ADU 220's kitchen suddenly detached from the ceiling and fell.

The fixture shattered when it struck the floor, dispersing additional glass into the kitchen and adjoining living area.

The Plaintiff immediately reported the fallen fixture to front-desk personnel.

Front-desk personnel submitted an urgent maintenance request on Plaintiff's behalf.

The Plaintiff also notified the leasing office by email.

Because maintenance did not immediately arrive, Plaintiff attempted to remove the broken fixture and glass to protect herself and Fluffy from further injury and harm.

Plaintiff alleges that she cut her finger while collecting the broken glass.

The Plaintiff preserved the fallen kitchen light fixture and some of the glass fragments.

Several days later, maintenance replaced the kitchen light fixture that had suddenly fallen.

Plaintiff alleges that maintenance did not inspect the two other overhead kitchen light fixtures to determine whether they were secured in the same manner or presented a similar risk and hazard.

In its later October 24, 2023 response, Defendant's counsel acknowledged a reported lighting-fixture issue and stated that an inspection would be scheduled.

**R. September 23 Water Intrusion From the Vacant Upstairs Apartment**

On the morning of September 23, 2023, Plaintiff discovered water entering ADU 220 from the direction of an apartment unit above her home.

The water traveled into the wall partition shared by Plaintiff's bedroom and closet and affected the carpeted area.

Plaintiff could hear persistent water-dripping sounds inside the wall.

Plaintiff promptly reported the hazardous conditions and possible mold to the leasing office.

A leasing agent entered Plaintiff's home (ADU 220) several times that day while leasing office personnel and maintenance investigated the source of the water intrusion.

During one of those visits, Plaintiff again showed the leasing office personnel additional unresolved conditions and maintenance repairs, and possible hazards, including:

a. the condition Plaintiff understood to be a missing refrigerator-base cover;

b. two holes in newly installed blinds;

c. deficient operation of the stove-vent fan;

d. continuing dirt and grime;

e. accumulated dust and debris near the water-heater door;

f. apparent dark material inside a sink opening; and

g. Grime, dust and debris along the bedroom doorframe and inside and, or around electrical outlets and lightswitches.

Plaintiff alleges that the water intrusion and dripping noise continued for more than forty-eight hours over the weekend.

The persistent dripping noise interfered with Plaintiff's sleep and also disturbed Fluffy's sleep.

In its October 24, 2023 response, the Leasing Office and Maintenance acknowledged that the leak originated from the vacant apartment unit above Plaintiff's home (ADU 220).

The Landlord asserted that its agents responded on the same day the leak was reported and engaged a water-remediation contractor.

The Landlord's written response therefore confirmed both the occurrence and source of the water intrusion, although the parties disputed the adequacy and timeliness of the response.

**S. Water-Remediation Work Inside Plaintiff's Bedroom and Closet**

After the weekend, Defendants' third-party remediation contractors, Leasing Office personnel, and maintenance personnel entered Plaintiff's ADU 220 to address the hazardous water-damaged area.

The maintenance personnel and contractors removed portions of the baseboards in Plaintiff's bedroom.

The maintenance personnel and contractors lifted portions of the bedroom and closet carpet.

The work exposed carpet edges, nails, debris, dust, insulated drywall, and portions of the wall or floor that ordinarily were covered.

The maintenance personnel and contractors created openings in the drywall to facilitate drying.

They placed multiple industrial dehumidifiers, blowers, and drying fans in Plaintiff's bedroom and closet.

The equipment was connected to electrical outlets within Plaintiff's unit and operated continuously for more than two days.

Plaintiff was responsible for the electricity consumed through her Pepco account.

Plaintiff alleges that Defendants did not reimburse her for the electricity used by the remediation equipment.

The size, placement, and continuous operation of the equipment substantially interfered with Plaintiff's use of her bedroom and closet.

The equipment generated significant noise and interfered with Plaintiff's sleep.

Plaintiff and Fluffy remained in the apartment while the drying equipment operated.

Plaintiff alleges that Defendants did not offer a guest suite, hotel placement, temporary apartment, rent abatement, or other relocation assistance during the remediation.

Plaintiff could not independently afford a hotel or temporary relocation.

Plaintiff was also reluctant to leave Fluffy alone in the apartment while contractors and maintenance personnel moved through the bedroom and closet.

Fluffy's usual hiding and resting areas were disrupted by the lifted carpet, equipment, workers, debris, and noise.

Plaintiff observed increased fear, reduced appetite, excessive grooming, shedding, and other stress-related behavior in Fluffy during the remediation period.

The repeated presence of multiple workers in Plaintiff's bedroom and closet heightened Plaintiff's anxiety and hyper-vigilance and interfered with her ability to sleep, apply for employment, prepare for interviews, and perform other daily activities.

After the drying process, workers replaced the carpet and baseboards and painted portions of the bedroom and closet.

**T. Plaintiff's Mold and Water-Damage Concerns**

During the remediation, Plaintiff asked the contractor whether the water intrusion could result in mold or hidden mold inside the wall.

Plaintiff alleges that the contractor initially provided an equivocal answer.

Plaintiff alleges that, after she asked again, the head of maintenance stated categorically that mold would not develop and that the contractor agreed.

Plaintiff remained concerned because the water had entered a concealed wall cavity and affected carpeted materials.

Plaintiff did not observe the contractor or maintenance personnel conduct a comprehensive inspection of the full wall cavity extending toward the upstairs unit.

Plaintiff also did not observe a pest-control inspection of the opened cavity.

Defendants did not provide Plaintiff with a written moisture report, mold-assessment report, water-quality report, photographs of the interior wall cavity, or a written remediation protocol.

In the October 24 letter, the Landlord denied that anyone had made a categorical assurance that mold would not develop.

The Landlord stated that its contractor had determined the area was dry, that no visible mold had been observed, that drywall replacement had not been recommended, and that patching the openings was sufficient.

The Landlord acknowledged, however, that it could not provide Plaintiff with a definitive assurance that mold would not develop from the water damage.

The Landlord stated that it had no present reason to believe the unit was unsafe or uninhabitable and would take action if future mold affecting habitability were discovered.

Plaintiff alleges that the Landlord's reliance on the absence of externally visible mold did not resolve her request for investigation of possible contamination concealed inside the water-damaged wall.

Plaintiff researched proper water remediation techniques on the web, noting several different professionals mentioning or advising on performing visible inspections if water seeped downwards between walls due to the risk of hidden mold. Plaintiff voiced her concerns in-person to Defendants' head of maintenance and contractors, inquiring why they were not conducting a visible inspection inside the wall and further asking questions about the risks of hidden mold proliferation. Defendants' head of maintenance and contractors told Plaintiff that mold would not manifest and dismissed her concerns and questions. Defendants did not properly perform a visible inspection inside the wall nor did they conduct a mold report. (See U.S. Dep't of Health & Human Servs., Nat'l Insts. of Health, Office of Research Servs., Div. of Occupational Health & Safety, Moisture and Mold Remediation Standard Operating Procedure, at 6 (2018), https://ors.od.nih.gov/sr/dohs/Documents/moisture-and-mold-remediation-sop.pdf).

Cut out and discard wallboard that is not sufficiently dry within 48 hours. Wallboard showing signs of mold growth should also be removed and discarded. Remove at least one foot of additional wallboard beyond the saturation point. For example, if moisture has wicked one foot up wallboard, remove two feet of wallboard.

Examine wall cavity for additional damage, such as wet insulation. Remove any water from the wall cavity, discard wet insulation, and allow the wall cavity to dry thoroughly before reconstructing wall. Source, https://www.mass.gov/info-details/quick-reference-water-damage-response-in-buildings.

**U. October 2 Failed Repair Appointment**

Additional repairs were scheduled for October 2, 2023.

The leasing office attempted to telephone Plaintiff on October 2.

Plaintiff did not hear the call when it was made and believes she may have been in the bathroom, where the loud exhaust fan made it difficult to hear sounds elsewhere in the unit.

Plaintiff returned the call after seeing that she had missed it.

A Property representative informed Plaintiff that maintenance intended to return.

Plaintiff remained in the unit and waited for maintenance.

Maintenance did not return that day and did not complete the scheduled repairs.

Plaintiff later documented this incident to rebut any suggestion that she had refused or obstructed maintenance access.

**V. October 9 Formal Written Notice**

On October 9, 2023, at approximately 2:13 a.m., Plaintiff sent a detailed email to Willowick Residential, the Property's assistant manager, and Morales under the subject line **"Important Resident Issues and Safety Matters—Immediate Attention Required."**

Plaintiff stated that repairs she had previously requested remained incomplete.

Plaintiff described the September 23 water intrusion, the affected bedroom and closet wall, the wet carpet, the remediation equipment, and her continuing concern about concealed mold.

Plaintiff stated that no inspection of the interior wall for water damage or mold had been disclosed to her.

Plaintiff again identified unresolved unit conditions, including the refrigerator condition, holes in blinds, deficient stove-vent operation, dirt and grime, debris near the water-heater door, suspected dark material in a sink opening, and grime around doorframes and electrical outlets.

Plaintiff explained the October 2 missed call, her prompt return call, and maintenance's failure to return after she waited in the unit.

Plaintiff renewed her request that the head of maintenance not be assigned to enter her unit because she questioned the adequacy of prior work.

Plaintiff requested that a different and qualified person complete the remaining repairs and cleaning.

Plaintiff requested a comprehensive assessment of the unusual noise transmitted into ADU 2 and questioned whether wall or building assemblies were contributing to the intrusion.

Plaintiff also reported that dogs were being permitted to remain off-leash in the courtyard, creating a risk to Fluffy when Plaintiff placed Fluffy outside in an enclosed cat condo.

Plaintiff requested enforcement of applicable animal rules and proposed consideration of an enclosed area for residents with cats.

Plaintiff warned that the continuing failure to address her complaints could appear retaliatory.

The October 9 email placed Willowick Residential and Property management on detailed written notice of Plaintiff's repair, safety, accommodation, noise, mold, and courtyard concerns.

**W. Twenty-Two Work Orders Submitted October 11**

On October 11, 2023, Plaintiff submitted at least twenty-two work orders concerning conditions in ADU 2 and the Property.

The work orders included complaints or requests relating to:

a. dogs, animal waste, and off-leash activity in the courtyard;

b. noise transmitted from neighboring apartments;

c. grime or filth on a light switch;

d. grime inside or around electrical outlets;

e. grime on bedroom windows;

f. grime on blind components;

g. grime in the bedroom-door crevice;

h. grime on hallway, bedroom, kitchen, living-room, and bathroom switches or outlets;

i. dirty baseboards;

j. deficient stove-vent suction;

k. dust accumulation beneath the water-heater door;

l. dark material inside the bathroom sink; and

m. holes in the newly installed blinds.

The work orders created individual electronic records of conditions that Plaintiff had already reported through emails and direct communications.

The October 24 counsel letter expressly acknowledged receipt of Plaintiff's October 9 email and at least twenty-two work orders submitted on October 11.

That acknowledgment establishes that the Property's ownership and management interests—and their counsel—had received documented notice of the listed conditions no later than October 24, 2023.

**X. October 24 Response From Landlord's Counsel**

On October 24, 2023, Defendant Magruder Cook Koutsouftikis & Palanzi sent Plaintiff a seven-page letter signed by attorney Giovanni Carillo.

The letter stated that the firm represented the Property's ownership and property-management interests, collectively defined in the letter as the "Landlord."

Counsel stated that the Landlord had received Plaintiff's October 9 email and at least twenty-two work orders submitted on October 11.

Counsel broadly denied all allegations of wrongdoing and denied that the Landlord was violating the Lease or applicable law.

Counsel nevertheless confirmed that a water leak had originated in the vacant apartment above Plaintiff's unit.

Counsel stated that the Landlord had hired a water-remediation contractor, that openings were made in the drywall, that dehumidifiers and blowers were installed, and that the Landlord later performed patchwork.

Counsel denied that anyone had guaranteed mold would not develop but stated that no visible mold had been observed and that the contractor had determined the affected area was dry.

Counsel denied that the refrigerator lacked a cover at its base.

Counsel rejected Plaintiff's request to prevent the head of maintenance from accessing ADU 2, stating that precluding his access could hinder the Landlord's ability to address future issues.

Counsel denied Plaintiff's request for a comprehensive noise assessment and stated that some level of noise was inherent in multifamily housing.

Counsel denied the requested cat park.

Counsel stated that a third-party contractor performed courtyard-maintenance services.

Counsel acknowledged a reported lighting-fixture issue and stated that an inspection would be scheduled.

Counsel attached written responses to Plaintiff's work orders.

In those responses, the Landlord stated that it did not consider visible grime and filth on the light switch to be a reasonable requested repair.

The Landlord incorporated that same response for numerous work orders involving grime or filth on electrical outlets, windows, blinds, door crevices, switches, baseboards, the water-heater-door area, and the bathroom sink.

The Landlord stated that maintenance had inspected the stove-vent fan and found it to be in good working order.

Regarding the two holes in the blinds, the Landlord stated only that the note would be marked in its records.

The Landlord also asserted that Plaintiff had refused to sign or complete the Inventory and Condition Form before move-in.

The Landlord relied on that assertion to contend that the premises should be deemed clean, safe, sanitary, and in good working condition under the Lease.

Plaintiff disputes that assertion.

Plaintiff alleges that she completed and submitted the ADU 220 Inventory and Condition Form to a leasing-office employee in or about September or October 2023.

Plaintiff alleges that the employee accepted the original but did not return or provide Plaintiff with a copy.

The form did not later appear in Plaintiff's resident portal, which was controlled by Defendants.

The parties' opposing accounts concerning the form create a material factual dispute regarding the condition of ADU 220 at the beginning of Plaintiff's tenancy and Defendants' maintenance of Plaintiff's records.

**Y. Offer to Terminate Plaintiff's Lease After Her Complaints**

In the final portion of the October 24 letter, counsel stated that the Landlord believed Plaintiff was unhappy with her residency because of her complaints and "apparent dissatisfaction."

The Landlord offered to permit Plaintiff to terminate the Lease without penalty if she surrendered possession of ADU 220.

The proposed terms included:

a. waiver of remaining rental responsibility after Plaintiff surrendered possession;

b. return of any security deposit as though the Lease had expired naturally; and

c. a neutral reference concerning Plaintiff's tenancy.

The offer required Plaintiff to relinquish her ADU and move from the Property.

The offer was transmitted less than two weeks after Plaintiff submitted twenty-two work orders and approximately two weeks after her October 9 written complaint concerning safety, repairs, mold, accommodation, and possible retaliation.

Plaintiff had already paid for two moves within a short period, had limited finances, and had experienced substantial difficulty securing an affordable dwelling unit that met her medical and financial needs.

Plaintiff alleges that offering departure rather than completing all requested inspections and legally required repairs placed pressure on her to relinquish scarce affordable housing because she had repeatedly reported conditions in the unit.

Plaintiff did not understand the offer as a substitute for Defendants' continuing duty to investigate and correct conditions in ADU 220.

Plaintiff remained in the apartment and continued requesting repairs and enforcement of her housing rights.

**Z. Late-2023 Inquiry to the Department of Buildings**

After the September 2023 water intrusion and remediation work, Plaintiff remained concerned that moisture or mold could exist inside the wall separating her bedroom and closet from the apartment above.

Plaintiff was also concerned about an unidentified condition or object she observed within or behind a ventilation opening in ADU 2.

In or about late 2023, Plaintiff contacted the District of Columbia Department of Buildings ("DOB") and requested an inspection.

Plaintiff informed the DOB inspector that water had entered the wall from the vacant apartment above ADU 220.

Plaintiff also informed the inspector that maintenance personnel had recently patched and painted portions of the bedroom and closet after the water intrusion.

Plaintiff explained that Defendants had not provided her with a mold-assessment report, moisture readings, or documentation establishing that the concealed portions of the wall had been inspected.

The inspector advised Plaintiff that a mold specialist or other qualified professional would be needed to investigate conditions that could not be observed through the ordinary visual inspection.

Plaintiff lacked the financial resources to retain an independent mold, ventilation, or building-systems specialist.

Plaintiff therefore remained dependent on Defendants, as the entities controlling the building and its systems, to conduct or authorize a competent thorough investigation.

**AA. Continuing Maintenance-Record Problems**

Plaintiff alleges that unresolved maintenance conditions continued after October 2023.

The resident portal identified Plaintiff's October 2023 request concerning holes in the living-room blinds as "completed with note."

Living Room Blinds (October 2023): A maintenance request concerning the living room blinds, which exhibited two holes, was marked "COMPLETED WITH NOTE" on October 11, 2023. The accompanying note stated, "Management will get in contact with tenant in regards to the work request," yet no subsequent contact or repair transpired. (See `Work Order, Living Room Blinds, Oct 11 2023.pdf`).

The accompanying note stated that management would contact Plaintiff regarding the request.

Plaintiff alleges that management did not subsequently contact her concerning that work order and did not repair or replace the damaged blinds at that time.

Plaintiff alleges that this was one of several instances in which the resident portal described a request as completed, suspended, or cancelled even though the requested work had not been performed or the underlying condition remained unresolved.

Because Defendants controlled the resident portal and maintenance database, Plaintiff could not independently correct the status assigned to a work order.

The accuracy of those records was material because Defendants later relied on maintenance records when responding to Plaintiff's complaints and disputing the existence or duration of conditions in ADU 220.

**AB. January 2024 Pest-Control Request**

In January 2024, Plaintiff submitted a maintenance request concerning ants or suspected pest activity in or around ADU 220.

The electronic record identified the request as "suspended" on or about January 7, 2024.

The request was subsequently identified as "cancelled."

Plaintiff received an email concerning the cancellation on or about January 18, 2024.

Plaintiff alleges that the pest condition had not been fully investigated or remediated when the request was suspended or cancelled.

The treatment of the January 2024 request reinforced Plaintiff's concern that Defendants were closing or changing maintenance records without completing the work described in the requests.

Plaintiff continued to observe pest activity after the January 2024 request.

**AC. Unauthorized Access to the Property in June or July 2024**

In or about June or July 2024, Plaintiff encountered an unidentified man in the second-floor courtyard and amenity area adjoining her patio.

The man had gained access to portions of the Property that ordinarily required a resident key fob, including the building, elevator, fitness-center area, or adjoining yoga studio.

Plaintiff observed a large shopping cart containing various items inside or near the yoga studio.

The unidentified man was seated on patio furniture outside a neighboring apartment.

Plaintiff initially believed that the man might be a new resident.

The man then asked Plaintiff to provide him with a glass of water.

The request caused Plaintiff to question whether the man lived at the Property and heightened her concern for her safety.

Plaintiff returned to ADU 220 and contacted The Apartments at CityCenter DC front-desk personnel.

Plaintiff permitted The Apartments at CityCenter DC leasing office personnel to enter her home/ADU 220 so that they could observe the man from Plaintiff's window or patio area.

Plaintiff alleges that The Apartments at CityCenter DC leasing office personnel were unable to determine immediately how the man had entered the controlled-access areas or to remove him immediately.

The incident caused Plaintiff to fear that unauthorized persons could gain access to residential and amenity areas located near her home/affordable dwelling unit 220.

Plaintiff alleges that Defendants did not issue a building-wide notice to residents concerning that incident.

During a second incident in approximately July 2024, another nonresident allegedly gained access to a rooftop amenity area and was unable to exit through the elevator or controlled doors because the person lacked a resident key fob.

Defendants issued a resident communication concerning the second incident.

Plaintiff perceived Defendants' different responses to the two incidents as inconsistent.

Plaintiff alleges that the Property relied primarily on concierge personnel and controlled-access systems rather than a dedicated on-site security guard.

**AD. July 27, 2024 Renewal and Recertification Notice**

Plaintiff's original ADU 220 lease term was scheduled to expire on September 7, 2024.

On July 27, 2024, Defendants sent Plaintiff an electronic renewal notice.

The notice stated that the monthly rate for a twelve-month renewal of Plaintiff's ADU would be $2,059.

The notice informed Plaintiff that she was required to complete the District's affordable-housing recertification process.

The notice stated: “It is imperative that you get re-certified as soon as possible or we will be forced to charge you Market rent.”

The notice did not identify the amount of the referenced market rent.

The notice also did not explain what procedural steps would occur before any market-rate charge could be imposed, how much time Plaintiff had to cure an incomplete submission, or whether Plaintiff could remain in the unit while the recertification was pending.

Plaintiff understood the notice to mean that failure to complete recertification promptly could cause a substantial increase in her housing costs.

Because Plaintiff was unemployed or had limited income at that time, the possibility of being charged market rent caused significant anxiety.

Plaintiff informed management that she intended to remain in the unit and was working to obtain the required income-certification materials.

**AE. July 30 Notice of Kitchen-Sink Inspection**

On July 30, 2024, Defendants notified Plaintiff that personnel needed to conduct a brief inspection of the kitchen-sink area on Friday, August 2, 2024.

The notice stated that the inspection would occur between 9:00 a.m. and 4:00 p.m.

Defendants represented that the inspection should require approximately five minutes.

On August 1, 2024, Plaintiff responded to Morales and confirmed receipt of the inspection notice.

Plaintiff informed Morales that she was experiencing problems with both the kitchen sink and the dishwasher.

Plaintiff's response placed Property management on written notice that the planned inspection implicated active plumbing or appliance problems rather than a merely routine condition.

Plaintiff also attached or referenced her tenant ledger in the August 1 communication.

**AF. Plaintiff Discovers Pet-Rent Charges**

In the same August 1 email, Plaintiff informed Morales that her billing statements had included pet-rent charges for more than four months.

Plaintiff asked management to explain why the charges had been assessed.

At that time, Defendants had already approved or recognized Fluffy as Plaintiff's assistance animal.

Plaintiff had previously completed the PetScreening process and had provided disability-related documentation concerning Fluffy.

Plaintiff alleges that she had not authorized Defendants to treat Fluffy as an ordinary pet or to assess monthly pet rent.

The charges appeared on Plaintiff's ledger while Defendants or their leasing agents or leasing office personnel maintained control over both her assistance-animal profile and tenant-account.

Plaintiff alleges that the recurring charges reduced the accuracy of the balance displayed in her resident account and required her to identify and challenge an error that Defendants should have prevented.

**AG. August 22 Admission and Credit of Pet Rent**

On August 22, 2024, Morales responded to Plaintiff's August 1 email.

Morales apologized for the delayed response.

Morales asked whether Plaintiff was still experiencing problems with the dishwasher.

Morales stated that she had investigated the pet-rent charges.

Morales acknowledged that Plaintiff's "pet profile was not entered correctly at the time of move in."

Morales apologized for the error.

Morales stated that management had credited all pet rent charged from September 2023 through August 2024.

Morales attached or provided Plaintiff with a revised ledger.

The communication established that the account-coding error began at or near the commencement of Plaintiff's ADU 220 tenancy and continued for approximately one year.

The communication also established that Plaintiff's account had been charged pet rent after Defendants had been informed that Fluffy was an emotional support animal.

Morales additionally stated that Plaintiff's PetScreening profile had expired that day and asked Plaintiff to renew it.

Plaintiff alleges that maintaining an accurate assistance-animal designation in the Property's systems was a function controlled by Defendants and their designated screening platform.

Plaintiff further alleges that correcting the ledger approximately one year later did not eliminate the time, confusion, financial-management burden, or potential payment consequences caused by the recurring charges.

**AH. August 2024 ADU Recertification**

During August 2024, Plaintiff participated in the recertification process for ADU 220.

The process involved communications with Housing, Inc. or another entity assisting with income certification and with the Property's leasing or management office.

During recertification, Plaintiff disclosed that she had diagnosed disabilities.

Plaintiff also disclosed that she was unemployed, had limited income and was actively seeking employment.

Plaintiff provided information concerning her income, employment efforts, and financial circumstances as requested during the recertification process.

Plaintiff sought clarification and assistance concerning how her reduced income affected her continued occupancy and monthly rent.

Plaintiff understood from Housing, Inc. that she could remain in the unit and continue paying rent.

Plaintiff did not understand whether the governing Affordable Housing Covenant permitted the Owner to reduce her rent, reclassify the unit, transfer her to another affordability category, or take some other action based on her reduced income.

Plaintiff states that no representative offered to lower her monthly rent or explained whether a lower lawful rent was available under the governing covenant.

Because Plaintiff lacked that information, she stated that she would continue paying the existing $2,017 monthly base rent.

Plaintiff alleges that Defendants did not deliver a fully executed twelve-month renewal lease at the proposed $2,059 rate.

Plaintiff nevertheless remained in possession of ADU 220 after September 7, 2024.

Plaintiff alleges that the Property continued accepting or demanding rent while her precise renewal or holdover status remained unclear.

The complete recertification file, communications with Housing, Inc., DHCD records, income calculations, and Defendants' internal renewal decisions are principally within Defendants' or the certifying entities' possession.

**AI. August 2024 Beginning of Rent-Payment Problems**

Plaintiff alleges that problems with the Property's Entrata payment system began or became materially worse in approximately August 2024.

Entrata permitted Plaintiff to store more than one bank account or payment method.

Plaintiff intended to pay from the account that contained sufficient funds for the monthly rent.

Plaintiff alleges that, on multiple occasions, Entrata attempted to withdraw funds from a different or unintended account.

The unintended withdrawals resulted in insufficient-funds conditions or rejected payments.

After a payment was rejected, Defendants' account system assessed fees against Plaintiff's ledger.

The charges included returned-payment or nonsufficient-funds fees and late fees.

The project record identifies recurring fee amounts of approximately $100 for returned payments and late charges calculated at or near five percent of the monthly rent.

Plaintiff disputed the fees because she attributed the failed transactions to the payment system's selection of the wrong stored account rather than to a deliberate failure to pay rent.

Plaintiff alleges that the account errors and resulting charges began during a period when Defendants knew she was unemployed, had limited income, and had disclosed disabilities affecting financial organization and management.

Plaintiff requested that Defendants investigate the account settings, identify why the incorrect account was being selected, remove the resulting charges, and restore a reliable fee-free payment method.

Plaintiff alleges that Defendants did not permanently correct the problem during 2024.

**AJ. Shift From Electronic Payments to Paper Checks**

As the electronic-payment problems continued, Plaintiff increasingly relied on paper checks to pay rent.

Plaintiff maintained two bank accounts.

Only one of the accounts provided Plaintiff with checks without requiring her to purchase an additional checkbook.

When funds were held in the other account, Plaintiff had to transfer money into the account from which she could write a check.

Plaintiff alleges that each transfer could require several days to complete and could result in an additional transfer fee.

The use of paper checks therefore required Plaintiff to coordinate bank transfers, mailing or delivery, check availability, processing time, and the Property's deposit practices.

Plaintiff alleges that this process was more difficult for her because of disability-related limitations affecting organization, financial management, concentration, and completion of multi-step tasks.

Plaintiff asked Defendants to allow her to use a direct checking-account transfer through the resident portal because that method had been represented as the available fee-free electronic option.

Plaintiff alleges that the Property did not provide a functioning fee-free electronic-check option for her account.

By approximately September 2024, Plaintiff was paying at least some rent and other account charges by paper check because she could not reliably use the electronic-payment option.

**AK. October and November 2024 Notice to Management**

Plaintiff alleges that she notified the Property by email in October 2024 that the payment system was not withdrawing funds from her intended bank account.

Plaintiff also disputed the late and returned-payment fees resulting from the failed electronic transactions.

Plaintiff requested that the Property correct the payment method associated with her account.

In November 2024, Plaintiff spoke by telephone with a woman associated with The Apartments at CityCenter concerning the payment-system problem.

Plaintiff explained that she needed access to a reliable checking-account payment option.

Plaintiff also explained that the problem was causing additional fees and making it more difficult for her to manage rent payments.

Plaintiff alleges that the representative did not restore the requested payment option.

Plaintiff further alleges that the representative did not remove all disputed charges.

Plaintiff understood the representative to have denied or rejected her request to use the resident portal's checking-account method as a disability-related accommodation.

The presently uploaded record does not identify the representative by name.

Plaintiff's later January 21, 2025 email memorialized that she had first raised the issue by email in October 2024 and had discussed it by telephone in November 2024.

Defendants' internal call logs, recordings, notes, emails, Entrata support records, and account-administration records should identify the employee involved and the action taken in response.

**AL. Continuing Charges Through December 2024**

Defendants continued posting monthly rent, trash reimbursement, utility charges, service fees, and other account entries to Plaintiff's tenant ledger.

The charges were administered through Entrata and, for utility billing, through Conservice or another third-party billing provider.

Plaintiff alleges that the combined presentation of rent, utilities, service fees, late charges, and returned-payment fees made it difficult to determine which amount represented base rent and which amounts represented non-rent charges.

Plaintiff requested access to an accurate and complete ledger so that she could reconcile the account.

Plaintiff alleges that the resident portal did not provide her with a readily downloadable ledger containing the complete transaction history in a format she could independently review and preserve.

Plaintiff continued attempting to pay the monthly amount she understood to be due while disputing system-generated penalties and account errors.

Defendants continued carrying disputed fees and balances forward into subsequent months.

Plaintiff alleges that the accumulating charges increased the amount required to bring the portal balance to zero even though she disputed the validity of portions of that balance.

The continuing balance and repeated failed transactions caused Plaintiff financial stress and impaired her ability to budget for food, medical expenses, transportation, Fluffy's care, and other necessities.

**AM. December 31, 2024 Attempt to Pay January Rent**

On December 31, 2024, Plaintiff attempted to submit the payment due for January 2025.

Plaintiff alleges that the Property had removed or disabled her ability to pay through the resident portal using the checking-account method she sought to use.

Plaintiff further alleges that the portal would not withdraw funds from the account she had selected as her principal payment account.

As of December 31, 2024, the payment-system issue Plaintiff had reported in October and November remained unresolved.

The account also continued to reflect fees that Plaintiff traced to payment problems beginning in approximately August 2024.

Plaintiff entered January 2025 without a reliably functioning fee-free electronic rent-payment method and with a disputed balance carried on her account.

The continuing payment dispute occurred against the background of unresolved maintenance conditions, Plaintiff's reduced income, and Defendants' knowledge of her disabilities and accommodation requests.

The next chronological block should begin with January 2025, including the failed heating system, shower and plumbing failures, repeated repair scheduling, Plaintiff's January 22 habitability demand, and the first DOB inspection and Notices of Infraction.

**AN. Emergency Maintenance Conditions in January 2025**

In January 2025, several material systems and fixtures in ADU 220 were simultaneously malfunctioning.

Plaintiff experienced a loss of central heat, an unstable or unusable shower, drainage problems, a leaking kitchen-sink area, an inoperable garbage disposal, and other unresolved maintenance conditions.

Plaintiff alleges that the shower did not provide a safe and stable water temperature.

The shower water alternated between extremely hot and cold temperatures without a reliable intermediate setting.

Plaintiff also heard an unusual sound emanating from behind the shower wall.

The condition made Plaintiff afraid that she could be burned or exposed to abruptly freezing water while bathing.

Plaintiff alleges that the shower's drainage was also impaired and that water accumulated or drained too slowly.

Plaintiff further experienced drainage problems affecting one or more sinks.

The kitchen garbage disposal was inoperable.

Water leaked beneath or around the kitchen sink and spread onto the adjoining floor.

Plaintiff alleges that these plumbing conditions had existed intermittently before January 2025 but materially worsened or remained unresolved during that month.

The simultaneous loss of heat and impaired plumbing substantially interfered with Plaintiff's ability to sleep, bathe, maintain sanitation, prepare food, and use ADU 220 as a residence.

**AO. Plaintiff's January 17–18 Reports to the Front Desk**

On or about January 17, 2025, the Property's leasing office contacted Plaintiff and requested dates and times when maintenance could address open work orders.

Plaintiff responded that she was available after 1:00 p.m. on dates she identified, including January 17 and January 21.

The leasing office stated that maintenance would not be available on Monday, January 20.

The leasing office subsequently confirmed that maintenance was expected to enter Plaintiff's home (ADU 220) on Tuesday, January 21, after 1:00 p.m.

At approximately 12:52 a.m. on January 18, 2025, Plaintiff separately notified the Property's concierge that the heating system in ADU 220 was not functioning.

Plaintiff also reported that the bathroom vent was blowing cold air.

Plaintiff informed the front desk of the shower, plumbing, kitchen-sink, and other defective conditions. The front-desk representative entered or caused maintenance requests to be entered into the Property's maintenance-management system.

Plaintiff understood the front desk to be an authorized point of contact for emergency conditions at the Property.

The front-desk representative confirmed that multiple work orders had been created.

Plaintiff did not instruct the front-desk representative to delay emergency repairs or limit maintenance to a specific entry time for the loss of heat.

Plaintiff expected that the heating failure and active water conditions would receive emergency attention.

Plaintiff alleges that she was not provided with a reliable estimated repair time.

After 5:00 p.m. on January 18, Plaintiff returned to the front desk and again reported that the heat and other essential systems remained un-repaired.

Plaintiff was informed that maintenance had serviced other units but had not completed repairs in ADU 2.

Plaintiff stated that she had received no advance notice that maintenance had attempted to enter her unit that day.

As of January 18, Plaintiff therefore understood that Defendants had received direct notice of the emergency conditions but had not restored the essential services she reported.

**AP. Conditions From January 18 Through January 21**

Plaintiff alleges that maintenance did not communicate with her or repair the heating system on January 18.

Plaintiff alleges that no heating repair occurred on January 19.

Plaintiff alleges that no heating repair occurred on January 20.

Plaintiff remained in ADU 220 while the central heating system was inoperative.

Plaintiff and Fluffy relied on a small portable space heater.

The space heater was insufficient to warm the entire apartment.

Plaintiff paid for the electricity consumed by the space heater through her Pepco account.

Plaintiff alleges that the prolonged use of the portable heater increased her electricity expenses.

Defendants did not offer Plaintiff and Fluffy a hotel room, guest suite, temporary unit, or other relocation assistance during this period.

Plaintiff lacked sufficient funds to obtain alternative accommodations independently.

Plaintiff was particularly concerned because her medical conditions and immunosuppressive medication increased her vulnerability to illness.

Plaintiff alleges that exposure to the cold caused or aggravated a sore throat, runny nose, flu-like symptoms, fatigue, and emotional distress.

Plaintiff also feared that the cold conditions could adversely affect Fluffy, who was an older cat.

On January 21, Plaintiff had a scheduled virtual healthcare appointment from approximately 1:15 p.m. until 2:00 p.m.

Plaintiff emailed the leasing and management offices early that morning requesting a definite maintenance time.

682. Plaintiff explained that she would be available after 2:00 p.m.

683. Plaintiff also renewed her complaint that she remained without heat and could not safely use the shower.

684. Plaintiff sent a follow-up email at approximately 2:30 p.m. because management had not provided the requested time.

685. At approximately 3:09 p.m., Assistant General Manager Tyler Schemehorn proposed a 3:30 p.m. visit.

686. Plaintiff promptly confirmed that she was available at 3:30 p.m.

687. Plaintiff also stated that, contrary to Schemehorn's email, she had not received the voicemail message he referenced.

688. In her formal January 22 demand, Plaintiff stated that maintenance did not arrive or complete repairs on January 21 despite her availability.

689. As of the morning of January 22, the central heating system remained nonfunctional and the plumbing conditions remained unresolved.

**AQ. January 22 Formal Habitability Demand**

690. On January 22, 2025, at approximately 6:50 a.m., Plaintiff sent a formal written demand to the Property's assistant manager, leasing office, general manager, and tenant advocates affiliated with Housing Counseling Services.

691. The subject of the email was **"Breach of Implied Warranty of Habitability, Failure to Provide Essential Services, and Request for Immediate Compensation."**

692. Plaintiff stated that the Property had failed to maintain ADU 2 in a habitable condition.

693. Plaintiff identified the lack of heat as an essential-services failure.

694. Plaintiff stated that she had reported the heating failure to the concierge at 12:52 a.m. on January 18.

695. Plaintiff documented that no repair or corrective communication had occurred on January 18, 19, 20, or 21.

696. Plaintiff stated that the heating system remained inoperative as of January 22.

697. Plaintiff also reported a leaking kitchen sink and her inability to use the shower.

698. Plaintiff stated that the unresolved conditions had caused physical symptoms and substantial emotional distress.

699. Plaintiff expressly reminded Defendants that she was a person with disabilities and was particularly vulnerable to the conditions.

700. Plaintiff requested a rent abatement of **$335.83** for five days of allegedly uninhabitable conditions.

701. Plaintiff calculated that amount using the daily prorated value of her stated monthly base rent of **$2,017**.

702. Plaintiff requested compensation in the range of **$5,000 to $10,000** for the physical and emotional distress she attributed to the cold and other conditions.

703. Plaintiff also renewed her demand that Defendants correct and reimburse disputed late fees arising from the rent-payment system.

704. Plaintiff stated that the disputed payment-system charges exceeded $400 at that time.

705. Plaintiff requested that Defendants acknowledge receipt and resolve the conditions within one business day.

706. Plaintiff warned that she would otherwise contact District agencies and pursue legal action.

707. The January 22 demand gave the Property's management personnel detailed written notice of the lack of heat, plumbing failures, Plaintiff's claimed injuries, her disabilities, her requested abatement, and her intent to enforce her rights.

**AR. January 23 Department of Buildings Inspection**

708. On January 23, 2025, DOB Housing Inspector **Chauncey Maddux** inspected ADU 2.

709. The inspection occurred at approximately 9:18 p.m.

710. Maddux inspected the heating system, sinks, garbage disposal, bathroom surfaces, window shade, and walking surface near the rear entrance.

711. The inspection evidence packet included photographs of the conditions and temperature measurements taken within the unit.

712. Maddux determined that conditions in ADU 2 violated multiple provisions of the International Property Maintenance Code and the District of Columbia Municipal Regulations.

713. DOB divided the violations into two Notices of Infraction based on their assigned priority classifications.

714. The Priority 1 notice addressed plumbing and heat conditions that DOB classified as life-safety hazards requiring correction within one day.

715. The Priority 2 notice addressed interior, surface, and flooring conditions requiring correction within sixty days.

716. The inspection was conducted by an independent District official after Plaintiff had repeatedly requested repairs from Property personnel.

**AS. Priority 1 Notice of Infraction No. 25NOIE-INS-01622**

### AS. Priority 1 Notice of Infraction No. 25NOIE-INS-01622

718. DOB issued Notice of Infraction No. **25NOIE-INS-01622** based on the January 23 inspection.

719. DOB served the Notice on January 31, 2025.

720. The Notice identified the infraction location as Plaintiff's occupied unit at 875 10th Street NW.

721. The Notice identified **CCDC Residential Rental LLC (IMPS ONLY)** as the respondent.

722. The Notice identified **Hines Interests LP** as the respondent's agent, care of the Property's management office at 825 10th Street NW.

723. The Notice did not charge Hines separately as the respondent.

724. DOB expressly stated that Priority 1 violations were life-safety hazards.

725. The Notice required each Priority 1 condition to be abated within one day.

726. The first charge cited **IPMC § 501.2** for failing to maintain required plumbing fixtures or facilities properly.

727. The first charge concerned the bathroom sink.

728. The inspector noted that water did not dissipate from the bathroom sink.

729. DOB imposed a stated fine of **$1,249** for that charge.

730. The second charge also cited **IPMC § 501.2**.

731. The second charge concerned the kitchen garbage disposal.

732. The inspector noted that the garbage disposal was inoperable and directed that it be repaired or replaced.

733. DOB imposed a stated fine of **$1,249** for that charge.

734. The third charge cited **IPMC § 501.2** concerning the kitchen sink.

735. The inspector noted that water did not dissipate from the kitchen sink.

736. DOB imposed a stated fine of **$1,249** for that charge.

737. The fourth charge cited **12-G DCMR § 602.2**.

738. The charge stated that the residential heating facilities were not capable of maintaining a temperature of 68 degrees Fahrenheit, or 20 degrees Celsius, in the habitable rooms, bathroom, and toilet room.

739. The inspector noted that heat was not being provided in the unit.

740. DOB directed that the heating facilities be repaired to comply with the code.

741. DOB imposed a stated fine of **$2,499** for the heating violation.

742. The total fines stated on Priority 1 Notice No. 25NOIE-INS-01622 were **$6,246**.

743. Inspector Maddux certified under penalty of perjury that he had observed or determined that the charged infractions had been committed.

**AT. Priority 2 Notice of Infraction No. 25NOIR-INS-02205**

744. DOB also issued Notice of Infraction No. **25NOIR-INS-02205** based on the January 23 inspection.

745. DOB served the Notice on January 31, 2025.

746. Like the Priority 1 Notice, the Priority 2 Notice identified CCDC Residential Rental LLC (IMPS ONLY) as the respondent and Hines Interests LP as the respondent's agent.

747. The Notice stated that Priority 2 violations were non-life-safety hazards that were required to be abated within sixty calendar days after receipt.

748. The first charge cited **IPMC § 305.1** for failure to maintain the interior structure and equipment in good repair, structurally sound, and sanitary condition.

749. That charge concerned the living-room window shade.

750. Inspector Maddux noted that the shade on the left would not come down properly.

751. DOB directed the respondent to repair or replace the shade.

752. DOB imposed a stated fine of **$1,249** for that charge.

753. The second charge cited **12-G DCMR § 305.3** for failure to correct cracked or loose plaster, holes, decayed wood, water damage, or other defective surface conditions.

754. That charge concerned the bathroom floor and the area between the doorframe and flooring.

755. The inspector noted a gap between the doorframe and flooring.

756. DOB directed the respondent to remove the old caulk and seal the area with new caulk or grout in a workmanlike manner.

DOB imposed a stated fine of $625 for that charge.

The third charge cited **12-G DCMR § 305.4** for failure to maintain walking surfaces in sound condition, good repair, and free from hazardous conditions.

That charge concerned the floor at the apartment's rear entrance.

Inspector Maddux determined that the subfloor was damaged and caused the walking surface to be unstable.

DOB directed the respondent to repair or replace the subfloor and reinstall like flooring material in a workmanlike manner.

DOB imposed a stated fine of $1,249 for that charge.

The total fines stated on Priority 2 Notice No. 25NOIR-INS-02205 were $3,123.

Inspector Maddux certified under penalty of perjury that he had observed or determined that the charged infractions had been committed.

**AU. Significance of the January 23 Findings**

DOB's findings independently confirmed that ADU 220 contained defective plumbing, an inoperable garbage disposal, inadequate heat, a broken window shade, a defective bathroom-floor surface, and an unstable rear-entry walking surface.

Three separate plumbing charges and the heating charge were classified as Priority 1 life-safety violations.

The Priority 1 findings required corrective action within one day.

The other three conditions required corrective action within sixty days.

The combined stated fines in the two Notices totaled $9,369.

The Notices identified the unit as occupied when the violations were observed.

The Notices also connected CCDC Residential Rental LLC (IMPS ONLY) and Hines Interests LP to the Property through the respondent and agent designations.

The notices did not expressly cite the unstable shower-water temperature.

Plaintiff's shower allegations are therefore based on her reports, maintenance requests, and experiences rather than on a DOB citation specifically addressing shower temperature.

DOB's bathroom plumbing citation concerned water failing to dissipate from the bathroom sink.

DOB's kitchen plumbing citations concerned the inoperable garbage disposal and water failing to dissipate from the kitchen sink.

The DOB findings nevertheless confirmed broader failures to maintain basic plumbing facilities in ADU 220.

**AV. Maintenance Requests Marked "Completed"**

After the January 23, 2025 inspection, Plaintiff began receiving electronic notices stating that maintenance requests had been completed.

On or about January 30, 2025, a maintenance request concerning the bathroom tub or shower was marked "Completed."

The request concerned Plaintiff's report that the shower alternated between scalding-hot and cold water and produced an audible sound behind the wall.

Plaintiff alleges that the shower had not been repaired when the request was marked completed.

Plaintiff also received or observed a "completed" status concerning the unit-wide heating request.

Plaintiff alleges that the central heating condition had not been corrected when the system reflected that status.

Plaintiff was concerned that the electronic records inaccurately suggested that maintenance had performed repairs or that Plaintiff's complaints had been resolved.

The maintenance portal and its underlying records were controlled by Defendants or their designated platform provider.

Plaintiff could not independently alter or correct the status entries.

**AW. January 31 "Lost All Credibility" Email**

On January 31, 2025, Plaintiff emailed the Property's assistant manager and leasing office concerning the completed-status notifications.

Plaintiff stated that she was receiving emails asserting that maintenance requests had been completed even though the repairs had not occurred.

Plaintiff wrote that management had "lost all credibility."

Plaintiff requested that the inaccurate records be addressed and that the actual repairs be completed.

Plaintiff alleges that Defendants did not provide a satisfactory explanation for the completed-status entries.

Plaintiff further alleges that Defendants did not promptly correct all disputed maintenance records.

The inaccurate status entries impaired Plaintiff's ability to determine which work orders remained open and created a record that could later be used to suggest that the cited conditions had been repaired.

By January 31, 2025 Defendants had received Plaintiff's direct reports, her January 22, 2025 formal demand, the January 23, 2025 inspection findings, and the two DOB Notices of Infraction.

**AX. Continued Plumbing Failures in February 2025**

AX. Continued Plumbing Failures in February 2025

During February 2025, Plaintiff continued experiencing plumbing and maintenance conditions that had been cited or reported during January.

Plaintiff again informed Property personnel that water was leaking beneath or around the kitchen sink.

Plaintiff also reported that the kitchen garbage disposal remained inoperable or failed again after attempted maintenance.

Plaintiff alleges that repairs performed by maintenance personnel or contractors were temporary, incomplete, or ineffective.

After purported repairs, water continued to appear beneath the kitchen sink and on the surrounding floor.

Plaintiff frequently used two or three bath towels to absorb the water and prevent it from spreading farther into the kitchen.

Plaintiff was required to bend, kneel, move objects stored beneath the sink, dry the floor, wash the towels, and monitor the area for additional leakage.

Plaintiff alleges that the repeated cleanup caused or aggravated lower-back pain, fatigue, and emotional distress.

Plaintiff observed that the flooring adjacent to the kitchen sink became soft or less stable after repeated exposure to moisture.

Plaintiff was concerned that the persistent moisture could damage the floor assembly, promote mold growth, and facilitate pest entry.

Plaintiff also continued reporting that the shower did not maintain a reliably safe temperature and that the bathroom or kitchen drainage conditions remained deficient.

Plaintiff alleges that Defendants did not provide an effective temporary solution, replacement fixture, alternate bathing arrangement, relocation assistance, or rent reduction while the conditions continued.

Plaintiff's allegations concerning continuing leakage and the inoperable garbage disposal were consistent with the plumbing failures documented during the January 23 DOB inspection.

**AY. February 5 Submission of Documentation to DOB**

On or about February 5, 2025, Plaintiff sent additional documentation to the District of Columbia Department of Buildings.

Plaintiff's correspondence concerned Defendants' alleged failure to complete the repairs required by the January inspection and Notices of Infraction.

Plaintiff also supplied documentation concerning maintenance requests that had been marked completed even though Plaintiff maintained that no corresponding repair had occurred.

The materials included or referenced maintenance emails, work-order records, Plaintiff's communications with management, and evidence concerning the scheduling or status of repair requests.

Plaintiff informed DOB that the records available to her did not accurately reflect the conditions she continued to experience inside ADU 220.

Plaintiff asked DOB to preserve or consider those materials when evaluating whether the cited conditions had been abated.

Plaintiff's February 5 submission further placed a District enforcement agency on notice of her contention that the Property's electronic maintenance records were inaccurate or incomplete.

The precise contents of the February 5 submission should be attached as an exhibit after the underlying email and its attachments are assembled in final exhibit order.

**AZ. Disability-Related Maintenance-Scheduling Requests**

Plaintiff takes prescribed medication for sleep insomnia.

Plaintiff alleges that the medication, her sleep disorder, and the continuing nighttime disturbances caused substantial morning fatigue and made early-morning appointments difficult.

Between January and March 2025, Plaintiff repeatedly asked the leasing office and maintenance personnel to schedule nonemergency entry into ADU 2 after approximately 1:00 p.m.

Plaintiff explained that the requested scheduling change related to her medical condition and prescribed sleep medication.

Plaintiff did not request that Defendants postpone genuine emergencies or refrain from providing heat, plumbing, or other essential repairs.

Instead, she requested advance coordination and an afternoon arrival time for ordinary or scheduled maintenance visits.

Plaintiff also wanted to be present because prior entry disputes and incomplete repairs had caused her to distrust the maintenance process.

Plaintiff was concerned about Fluffy's safety while workers entered and moved through her home (ADU 220).

Plaintiff was also concerned about medication, personal documents, electronics, and other property inside the dwelling.

Plaintiff alleges that Defendants did not consistently acknowledge or evaluate the requested scheduling accommodation.

On multiple occasions, maintenance personnel allegedly appeared at approximately 10:00 a.m. or earlier.

Plaintiff was sometimes asleep, affected by medication, or physically unable to answer the door when personnel arrived during those morning periods.

Defendants or their agents later suggested that Plaintiff had not provided access for repairs.

Plaintiff disputed that characterization and maintained that she had repeatedly supplied afternoon availability and had not refused access when visits were properly coordinated.

Plaintiff alleges that Defendants failed to distinguish between a refusal of access and an unsuccessful early-morning visit made contrary to her requested accommodation.

Defendants' complete work-order histories, employee schedules, entry logs, key-control records, emails, telephone records, and accommodation records are necessary to determine the dates and times of attempted visits and the instructions given to maintenance personnel.

**BA. Work-Order Times Entered Without Plaintiff's Authorization**

While reviewing maintenance communications, Plaintiff observed that one or more work orders contained specific entry or appointment times.

Plaintiff alleges that she had not selected, directed, or authorized some of those times.

Plaintiff understood that the times had been entered by a front-desk employee or another person with access to the Property's maintenance system.

The unauthorized entries were material because they could make it appear that Plaintiff had requested or accepted an appointment and then failed to provide access.

Plaintiff informed DOB that she feared Defendants could rely on those records to blame her for the failure to abate the violations.

Plaintiff also informed DOB that her communications showed repeated requests for afternoon maintenance access rather than a blanket refusal to permit entry.

Plaintiff alleges that Defendants did not provide her with a corrected work-order history or a written explanation identifying who entered the disputed times.

Plaintiff does not presently know whether the disputed entries resulted from employee error, automated scheduling, inaccurate data entry, or an intentional act.

The identity of the person who entered each time and the audit history of the work orders are matters within Defendants' and their platform provider's possession.

Plaintiff therefore alleges only that the entries were inaccurate or unauthorized from her perspective and reserves any allegation of intentional falsification until supported by system audit records or other evidence.

**BB. Defendants' Silence and Continuing Dispute Over Abatement**

Plaintiff alleges that management's communications decreased after she submitted the January 2023 demand and supplied evidence to DOB.

Plaintiff continued requesting repairs, clarification of work-order statuses, correction of account charges, and responses to her accommodation requests.

Plaintiff alleges that several of those communications received no substantive response.

Defendants did not agree to the rent abatement Plaintiff had requested in her January 22, 2023 demand.

Defendants did not pay the compensation Plaintiff requested for physical and emotional harm.

Defendants did not reimburse the increased electricity costs Plaintiff attributed to her reliance on a portable heater.

Plaintiff alleges that the central-heating, plumbing, shower, flooring, window-shade, and surface conditions were not all corrected within the abatement periods identified in the DOB Notices.

Plaintiff further alleges that Defendants did not voluntarily provide her with copies of all DOB violation documents and abatement records concerning her unit.

Because Plaintiff did not control Defendants' repair records or DOB's enforcement records, she could not independently determine whether Defendants had reported any conditions as abated.

The uploaded narrative states that Inspector Maddux later conducted two follow-up inspections and found uncorrected violations.

The presently identified project files, however, do not establish the exact dates of those inspections, identify each condition observed during them, or include the complete follow-up reports.

Plaintiff therefore reserves detailed allegations concerning those follow-up inspections until the official DOB records are obtained or identified as exhibits.

**BC. February Ledger Entries and Additional Charges**

Defendants continued posting monthly charges to Plaintiff's ledger while the maintenance and accommodation disputes remained unresolved.

The ledger later produced in connection with the tenancy reflects a February 2025 monthly base-rent charge of $2,017.

The ledger also reflects a separate monthly charge of $100 described as amenity rent associated with luxury-vinyl-plank flooring.

The February entries further include a $10 trash reimbursement, approximately $25.16 in water-and-sewer charges, and a $4.70 utility-service fee.

The ledger reflects a late fee of approximately $105.85.

It also reflects a returned-check or nonsufficient-funds transaction and a separate $100 returned-item fee in February.

Plaintiff disputed the accumulation of such fees because she maintained that the Property's payment system had been malfunctioning, that she had requested a reliable checking-account option, and that the account balance included non-rent charges.

The ledger's presentation combined base rent, amenity rent, utilities, reimbursements, service fees, late fees, and returned-payment entries into a running balance.

Plaintiff alleges that this format made it difficult for her to determine what amount Defendants regarded as legally collectible rent and what amount consisted of disputed fees or other charges.

The ledger also reflects the posting of March base rent and the separate $100 amenity-rent charge on or about March 1, 2025.

**BD. Increasing Financial Hardship**

BD. Increasing Financial Hardship

Plaintiff remained unemployed during February and March 2025.

Plaintiff states that federal employment opportunities she had anticipated were rescinded or suspended following a federal hiring freeze.

Plaintiff had previously informed Property personnel of her unemployment and financial limitations during the ADU recertification process and subsequent communications.

Plaintiff continued incurring housing charges while also paying for utilities, food, transportation, medical needs, cleaning supplies, and Fluffy's care.

Plaintiff alleges that the repeated late and returned-payment charges further reduced the funds available for necessities.

By approximately March 2025, Plaintiff's combined checking and savings balances had fallen below $1,000.

Plaintiff alleges that she was no longer able to pay every amount Defendants displayed as due while also maintaining basic necessities.

Plaintiff continued to dispute portions of the ledger, including late fees, returned-item fees, payment-system-related charges, and amounts she believed should be reduced through rent abatement or offsets for the defective conditions.

Plaintiff's inability to pay the full portal balance did not resolve the parties' dispute concerning the lawful rent, habitability abatements, accommodation requests, or accuracy of the ledger.

**BE. Missing Maintenance Records Discovered in March 2025**

During approximately March 2025, Plaintiff began compiling documents for possible legal action.

Plaintiff reviewed the resident portal and mobile application to locate earlier maintenance requests, communications, and status histories.

Plaintiff observed that multiple historical and current work orders no longer appeared in the locations where she expected to find them.

Plaintiff also observed that conversations involving the leasing office or front desk appeared incomplete or unavailable.

Some records remained visible, but Plaintiff could not locate the complete history she believed had previously been available.

Plaintiff alleges that the absent records included matters involving heat, plumbing, the shower, pests, blinds, flooring, and prior maintenance communications.

Plaintiff did not receive advance notice that records would be archived, migrated, hidden, or removed from tenant access.

Plaintiff asked or expected Defendants to explain the missing records but alleges that no adequate explanation was provided.

At that time, Plaintiff could not determine whether the records had been deleted, archived, suppressed from tenant view, migrated to another system, or rendered inaccessible because of a technical change.

Plaintiff alleges that Defendants and their third-party platform provider controlled the system configuration and retained superior access to the underlying data.

Plaintiff later documented the portal's display with screenshots taken on April 28, 2025, which are addressed in the next chronological segment.

Plaintiff alleges that losing access to the records impaired her ability to document notice, repair history, appointment times, and the duration of the cited conditions.

**BF. Plaintiff's March 2025 Research Into the Property's Ownership and Management Structure**

While researching Defendants and the Property in approximately March 2025, Plaintiff located Superior Court Case No. 2025-LTB-003095, filed on March 27, 2025.

The materials currently summarized in the project record describe that case as a possession action filed by CCDC Residential Rental LLC concerning alleged Airbnb use at The Apartments at CityCenter.

The presently available excerpts do not establish that Jane Doe was the tenant-defendant in that case.

Plaintiff therefore relies on the filing only as a public record concerning Defendants' claimed ownership, management, agency, and safety positions—not as an eviction action taken against her.

The filing identified CCDC Residential Rental LLC as the landlord or owner asserting a right to possession.

Attorney Giovanni Carillo was identified as counsel in the filing.

An affidavit associated with the case described Willowick Residential as the property-management company and agent for The Apartments at CityCenter.

A Rental Accommodations Division registration or claim-of-exemption form associated with the filing identified CCDC Residential Rental LLC as owner.

That form reportedly identified Hines CCDC Partners, LLC as a partner or officer of the owner.

The form also reportedly identified Bozzuto as the owner's property-management company and Jared Bailey as the owner's registered agent.

Those descriptions differed from the January DOB Notices, which identified CCDC Residential Rental LLC (IMPS ONLY) as respondent and Hines Interests LP as its agent.

Plaintiff alleges that the differing descriptions made it difficult for her to determine which entity owned the Property, which entity managed it, which entity was responsible for repairs, and which entity possessed authority over her tenancy.

The Airbnb complaint also reportedly alleged that an increase in unknown or unauthorized third parties presented a safety hazard at the Property.

Plaintiff considered that position relevant to her earlier reports of unauthorized persons gaining access to controlled areas of the Property.

**BG. Status at the End of March 2025**

By the end of March 2025, Plaintiff had:

a. repeatedly reported hazardous and defective conditions;

b. submitted a formal habitability demand;

c. obtained two DOB Notices of Infraction arising from an independent inspection;

d. submitted additional documentation to DOB concerning repair and work-order disputes;

e. requested disability-related scheduling accommodations;

f. disputed late fees, returned-payment fees, and the operation of the rent-payment system;

g. experienced substantial financial hardship; and

h. begun compiling records for possible litigation.

Plaintiff alleges that the heat, plumbing, shower, flooring, and other cited conditions had not all been effectively and permanently corrected.

Plaintiff also alleges that the parties had not resolved the lawful amount of rent, Plaintiff's requested abatement, the disputed fees, or the requested payment accommodation.

Plaintiff remained in ADU 220 because she lacked a financially feasible alternative and because affordable, medically suitable housing was difficult to obtain.

Plaintiff continued to rely on Defendants to maintain the Property, preserve accurate records, administer the ADU 220 fairly, and comply with the DOB directives and applicable housing laws.

**BH. April 2025 Rent and Account Charges**

On or about April 1, 2025, Defendants posted the monthly charges for Plaintiff's continued occupancy of ADU 220.

The ledger reflects a monthly base-rent charge of $2,017.

The ledger separately reflects a monthly $100 amenity-rent charge associated with luxury-vinyl-plank flooring.

Defendants also posted trash reimbursement, water-and-sewer charges, and a utility-service fee to Plaintiff's account.

Plaintiff continued disputing the accuracy of the running balance because the ledger included base rent, amenity charges, utilities, service fees, late fees, and returned-payment charges in a single cumulative total.

Plaintiff remained unable to use the resident portal to make a fee-free electronic payment directly from either of her stored checking accounts.

Plaintiff therefore prepared a paper check for the April payment while arranging to transfer money between her bank accounts.

**BI. First Severe Ant Infestation of April 2025**

On or about April 4 or 5, 2025, Plaintiff discovered a substantial ant infestation throughout ADU 220.

Plaintiff observed ants in the kitchen, dining area, living room, bathroom, hallways, and near structural gaps along the walls.

Plaintiff observed ants moving in lines from more than one area of the living-room wall.

Plaintiff also observed an ant moving toward or along the bedroom wall.

Plaintiff believed that at least some ants were entering through gaps, cracks, or unfinished areas in the unit.

Plaintiff alleges that the infestation occurred while Defendants had not completed all repairs associated with the previously cited wall, flooring, plumbing, and surface conditions.

Plaintiff observed ants on or around her desk, furniture, personal property, and electronic equipment.

Plaintiff also observed an ant emerging from or moving on one of her laptop computers.

Ants reached Fluffy's automatic feeder, ceramic food dish, and water fountain.

Shortly after Plaintiff placed food in Fluffy's freshly cleaned dish, ants covered or surrounded the food.

Plaintiff observed ants moving toward Fluffy when Fluffy approached the dish.

The infestation prevented Fluffy from safely eating from her ordinary feeding area.

Plaintiff also discovered ants inside or around Fluffy's water fountain.

Plaintiff immediately moved Fluffy, food, water, and a portable litter box into the bedroom.

Plaintiff kept the bedroom door closed to create a comparatively protected area where Fluffy could eat and drink while Plaintiff cleaned the remainder of the apartment.

Plaintiff alleges that the infestation caused Fluffy visible distress, including excessive grooming, shedding, head rubbing, reluctance to approach food, and agitation.

Plaintiff could not afford a veterinary examination at that time.

BJ. Plaintiff's April 5–6 Cleaning and Mitigation Efforts

Plaintiff spent most or all of the weekend of April 5 and 6 cleaning the apartment and attempting to remove the ants' scent trails.

Plaintiff cleaned the kitchen, dining area, living room, bathroom, hallways, floors, surfaces, and areas surrounding Fluffy's feeding equipment.

Plaintiff used or purchased multiple cleaning and pest-control products.

The intake record identifies those products and approximate costs as:

a. Pine-Sol — $17;

b. Raid House and Garden — $7;

c. distilled white vinegar — $4;

d. lemon-eucalyptus or similar oil — $10;

e. citronella oil — $15;

f. ant baits — $8;

g. peppermint liquid soap — $13;

h. disinfecting wipes — $6; and

i. oregano oil — $22.

The listed expenditures total approximately $102, subject to confirmation through receipts.

The prolonged cleaning required Plaintiff to bend, lift, move household items, repeatedly wash surfaces, and monitor the apartment for renewed activity.

Plaintiff alleges that the work caused exhaustion, physical discomfort, anxiety, and worsening of her obsessive-compulsive symptoms.

Plaintiff undertook those efforts herself because she did not believe that ordinary weekly pest service would respond sufficiently quickly to the infestation.

**BJ. Plaintiff's April 5–6 Cleaning and Mitigation Efforts**

**BK. Missed USPS Orientation**

Plaintiff had been scheduled to attend mandatory orientation for a prospective United States Postal Service position on Monday, April 7, 2025.

Plaintiff alleges that the infestation, extensive cleaning, lack of sleep, concern for Fluffy, continuing maintenance conditions, and resulting physical and emotional exhaustion prevented her from attending the first day of orientation.

Plaintiff did not begin the position.

Plaintiff alleges that missing the orientation caused her to lose that employment opportunity.

Plaintiff estimates that the lost position would have provided at least approximately $2,512 in income during the first month, subject to proof through the offer, orientation, compensation, and employment records.

Plaintiff further alleges that she later lost or was unable to pursue a second USPS employment opportunity.

The currently identified project record does not contain all underlying USPS employment documents.

Plaintiff therefore will attach the offer, orientation notice, compensation records, and related communications if available before seeking economic damages based on the lost employment opportunities.

**BL. April 7 Notice to the Leasing Office**

At approximately 6:00 a.m. on April 7, 2025, Plaintiff emailed the Property's leasing office under the subject line "Rent and ant infestation."

Plaintiff explained that she had spent the weekend addressing what she described as a large or severe ant infestation.

Plaintiff reported that an ant had crawled from or on her laptop.

Plaintiff stated that the ants had reached Fluffy's food and feeding area.

Plaintiff reported observing ants emerging from two areas of the living-room wall and from a large gap in the bathroom.

Plaintiff also reported observing an ant moving toward a bedroom wall adjoining another residential or guest-suite area.

Plaintiff attached three photographs depicting ants or infestation-related conditions.

Plaintiff requested that Defendants identify the date and time when a professional exterminator experienced with ant infestations would inspect and treat ADU 220.

Plaintiff distinguished the requested professional service from the Property's ordinary weekly pest-control visit.

Plaintiff requested cleaning assistance.

Plaintiff also requested a hotel room or other temporary accommodation for herself and Fluffy if treatment of the infestation required them to leave their home (ADU 220).

Plaintiff stated that ADU 220 was not the source of the infestation and explained that obsessive-compulsive disorder made ants crawling on her or contaminating Fluffy's food especially distressing.

Plaintiff requested a prompt response by the end of the day.

Plaintiff alleges that the leasing office did not provide a substantive response to the April 7 email that day.

**BM. April Rent Check and Requested Deposit Delay**

In the April 7 email, Plaintiff informed the leasing office that she had written a paper check for rent.

Plaintiff explained that the check was intended to demonstrate that she wished to pay and remained in possession of the unit.

Plaintiff also explained that the funds required to cover the check were held in another bank account.

Plaintiff stated that she needed to log into her accounts, transfer the money into the account associated with the checkbook, pay the transfer fee, and wait for the transfer to clear.

Plaintiff therefore asked Defendants to wait approximately four or five days before depositing the check.

Plaintiff linked the need for a paper check and bank transfer to Defendants' failure to restore the electronic checking-account payment option she had previously requested.

Plaintiff alleges that Defendants deposited or presented the check before the funds transfer was available.

The working narrative identifies April 8, 2025, as the date on which Defendants presented the check.

The current ledger shows that an April check was posted and later returned, but the ledger excerpt available to Plaintiff does not unambiguously establish the exact date on which the physical check was first deposited.

Plaintiff therefore alleges that the check was deposited before the date she later expressly confirmed—April 15—subject to verification through the check image and bank records.

The check was returned for insufficient funds.

Defendants then posted a returned-item or nonsufficient-funds fee and a late fee to Plaintiff's account.

The ledger reflects a $100 returned-item fee associated with the April transaction.

The ledger also reflects a late fee of approximately $105.85.

**BN. April 10 Follow-Up and Express Payment Accommodation Request**

BN. April 10 Follow-Up and Express Payment Accommodation Request

On April 10, 2025, at approximately 7:13 a.m., Plaintiff emailed the assistant manager, leasing office, and general manager and copied Housing Counseling Services personnel.

Plaintiff stated that she had received no reply to her April 7 email.

Plaintiff clarified that the bank transfer was expected to be completed by April 15.

Plaintiff expressly instructed Defendants to deposit the check on or after April 15, 2025.

Plaintiff stated that she had paid a fee to transfer funds into the second bank account because that was the account for which she possessed checks.

Plaintiff again requested that Defendants repair or restore the resident-portal payment system.

Plaintiff stated that paying through the resident portal by checking account would allow her to transfer funds more quickly and would avoid additional out-of-pocket costs.

Plaintiff expressly connected the requested payment method to her learning disabilities and medical conditions, including ulcerative colitis.

Plaintiff characterized the request as a request for a reasonable accommodation.

Plaintiff asked to pay rent through her checking account using the Property's payment system without an added payment fee.

Plaintiff requested a substantive response explaining whether the accommodation would be granted.

Plaintiff also asked for clarification if Defendants denied the request.

The April 10 email supplied Defendants with written notice of:

a. Plaintiff's disabilities;

b. the requested modification to the payment practice;

c. the relationship between the requested modification and Plaintiff's financial-management limitations;

d. the added transfer expenses caused by reliance on paper checks; and

e. the risk that a premature deposit would cause a returned payment and additional fees.

Plaintiff alleges that Defendants did not engage in a documented interactive process concerning the request.

Plaintiff further alleges that the fee-free checking-account payment option remained unavailable.

BO. April 10 Follow-Up Concerning the Ant Infestation

In the same April 10 email, Plaintiff again requested action concerning the ant infestation and the surrounding structural conditions.

Plaintiff requested competent repairs of the conditions she believed violated the District housing standards.

Plaintiff requested compensation for alleged rent abatement, electricity and water costs, damage to electronics, and emotional distress.

Plaintiff stated that she had heard from a cleaning service after her April 7 email.

Plaintiff stated that she would inform the cleaning company that charges should be forwarded to the leasing office.

Plaintiff requested a date and time for a professional exterminator to inspect ADU 220.

Plaintiff requested that the exterminator arrive after 1:00 p.m., if possible.

Plaintiff informed Defendants that the infestation and absence of a timely response had materially disrupted her daily life and contributed to her missed employment orientation.

Plaintiff described finding Fluffy looking at a food dish covered with ants and being unable to approach the food safely.

Plaintiff stated that the event caused her substantial emotional distress.

Plaintiff requested a response by the close of business on April 10 or April 11.

**BO. April 10 Follow-Up Concerning the Ant Infestation**

**BP. Request for Rent Reduction and Assistance Understanding the Process**

Plaintiff's April 10 email also asked whether her monthly base rent could be reduced to $1,800.

Plaintiff stated that she had been considering the request for several months.

Plaintiff asked Defendants to explain the available process and assist her in understanding it.

Plaintiff characterized the request for clarification and assistance as disability-related.

Plaintiff asked for a clear explanation if Defendants refused to consider the requested reduction.

The currently identified email record does not contain a substantive written response from Defendants addressing whether the governing Affordable Housing Covenant permitted a lower rent, a change in affordability category, or another form of relief.

Plaintiff does not allege merely from her request that Defendants were legally required to set the rent at exactly $1,800.

Plaintiff alleges instead that Defendants had a duty to respond accurately and evaluate any available accommodation or ADU-administration option in good faith.

**BQ. Second Ant Infestation Beginning April 27**

On or about April 27, 2025, Plaintiff experienced a renewed and substantial ant infestation.

Plaintiff again observed ants throughout portions of ADU 220 and on or inside personal property.

Plaintiff observed ants around electronic equipment and household devices.

Plaintiff lifted the lid of her iRobot vacuum to empty the collection bag and found ants inside or around the unit.

Plaintiff also observed ants near the exterior of the iRobot.

Plaintiff alleges that the iRobot had previously traveled through water leaking from the kitchen sink or dishwasher.

Plaintiff believes that water entered portions of the vacuum containing electronic components.

Plaintiff subsequently observed intermittent operational problems, including difficulty locating its charging base or recognizing room boundaries.

Plaintiff does not presently possess an expert diagnosis identifying whether the glitches resulted from water, insects, ordinary wear, software, or another cause.

Plaintiff therefore alleges exposure and subsequent diminished functionality but reserves a definitive causation allegation pending technical inspection.

Plaintiff again spent substantial time cleaning and monitoring the unit.

Plaintiff used distilled vinegar and other products to reduce ant activity.

Plaintiff continued observing ants in the bathroom, kitchen, hallways, walls, and structural gaps after the second outbreak.

**BR. April 28 Resident-Portal Evidence**

On April 28, 2025, Plaintiff accessed the resident portal for ADU 220.

At approximately 8:43 p.m., the portal displayed that Plaintiff had no past maintenance requests available for review.

At approximately 8:48 p.m., the portal displayed that Plaintiff had no open maintenance requests available for review.

Plaintiff took screenshots of both displays.

Those displays were inconsistent with the numerous maintenance requests, work orders, appointment communications, and completed-status messages generated during Plaintiff's tenancy.

The screenshots do not, standing alone, establish whether the underlying records were permanently deleted.

The records may have been deleted, archived, migrated, filtered, suppressed from tenant view, or rendered inaccessible because of a system malfunction or account setting.

Plaintiff alleges that Defendants did not provide an explanation identifying which of those events had occurred. Plaintiff also documented the portal's payment settings on April 28.

The payment page displayed two stored checking accounts.

Beneath each account, the portal stated: "Your property does not accept eCheck payments."

The screenshot corroborated Plaintiff's prior complaints that she could not use either stored checking account for the resident portal's electronic-check feature.

The page nevertheless allowed Plaintiff to select a payment amount, payment date, and autopayment period, creating the appearance of an available autopayment process while rejecting both stored checking accounts.

Plaintiff alleges that the portal did not provide her with the fee-free checking-account method she had requested as an accommodation.

**BS. May 2025 Ledger Activity**

On or about May 1, 2025, Defendants posted another $2,017 base-rent charge to Plaintiff's account.

Defendants also posted the separate $100 amenity-rent charge.

Additional charges included trash reimbursement, water-and-sewer charges, and a utility-service fee.

The ledger carried forward the unpaid or disputed balance from prior months.

The ledger reflects the returned April check, the reversal of the associated payment credit, a $100 returned-item fee, and a late fee of approximately $105.85.

The ledger also reflects later check-payment activity during May, including payments or attempted payments posted on or around May 6, May 12, May 17, and May 28.

The presently parsed ledger is not sufficiently clear to attribute each May entry to a particular physical check without reviewing the original check images and transaction details.

Plaintiff alleges that she also asked Defendants to delay presentation of a May check until funds were available.

The current project record contains that allegation in the narrative draft but does not yet identify the underlying May email or written instruction.

The precise May deposit instructions, deposit date, check number, returned-payment event, and resulting fees therefore should be verified through the check images, bank statements, and complete ledger before being pleaded with greater specificity.

**BT. May 7 Ants on Plaintiff, Fluffy, and MacBook Pro**

At approximately 12:43 a.m. on May 7, 2025, Plaintiff observed an ant crawling on the trackpad of her MacBook Pro.

Plaintiff also observed ants crawling on her body.

Plaintiff observed ants on Fluffy's body.

Plaintiff alleges that the infestation had reached multiple electronic and household devices, including laptop computers, a monitor, printer, television, automatic feeder, water fountain, automatic litter box, and robotic vacuum.

Plaintiff relied on her computers to apply for employment, participate in virtual interviews, communicate with healthcare providers, refill prescriptions, store legal documents, and prepare this action.

Plaintiff observed screen glitches and increased fan noise in at least one MacBook Pro after the infestation began.

Plaintiff states that those symptoms had not been present before her tenancy.

Plaintiff has not yet obtained a qualified technical inspection determining whether ants, moisture, ordinary aging, software, or another cause produced the reported symptoms.

Plaintiff therefore alleges interference with use, exposure to insects and moisture, and observed performance changes, while reserving the amount and cause of permanent property damage for expert or repair evidence.

Plaintiff photographed at least one ant on the MacBook Pro trackpad.

That photograph should be included as an exhibit supporting the May 7 occurrence.

**BU. Effect on Fluffy and Plaintiff's Daily Activities**

The continuing infestation prevented Plaintiff from using Fluffy's ordinary feeding equipment with confidence.

Plaintiff manually inspected food, water, bowls, appliances, floors, and surrounding surfaces before permitting Fluffy to eat or drink.

Plaintiff could not reliably use the automatic feeder because ants had reached or entered it.

The loss of the automatic feeding system increased the number of daily tasks Plaintiff was required to perform.

Plaintiff alleges that this burden was significant because of her disabilities, insomnia, unemployment, medical appointments, and need to search for work.

Plaintiff repeatedly cleaned surfaces and discarded or replaced contaminated food.

Plaintiff worried that Fluffy could ingest ants, cleaning products, ant bait, or contaminated food.

Plaintiff alleges that she experienced anxiety, obsessive cleaning, sleep disruption, fatigue, and difficulty concentrating.

The infestation also interfered with Plaintiff's ability to prepare employment applications, attend appointments, organize rent payments, and prepare legal documents.

Plaintiff alleges that the continuing kitchen-sink and dishwasher leaks complicated pest mitigation by creating moisture in areas where ants were active.

**BV. Status at the End of May 2025**

By the end of May 2025, Plaintiff had given Defendants written notice of:

a. the first severe April infestation;

b. ants affecting Fluffy's food and water;

c. ants reaching Plaintiff's laptop and personal property;

d. suspected entry points through walls and gaps;

e. her request for professional extermination;

f. her request for cleaning and possible temporary relocation;

g. her disability-related request for afternoon scheduling;

h. her request for a functioning fee-free checking-account payment method;

i. her requested rent reduction or explanation of available ADU options; and

j. the financial and employment consequences she attributed to the conditions.

Plaintiff alleges that the ant activity continued after her April notices and recurred substantially on or about April 27 and May 7.

Plaintiff alleges that Defendants did not provide a lasting structural or pest-control solution during April or May.

Plaintiff further alleges that the payment portal continued to reject eCheck payments from both stored checking accounts.

Defendants continued assessing monthly charges and carrying disputed late and returned-payment fees on Plaintiff's ledger.

Plaintiff remained in ADU 2 because she lacked a financially feasible alternative and because relocation with Fluffy would require additional money, planning, and access to scarce affordable housing.

The unresolved infestation, payment-system dispute, maintenance-record access problem, plumbing conditions, and growing account balance continued into June 2025.

The next chronological block is June through July 2025, including the Conservice statement, the account balance and payments, continued plumbing and pest conditions, medical impacts, and additional notices or enforcement activity.

One evidentiary limitation is preserved in this draft: the exact date of the July sink detachment is not established, and Plaintiff states that she did not report the incident contemporaneously or obtain immediate medical treatment. The event is therefore pleaded from Plaintiff's firsthand account, with the extent of injury, property damage, and causation reserved for photographs, medical evidence, inspection records, and discovery.

**BW. June 1, 2025 Conservice Statement**

On May 10, 2025, Conservice issued Plaintiff a monthly statement for charges due June 1, 2025.

The statement identified The Apartments at CityCenter as the residential community associated with the account.

The statement grouped Plaintiff's housing and utility charges together.

Under "Current Rent and Lease Charges," the statement listed $2,117 for the period June 1 through June 30, 2025.

The $2,117 amount appears to combine Plaintiff's $2,017 base rent with the separate $100 monthly amenity-rent charge reflected in the Property's ledger.

The statement separately charged a $10 trash reimbursement.

The stated rent and leasing charges due June 1 therefore totaled $2,127.

The statement also billed Plaintiff for utility service covering the period April 1 through May 1, 2025.

The utility charges consisted of:

a. $13.82 for cold water;

b. $4.57 for hot water;

c. $25.63 for sewer service; and

d. a $4.70 Conservice service fee.

The current utility charges totaled $48.72.

The statement identified total current charges of $2,175.72.

It also identified a prior balance, as of May 9, 2025, of $4,670.55.

The resulting grand total displayed as due on June 1, 2025, was $6,846.27..

The statement informed Plaintiff that she had not logged into the Conservice website and directed her to register an account to view utility information or payment options.

Plaintiff alleges that the use of separate Entrata and Conservice systems made it more difficult for her to identify and reconcile base rent, amenity rent, trash charges, utility reimbursements, service fees, late fees, returned-payment fees, and payments.

Plaintiff further alleges that the statement presented the $2,117 base-and-amenity amount simply as “Rent,” even though the Property’s ledger separately classified $100 of that amount as amenity rent for luxury-vinyl-plank flooring.

Plaintiff considered that distinction material when determining the lawful rent, the proper basis for late fees, the amount subject to abatement, and the amount Defendants could lawfully demand in a possession proceeding.

**BX. Plaintiff’s Dispute Concerning Water and Sewer Charges**

Plaintiff continued receiving variable cold-water, hot-water, sewer, and service-fee charges through Conservice.

Plaintiff alleges that defective plumbing, recurring kitchen-sink and dishwasher leaks, impaired drainage, and the need to perform repeated cleaning increased her water usage.

Plaintiff also incurred additional water and electricity costs when she repeatedly laundered towels used to absorb water leaking into the kitchen and living areas.

Plaintiff questioned whether the utility charges accurately distinguished between water used for ordinary household purposes and water lost or consumed because of defective building fixtures and repeated leaks.

The statements available to Plaintiff did not disclose the complete methodology used to calculate or allocate the water and sewer charges.

Plaintiff does not presently possess meter records, allocation formulas, building-level invoices, unit-level consumption data, leak-adjustment calculations, or audit materials sufficient to establish the amount of any overcharge.

Plaintiff therefore alleges that the utility charges were disputed and require accounting and discovery rather than alleging that every variable charge was necessarily unlawful.

Plaintiff seeks records sufficient to determine:

a. whether ADU 220 was individually metered or allocated a share of building consumption;

b. the formula used to calculate the charges;

c. whether leak-related consumption was included;

d. whether Plaintiff received every applicable utility allowance for an ADU;

e. whether the $4.70 monthly service fee was required as a condition of occupancy; and

f. whether all mandatory charges were included when the maximum lawful ADU 220 rent was calculated.

**BY. June Ledger Activity and Continuing Account Dispute**

Defendants continued posting monthly charges to Plaintiff's ledger during June 2025.

The ledger reflects a June base-rent charge of $2,017.

The ledger separately reflects a $100 amenity-rent charge.

The ledger also reflects a $10 trash reimbursement, water-and-sewer charges, and a utility-service fee.

The ledger further reflects a late-fee entry of approximately $105.85.

The ledger reflects check or payment activity during June, including at least one payment entry and at least one returned-payment or reversal entry.

The presently parsed ledger does not permit every June transaction, check number, amount, presentation date, and reversal to be stated with confidence.

Plaintiff therefore reserves a transaction-by-transaction allegation until the complete ledger, check images, bank statements, and Entrata audit history are reconciled.

Plaintiff alleges that Defendants continued adding late or returned-payment charges even though she had repeatedly challenged the payment system and requested a functioning fee-free checking-account option.

Plaintiff also continued disputing whether Defendants had properly credited rent abatements or offsets arising from the unresolved housing conditions.

**DV. Continued Dispute Over the Claimed Arrearage**

**BZ. Continuing Shower and Drainage Conditions During June and July 2025**

During June and July 2025, Plaintiff continued experiencing serious problems with the ADU 2 shower.

The shower continued alternating unpredictably between very hot and very cold water.

Plaintiff could not reliably select and maintain a safe intermediate temperature.

The shower also drained slowly and periodically left standing water in the tub.

Plaintiff observed gnats or other small insects around the bathroom and standing-water areas.

Plaintiff alleges that, on at least one occasion, the unexpectedly hot water caused painful superficial burns or chafing on her lower legs or feet.

Plaintiff photographed the affected skin.

Plaintiff has not yet identified a contemporaneous medical record diagnosing the degree or cause of those injuries.

To reduce the risk of further burns, Plaintiff stopped using the showerhead in the ordinary manner for extended periods.

Plaintiff instead used a cup and washcloth or loofah to bathe portions of her body from the bathtub faucet.

Plaintiff manually mixed hot and cold water in the cup to obtain a tolerable temperature.

Plaintiff often washed her hair separately.

This process required substantially more time and physical effort than an ordinary shower.

Plaintiff alleges that the bathing limitations caused or contributed to oily hair, dandruff, skin irritation, acne, body odor, embarrassment, and reduced confidence.

Plaintiff alleges that the condition interfered with her preparation for medical visits, employment interviews, training, and other appointments.

Plaintiff further alleges that she sometimes delayed or avoided in-person activities because she was unable to bathe normally.

The January DOB notices did not cite the unstable shower temperature specifically, but they had independently confirmed broader plumbing defects within ADU 220.

Plaintiff alleges that the shower and drainage conditions remained unresolved despite her prior reports and the work order that Defendants had marked completed in January.

**CA. June 2025 Medical Visit and Reported Weight Loss**

Plaintiff visited her gastrointestinal healthcare provider in or about June 2025.

Plaintiff reports that she weighed approximately 99 pounds at that visit.

Plaintiff alleges that her weight had declined during the period in which she experienced chronic stress, disrupted sleep, difficulty preparing meals, plumbing failures, infestations, financial hardship, and worsening ulcerative-colitis symptoms.

Plaintiff further alleges that the housing conditions interfered with her ability to maintain a consistent sanitary environment, food-preparation routine, medication schedule, and adequate calorie intake.

The present project record does not contain the complete June medical chart, weight history, laboratory results, or medical opinion attributing the weight change to any specific Defendant or housing condition.

Plaintiff therefore alleges the June weight measurement and contemporaneous symptoms but reserves medical causation for her healthcare records and qualified medical testimony.

Plaintiff continued to experience fatigue, gastrointestinal distress, anxiety, depression, sleep disruption, and difficulty concentrating.

Plaintiff alleges that those symptoms reduced her ability to search for employment, organize evidence, maintain her household, and complete this Complaint.

**CB. July 2025 Rent and Account Charges**

Defendants posted another $2,017 base-rent charge for July 2025.

Defendants also posted the separate $100 amenity-rent charge.

The ledger reflects an additional $10 trash reimbursement, water-and-sewer charges, and a service fee.

The ledger also reflects another late-fee entry of approximately $105.85.

The ledger reflects payment or check activity during June and July, including a returned transaction and an associated returned-item fee.

The account balance continued increasing as monthly charges and disputed fees were carried forward.

Plaintiff alleges that she had been unable to pay the full amount displayed by the Property for several months by July 2025.

Plaintiff continued to distinguish between:

a. undisputed base rent;

b. the separate amenity-rent charge;

c. utility and service charges;

d. late and returned-payment fees;

e. amounts she asserted should be abated because of housing-code violations; and

f. charges she attributed to the unavailable eCheck accommodation.

Plaintiff alleges that Defendants did not provide a corrected ledger resolving those categories before continuing to demand the cumulative balance.

**CC. July Maintenance and Contractor Access to the Kitchen Sink**

In approximately early or mid-July 2025, Plaintiff permitted maintenance personnel and one or more third-party contractors to enter ADU 220.

The visit included inspection or maintenance of the kitchen sink and garbage-disposal area.

Plaintiff permitted the work despite her distrust resulting from prior incomplete repairs and inaccurate work-order records.

Plaintiff expected the workers to identify and correct the source of the recurring kitchen-sink and dishwasher leaks.

Plaintiff alleges that the workers performed routine or limited maintenance but did not permanently correct the underlying problem.

Plaintiff further alleges that the workers did not conduct water-quality testing or provide her with a written plumbing assessment.

The presently identified project record does not include the July work order, contractor invoice, service report, entry notice, photographs, or names of the workers.

Plaintiff therefore alleges the approximate timing and scope of the visit from personal knowledge and seeks the corresponding records through discovery.

**CD. Escalation of Kitchen-Sink and Dishwasher Leaks**

After the July inspection or maintenance visit, the leaks beneath the kitchen sink became more frequent.

Plaintiff alleges that water leaked beneath the sink more than three times during some weeks.

The dishwasher also discharged or leaked water into the kitchen area with increasing frequency.

Water pooled on the open kitchen floor and spread toward the living area.

Plaintiff used multiple towels to absorb the water.

Plaintiff repeatedly washed and dried the contaminated towels.

The cleanup consumed substantial water, electricity, time, and physical effort.

Plaintiff alleges that the wet conditions contributed to humidity, gnats, odors, and rapid spoilage or apparent mold growth on dishes left in the sink or dishwasher.

Plaintiff began soaking dishes in the kitchen sink using dish soap and diluted distilled vinegar in an effort to sanitize them.

Plaintiff alleges that washing and soaking dishes became a prolonged and exhausting task.

Plaintiff continued observing softness or instability in flooring near areas repeatedly exposed to water.

Plaintiff alleges that the repeated leakage was foreseeable in light of her August 2024 written notice, February 2025 renewed complaints, January DOB plumbing citations, and the July 2025 maintenance visit.

Plaintiff further alleges that Defendants did not replace the sink, disposal, dishwasher connection, cabinet support, or affected flooring before the incident described below.

**CE. Detachment of the Kitchen Sink**

On an exact date presently unknown in July 2025, Plaintiff filled the kitchen sink with water and dishes for cleaning.

Plaintiff was standing in front of the kitchen cabinets and near the kitchen island.

Without warning, the kitchen sink separated or detached from the countertop.

The sink assembly pulled away from the garbage disposal, plumbing connections, or cabinet supports beneath it.

The water-filled sink, dishes, disposal components, plumbing components, and cabinet doors moved abruptly toward Plaintiff.

Plaintiff alleges that the force of the falling assembly struck her and pushed or pinned her against the kitchen island.

Water and dishes struck Plaintiff's arms, legs, feet, and body.

Plaintiff alleges that she briefly lost consciousness or awareness for several seconds.

When she regained awareness, Plaintiff experienced severe generalized pain, dizziness, headache, blurred vision, difficulty breathing, and disorientation.

Plaintiff also experienced pain affecting her arms, back, wrists, legs, ankles, feet, and abdomen.

Plaintiff alleges that the incident made walking, standing, bending, cleaning, and performing ordinary household activities difficult.

Plaintiff did not obtain an immediate medical examination.

The existence, nature, duration, and cause of each claimed physical injury therefore require medical evaluation and supporting records.

Plaintiff alleges the occurrence, impact, immediate symptoms, and continuing pain based on her personal perception.

The exact mechanical cause of the sink's detachment is presently unknown.

Plaintiff does not know whether the failure resulted from inadequate supports, improper installation, deteriorated adhesive, defective fasteners, water damage, prior repairs, the garbage-disposal assembly, or a combination of conditions.

The sink, cabinet, disposal, plumbing, maintenance, installation, and inspection records are principally within Defendants' possession.

**CF. Flooding and Loss of Kitchen Use**

When the sink detached, its contents discharged onto the kitchen floor.

Water spread through a substantial portion of the open kitchen.

Water also spread toward or into portions of the living room and hallway.

The water contacted flooring, furniture, personal property, food, and electronic items located in or near the affected areas.

Plaintiff alleges that some items were damaged or rendered unreliable.

The particular items, acquisition dates, pre-incident condition, repairability, replacement value, and causal connection to the flooding require itemized proof.

Plaintiff alleges that the detached sink made the kitchen materially unusable.

Plaintiff could not use the kitchen sink for food preparation, ordinary dishwashing, sanitation, or baking.

Plaintiff began cleaning dishes in the bathroom sink.

The bathroom sink had itself previously been cited by DOB because water failed to dissipate properly.

Plaintiff alleges that using the bathroom sink for kitchen sanitation was difficult, unsanitary, and physically burdensome.

The loss of the kitchen sink also interfered with Plaintiff's ability to prepare meals appropriate for ulcerative colitis and her other medical needs.

Plaintiff received approximately $259 per month in food assistance through the District's EBT program.

Plaintiff alleges that she could not readily replace food contaminated or rendered unusable because of the flooding and lack of a functional kitchen.

Plaintiff changed some of the food she consumed because she could not prepare ordinary meals.

Plaintiff alleges that her diet became less nutritious and more dependent on easily consumed or prepared foods.

Plaintiff alleges that the kitchen disruption contributed to inadequate calorie intake and concerns about her dental and gastrointestinal health.

The amount and value of any lost food and damaged property remain to be established through receipts, photographs, replacement records, and testimony.

**CG. Medication and Sanitation Concerns After the Sink Failure**

Plaintiff self-administers Stelara injections for ulcerative colitis.

Plaintiff alleges that the flooding, insects, standing water, lack of a kitchen sink, and inability to maintain the sanitary environment she considered necessary caused her to delay or refrain from administering one or more injections.

Plaintiff feared contamination or additional incidents inside the apartment.

The current record does not contain pharmacy records, injection dates, prescribing instructions, or a medical opinion addressing whether the housing conditions required or justified interruption of the medication.

Plaintiff therefore alleges her decision and concern but reserves any medical consequences for treatment records and expert testimony.

Plaintiff alleges that interruption of her routine increased her fear of an ulcerative-colitis flare and contributed to physical and emotional distress.

**CH. Plaintiff Did Not Immediately Report the Sink Incident**

Plaintiff did not immediately notify the leasing office or maintenance personnel that the kitchen sink had detached and struck her.

Plaintiff alleges that she did not report the incident because she had lost trust in the maintenance process after repeated temporary repairs, disputed entry practices, inaccurate work-order statuses, and unresolved DOB violations.

Plaintiff feared that additional maintenance work would be performed inadequately and could create further danger.

Plaintiff also feared that reporting the condition to DOB could result in the ADU being declared unsafe or uninhabitable, leaving her and Fluffy without affordable housing.

Plaintiff feared that Defendants would use the growing rent balance to seek her eviction.

Plaintiff did not want to leave Fluffy unattended while strangers entered the unit.

Plaintiff also lacked sufficient funds for transportation to an emergency room or other medical facility.

Plaintiff's failure to provide immediate notice after the sink detachment may bear on Defendants' opportunity to investigate or mitigate the post-incident condition.

It does not alter Plaintiff's allegation that Defendants had received prior notice of recurring leaks, the inoperable disposal, plumbing failures, water accumulation, and the need for competent repair before the detachment occurred.

Plaintiff seeks preservation and inspection of the sink, countertop, cabinets, mounting hardware, disposal, plumbing connections, maintenance records, contractor records, and photographs before those materials are altered or destroyed.

**CI. Continuing Effects of the Sink Incident**

Plaintiff alleges that she continued experiencing pain after the incident, especially in her feet, ankles, legs, wrists, arms, and back.

Plaintiff alleges that the pain made it difficult to move around the apartment and complete basic activities.

Plaintiff also experienced depression, anxiety, insomnia, fear, emotional numbness, and difficulty getting out of bed.

Plaintiff alleges that those symptoms further delayed completion and filing of this action.

Plaintiff did not immediately seek medical care because of her concerns for Fluffy, lack of funds, fear of apartment entry while she was away, fear of displacement, and emotional exhaustion.

Plaintiff anticipates that medical evaluation may include primary care, orthopedic, rheumatological, neurological, dermatological, dental, gastrointestinal, rehabilitative, or mental-health care.

The necessity, reasonableness, and cost of any future care have not yet been established.

Plaintiff alleges continuing symptoms and a need for evaluation but does not presently allege a medical diagnosis that has not been made.

**CJ. Effect on Fluffy**

The kitchen flooding, insects, loss of feeding equipment, and continued household instability affected Plaintiff's ability to care for Fluffy in the ordinary manner.

Plaintiff feared that, if she were hospitalized, Fluffy would be left without reliable automatic food or water because ants had contaminated or impaired the automatic feeder and water fountain.

Plaintiff also feared that additional plumbing or structural failures could occur while Fluffy was alone.

Those concerns contributed to Plaintiff's decision not to leave the apartment for immediate treatment.

Plaintiff alleges that Fluffy experienced stress, excessive grooming, dandruff, matted hair, and difficulty remaining clean.

Plaintiff has not yet obtained a veterinary opinion attributing those conditions to a specific housing event.

Plaintiff seeks recovery only for legally cognizable expenses or injury supported by veterinary, grooming, purchase, or other admissible evidence.

**CK. July Discovery Concerning PetScreening Records**

While collecting documents between approximately April and July 2025, Plaintiff accessed or reviewed her PetScreening profile.

The profile displayed that her assistance-animal documentation had “expired.”

Plaintiff also observed that some or all of the documentation and communications she expected to see were no longer visible.

Those materials included records concerning her 2023 request to recognize Fluffy as an emotional support animal.

Plaintiff did not receive advance notice that the records would be removed from her view.

Plaintiff alleges, upon information and belief, that Defendants or PetScreening possessed continuing access to records concerning the accommodation process.

The present evidence does not establish whether the records were deleted, archived, expired under a retention policy, migrated, filtered from Plaintiff’s view, or made unavailable because of an account or platform setting.

Plaintiff therefore alleges loss of access rather than intentional destruction as an established fact.

Plaintiff seeks discovery concerning the retention, deletion, audit, access, and modification history of the PetScreening profile and associated records.

**CL. Status at the End of July 2025**

By the end of July 2025, Plaintiff alleges that:

a. the shower remained unsafe or materially impaired;

b. the kitchen-sink and dishwasher leaks had escalated;

c. the kitchen sink had detached from the countertop;

d. Plaintiff had sustained physical symptoms and continuing pain;

e. portions of the kitchen, living room, and hallway had been flooded;

f. the kitchen sink was unusable;

g. Plaintiff was washing dishes in the bathroom sink;

h. gnats and other insects remained present;

i. the account balance continued increasing;

j. Plaintiff remained unable to use the requested eCheck payment method;

k. Plaintiff had lost access to maintenance and PetScreening records; and

l. Plaintiff remained unemployed and financially unable to relocate.

Plaintiff had not yet reported the sink detachment to management or obtained an official inspection of the failed assembly.

Plaintiff remained in ADU 220 with Fluffy because she lacked a safe and financially feasible alternative.

Plaintiff alleges that the combination of physical conditions, financial pressure, disability-related barriers, and fear of displacement left her unable to secure meaningful relief without judicial intervention.

**CM. Continuing Loss of the Kitchen Sink in August 2025**

Plaintiff entered August 2025 without a functional kitchen sink.

The sink remained detached from the countertop and disconnected from some or all of the plumbing, garbage-disposal, mounting, or cabinet components beneath it.

Plaintiff could not use the kitchen sink for ordinary food preparation, dishwashing, sanitation, cleaning, or disposal of food waste.

Plaintiff continued washing dishes, utensils, food containers, and some food items in the bathroom sink or bathtub.

The bathroom sink had previously been cited by DOB because water did not dissipate properly.

The bathtub and bathroom sink also continued draining slowly.

Plaintiff alleges that using bathroom plumbing for kitchen sanitation was physically burdensome, unsanitary, and inconsistent with the ordinary residential use of the apartment.

Plaintiff was required to carry dishes and food items between the kitchen and bathroom.

Plaintiff's physical pain after the sink-detachment incident made carrying, bending, standing, and cleaning more difficult.

Plaintiff alleges that the lack of a kitchen sink impaired her ability to prepare meals appropriate for ulcerative colitis and contributed to her reliance on food that required less preparation.

Plaintiff continued to fear that reporting the detached sink would expose her and Fluffy to displacement, unwanted entry, ineffective repairs, or accelerated possession efforts.

Plaintiff did not possess the funds necessary to replace or professionally repair the sink herself.

The Owner and Property-management entities controlled the plumbing infrastructure, original installation records, maintenance history, and authority to perform structural repairs.

CN. Standing Water in the Bathtub Beginning in or About August 2025

By approximately August 2025, the slow drainage in the bathtub had materially worsened.

Water remained standing in the bathtub after Plaintiff attempted to bathe or wash items.

Plaintiff described the retained water as stale, dirty, or contaminated by residue from bathing and household cleaning.

The standing water made it increasingly difficult for Plaintiff to use the bathtub even for the modified bathing method she had adopted.

**CN. Standing Water in the Bathtub Beginning in or About August 2025**

Beginning in approximately August 2025, the standing water prevented or substantially limited even that partial method of bathing.

Plaintiff alleges that she had not been able to take a conventional shower since approximately January 2025.

The combination of unstable water temperature, slow drainage, standing water, and the lack of a kitchen sink substantially impaired both bathroom and kitchen sanitation.

Plaintiff continued experiencing scalp irritation, oily hair, dandruff, acne, body odor, embarrassment, and diminished self-confidence.

Plaintiff alleges that these conditions interfered with medical appointments, job-seeking activities, interviews, personal relationships, and ordinary activities outside the apartment.

Plaintiff further alleges that the bathing restrictions aggravated her depression, anxiety, obsessive-compulsive symptoms, insomnia, and gastrointestinal stress.

CO. August 2025 Discovery of Another Glass Shard

In or about August 2025, Fluffy vomited on the bedroom carpet due to the stressful housing environment. Plaintiff promptly cleaned the affected carpet. While cleaning, Plaintiff discovered another small glass shard in or on the bedroom carpet.

The shard was discovered nearly two years after Plaintiff initially reported glass fragments embedded in the bedroom carpet following her September 2023 move into ADU 2.

Plaintiff alleges that neither she nor her movers had broken glass in the bedroom.

Plaintiff had previously asked Defendants to investigate and remove the fragments.

Plaintiff alleges that Defendants had not conducted a sufficiently thorough inspection or professional cleaning of the bedroom carpet.

The August 2025 discovery reinforced Plaintiff's belief that sharp fragments remained concealed in the carpet.

Plaintiff feared that she could step, kneel, sit, or place a hand on another fragment.

Plaintiff also feared that Fluffy could cut a paw, ingest a fragment, or otherwise be injured.

Plaintiff preserved or attempted to preserve the newly discovered shard with the other physical evidence collected during her tenancy.

**CO. August 2025 Discovery of Another Glass Shard**

**CP. Continuing Ant and Gnat Activity**

Plaintiff continued observing ants, gnats, or other small insects inside ADU 2 during the late summer and fall of 2025.

The activity appeared intermittently in the bathroom, kitchen and living area, bedroom, and areas near walls, plumbing fixtures, and structural gaps.

Plaintiff remained concerned that ants were traveling through wall cavities, unfinished surfaces, moisture-damaged areas, or openings surrounding plumbing and electrical components.

Plaintiff had previously observed lines of ants moving toward or along walls and had reported gaps through which insects appeared to travel.

Plaintiff alleges that recurring moisture from plumbing and drainage failures provided conditions conducive to continued insect activity.

Plaintiff continued cleaning floors, fixtures, feeding areas, and surfaces to protect Fluffy and her personal property.

Plaintiff also continued inspecting Fluffy's food and water before permitting her to eat or drink.

Plaintiff alleges that she could not safely resume ordinary use of Fluffy's automatic feeding and water systems with confidence.

The recurrent insects intensified Plaintiff's obsessive-compulsive symptoms and fear of contamination.

Plaintiff has not identified the ant species or obtained an expert determination of the insects' nesting location or precise route of entry.

Plaintiff therefore alleges continuing observable infestation activity and moisture-related conditions while reserving structural and biological causation for expert inspection.

CQ. August 2025 Ledger Entries

Defendants continued charging Plaintiff for occupancy during August 2025.

The ledger reflects an August base-rent charge of $2,017.

The ledger also reflects the separate $100 amenity-rent charge for luxury-vinyl-plank flooring.

Defendants additionally charged a $10 trash reimbursement, water-and-sewer charges, and a utility-service fee.

The ledger reflects a late fee of approximately $105.85.

The ledger further reflects a returned check in the amount of approximately $550 and a related $100 returned-item fee during the August accounting period.

Plaintiff disputes the characterization and legal treatment of the account balance because the ledger included base rent, amenity rent, utility reimbursements, service fees, late fees, returned-item fees, and prior disputed charges.

Plaintiff also maintained that rent was subject to substantial abatement because of the prolonged loss or impairment of essential facilities.

Plaintiff alleges that Defendants did not provide an accounting that separated legally recoverable rent from disputed penalties, utility charges, amenity charges, and potential abatements.

**CQ. August 2025 Ledger Entries**

CR. September 2025 Monthly Charges

Defendants posted another $2,017 base-rent charge for September 2025.

Defendants also posted the separate $100 amenity-rent charge.

The ledger reflects an additional $10 trash reimbursement, water-and-sewer charges, and a utility-service fee.

Defendants also assessed another late fee of approximately $105.85.

**CR. September 2025 Monthly Charges**

Plaintiff alleges that the balance did not reflect an agreed rent abatement for the loss of heat, defective plumbing, lack of a kitchen sink, unusable shower, infestations, unstable flooring, or other defective conditions.

Plaintiff remained unable to pay the entire balance displayed on the ledger.

Plaintiff did not concede that every amount listed in the running balance constituted lawful rent.

1309. Plaintiff continued to distinguish the monthly $2,017 base charge from the amenity charge, utilities, service fees, late fees, returned-item fees, and other non-rent amounts.

CS. Worms/Gnats Emerging From the Bathroom Sink

Beginning in approximately January 2025, Plaintiff had occasionally observed small worm-like organisms (gnats) emerging from or near the bathroom-sink drain.

The earlier incidents generally involved fewer than three organisms at a time.

During the week beginning approximately September 28, 2025, Plaintiff observed a materially larger occurrence.

Plaintiff estimates that more than six worm-like organisms (gnats) emerged from or were present in and around the bathroom sink and drain.

At that time, the bathroom sink continued to drain slowly.

The bathtub also retained stale and, or dirty standing water.

Plaintiff lacked a functional kitchen sink and was using bathroom plumbing to wash dishes, food containers, utensils, her face, and her teeth.

The presence of worm-like organisms (gnats) in the only available sink intensified Plaintiff's concern that the plumbing and sanitation conditions were unsafe.

The sight of the organisms caused Plaintiff severe disgust, anxiety, and obsessive-compulsive distress.

Plaintiff alleges that she was unable to eat normally the following day.

Plaintiff also feared that the organisms, drain conditions, standing water, or cleaning products could affect Fluffy.

Plaintiff did not obtain a laboratory or pest-control identification of the organisms.

Plaintiff therefore describes them according to their visible appearance and does not presently allege a particular species or biological source.

**CS. Worms/Gnats Emerging From the Bathroom Sink**

**CT. Continuing Use of Bathroom Plumbing for Food and Dish Sanitation**

After the late-September occurrence, Plaintiff continued to lack a kitchen sink.

Plaintiff had no ordinary location in the kitchen to wash dishes, clean food, fill pots, or dispose of wastewater.

Plaintiff continued using the bathroom sink or bathtub despite the drainage problems and insect and, or worm activity.

Plaintiff attempted to sanitize dishes and food-contact items with dish soap, vinegar, hot water when available, or other household products.

Plaintiff alleges that the process was physically exhausting and aggravated pain in her back, arms, wrists, legs, and feet.

The process also increased her use of water, cleaning supplies, towels, and electricity.

Plaintiff's concerns regarding contamination caused her to rewash items and repeatedly clean surrounding surfaces.

Plaintiff alleges that these tasks consumed time she otherwise would have used for employment applications, medical care, legal preparation, sleep, and ordinary daily activities.

Plaintiff's limited food budget made it difficult to replace food or prepared items she considered contaminated.

The continued inability to maintain an ordinary kitchen sanitation routine aggravated Plaintiff's fear of infection while using immunosuppressive medication.

**CU. Fluffy's Condition During Late 2025**

Plaintiff observed continuing changes in Fluffy's behavior and physical condition during late 2025. Plaintiff observed excessive grooming, shedding, dandruff, matting, and increased head rubbing.

Plaintiff also observed Fluffy’s back legs twitching at intermittent and unpredictable times.

Plaintiff believed that Fluffy appeared to experience jaw and, or facial discomfort. Fluffy had about two seizures.

Plaintiff is unable to bathe or groom Fluffy in the ordinary manner because of the unsafe shower and standing water.

Plaintiff was unemployed and lacked sufficient money for a veterinary examination or professional grooming.

Plaintiff experienced substantial distress because she could not determine whether Fluffy’s symptoms resulted from age, stress, insects, grooming limitations, diet, another medical condition, or conditions inside the apartment.

Plaintiff has not obtained a veterinary diagnosis establishing the cause of Fluffy’s reported symptoms.

Plaintiff therefore alleges the observations and her inability to obtain care while reserving veterinary causation and damages for professional records and testimony.

**CV. Alleged Rent-Arrear Notices Placed at Plaintiff's Door**

Beginning in or about August 2025, Plaintiff alleges that documents concerning alleged rent arrears, termination, payment, or possession were placed on, taped to, or left near the exterior of her apartment door.

Plaintiff alleges that some papers were not securely affixed and were partially detached, folded, or on the hallway floor when she discovered them.

Plaintiff was concerned that the placement exposed private financial and tenancy information to neighbors, visitors, contractors, and Property employees.

Plaintiff alleges that she returned one or more of the documents to the concierge or management office rather than accepting the papers as properly served.

Plaintiff also alleges that at least one related document was later mailed to her.

Plaintiff recalls receiving or discovering multiple postings during the period beginning in approximately August 2025.

The current project files do not contain a complete set of the original late-2025 notices, envelopes, photographs, declarations of service, or certified-mail records.

Plaintiff therefore does not presently allege the exact date, amount, title, statutory basis, cure period, or method of service for each late-2025 document.

Plaintiff will amend or particularize these allegations after matching each notice to its envelope, photograph, ledger, certificate, and service record.

Plaintiff alleges that the postings intensified her fear of eviction while the apartment lacked essential facilities and while the amount of lawful rent remained disputed.

Plaintiff further alleges that the documents did not resolve her prior requests for rent abatement, correction of fees, accommodation of the payment method, or repair of the apartment.

CW. No Filed Possession Action Identified During Late 2025

Plaintiff began searching public court records after receiving or discovering the late-2025 documents.

Plaintiff did not identify a filed possession action against her during the August-through-December 2025 period.

The subsequently filed Superior Court complaint presently in the project record was not filed until April 17, 2026.

That later complaint alleges unpaid rent beginning in January 2025 and relies on a February 6, 2026 Notice of Past Due Rent.

The 2026 filing therefore does not establish the contents, validity, or service of any separate document allegedly posted during late 2025.

The distinction is material because a demand, ledger, or pre-suit notice is not itself a judgment for possession.

**CW. No Filed Possession Action Identified During Late 2025**

CX. October Through December 2025 Continuing Habitability Conditions

During October, November, and December 2025, Plaintiff alleges that the kitchen sink remained detached or unusable.

The shower continued failing to provide stable water temperature.

The bathtub and bathroom sink continued draining slowly or retaining water.

Plaintiff continued using bathroom fixtures for both personal hygiene and kitchen-related sanitation.

Plaintiff continued observing gnats, ants, or other small organisms intermittently.

Plaintiff remained concerned about hidden moisture, plumbing deterioration, and contamination.

The unstable walking surface previously cited by DOB remained a source of concern.

Plaintiff alleges that repeated contact with the unstable flooring caused or aggravated pain, abnormal toe curling, spasms, or difficulty walking.

Plaintiff has not identified a late-2025 medical diagnosis linking those symptoms to the flooring.

Plaintiff therefore alleges the condition, repeated exposure, and symptoms while reserving medical causation for qualified evidence.

Plaintiff further alleges that the defective blinds, surfaces, plumbing, shower, flooring, and other conditions cited or previously reported were not all permanently corrected by the end of 2025.

Defendants did not provide Plaintiff with a comprehensive written report establishing that every January 2025 DOB violation had been abated.

Plaintiff alleges that Inspector Maddux conducted follow-up inspections after February 2025 and found one or more conditions uncorrected.

The present project files do not establish the exact follow-up dates, findings, or resulting enforcement actions.

Plaintiff therefore reserves detailed allegations concerning later DOB enforcement until the official follow-up inspection reports and agency records are obtained.

**CX. October Through December 2025 Continuing Habitability Conditions**

Defendants continued posting monthly charges during October, November, and December 2025.

Those monthly charges included the $2,017 base-rent amount.

They also included the separate $100 amenity-rent charge.

The account further included trash reimbursement, water-and-sewer charges, utility-service fees, and recurring late fees.

The ledger carried the cumulative unpaid or disputed balance from earlier months into each successive month.

Plaintiff alleges that the ledger did not separately credit any habitability abatement for the continuing lack of the kitchen sink or impairment of the shower and bathroom plumbing.

The ledger also did not resolve Plaintiff's dispute concerning the unavailable eCheck option and the late and returned-payment fees resulting from prior transactions.

By the end of 2025, the running balance had increased substantially.

The precise December 31 balance should be established through the original ledger rather than the imperfect optical-character-recognition text presently available.

The ledger later attached to the 2026 possession complaint reflects monthly charges and a continuing balance through the final months of 2025.

**CY. October Through December 2025 Ledger Accumulation**

**CZ. Plaintiff's Late-2025 Review of Lease and Corporate Records**

During late 2025, Plaintiff continued reviewing her lease packet, ADU Rider, account documents, public records, and property-related materials in preparation for possible litigation.

Plaintiff observed that the lease and ADU Rider identified CCDC Residential Rental LLC as Owner. Other official records identified Willowick Residential, Willowick Management, Bozzuto, Hines Interests LP, CCDC Residential Rental LLC (IMPS ONLY), or other related entities in owner, manager, agent, developer, or administrative roles.

The January DOB Notices had identified CCDC Residential Rental LLC (IMPS ONLY) as respondent and Hines Interests LP as the respondent's agent.

Plaintiff found it difficult to determine which entity possessed final authority over repairs, rent accounting, accommodation decisions, affordable-housing administration, and possession-related activity.

Plaintiff alleges that the overlapping names and roles complicated her ability to direct demands to the legally responsible entity.

Plaintiff's review also reinforced her concern that the Property's public presentation did not clearly explain the relationships among the owner, landlord, property manager, development entities, and third-party service providers.

The precise relationships among those entities remain matters for corporate, contractual, and jurisdictional discovery.

**DA. Effect on Plaintiff's Employment and Litigation Preparation**

Plaintiff alleges that the continuing absence of functional kitchen and bathing facilities significantly impaired her daily functioning during late 2025.

Plaintiff experienced depression, anxiety, insomnia, obsessive-compulsive symptoms, brain fog, fatigue, gastrointestinal symptoms, and difficulty initiating or completing tasks.

The Plaintiff sometimes remained in bed for extended periods.

Plaintiff experienced difficulty eating and maintaining a regular meal schedule.

Plaintiff's inability to bathe normally affected her confidence and willingness to attend interviews, appointments, or training.

Plaintiff continued attempting to search for employment and prepare this litigation.

The need to clean, monitor insects, wash dishes in the bathroom, care for Fluffy, review the growing ledger, and locate missing records consumed substantial time.

Plaintiff alleges that the continuing conditions delayed her completion of a federal complaint and impaired her ability to organize the supporting exhibits.

Plaintiff has not attributed every employment rejection or missed opportunity to Defendants.

Plaintiff alleges instead that the housing conditions materially interfered with her ability to apply, prepare, attend, and perform at the level she otherwise could have achieved.

**DB. Status as of December 31, 2025**

As of December 31, 2025, Plaintiff alleges that:

a. the kitchen sink remained detached or unusable;

b. the shower remained unsafe or substantially unusable;

c. the bathtub and bathroom sink remained slow-draining or retained standing water;

d. bathroom plumbing remained Plaintiff's only available source for washing dishes and food-related items;

e. insect or worm activity had continued;

f. glass fragments had remained undiscovered in the bedroom carpet until at least August 2025;

g. Defendants had not provided a complete written accounting of the lawful rent after abatements and offsets;

h. the ledger continued including amenity rent, utilities, fees, and penalties in the running balance;

i. Plaintiff had received or discovered multiple documents concerning alleged arrears or possession;

j. no possession action against Plaintiff had yet been identified as filed during 2025;

k. Plaintiff remained unemployed or financially unable to relocate; and

l. Plaintiff and Fluffy remained exposed to the unresolved conditions.

Plaintiff remained in ADU 220 because she lacked a safe, affordable, and immediately available housing alternative.

Plaintiff's continued occupancy did not constitute an admission that ADU 220 was habitable or that Defendants' ledger was accurate.

Plaintiff alleges that she remained under economic and practical compulsion because moving would require money, transportation, an available ADU 220, accommodation of Fluffy, and the ability to coordinate relocation while medically and financially impaired.

The unresolved conditions, disputed rent balance, and possession-related pressure continued into 2026.

**DC. Conditions and Account Charges Continuing Into January 2026**

The conditions described above continued into January 2026.

Plaintiff alleges that she still lacked the ordinary use of essential kitchen and bathroom facilities, including a functional kitchen sink and a reliably usable shower.

Plaintiff continued using bathroom plumbing for some kitchen-related washing and sanitation.

Plaintiff continued experiencing slow drainage, standing water, insects or other organisms, and concerns regarding moisture and sanitation.

Plaintiff remained financially unable to relocate from ADU 220 with Fluffy.

Defendants continued charging Plaintiff for full occupancy notwithstanding Plaintiff's contention that the unit remained materially impaired and that substantial rent abatements were due.

On or about January 1, 2026, Defendants posted a monthly base-rent charge of $2,017.

Defendants separately posted a $100 monthly amenity-rent charge identified with luxury-vinyl-plank flooring.

Defendants also posted a $10 trash reimbursement, water-and-sewer charges, a utility-service fee, and other account entries.

The ledger reflects a $20 renter's-insurance risk-mitigation fee during the January–February 2026 accounting period.

Defendants also assessed a January late fee of approximately $105.85.

The ledger reflected a running balance exceeding $22,000 after the January charges were posted.

Plaintiff disputes whether the displayed balance constituted legally recoverable rent because it combined base rent with amenity rent, utility reimbursements, service charges, insurance-related charges, late fees, returned-payment fees, and balances potentially subject to habitability abatements and other offsets.

Plaintiff alleges that Defendants had not provided a corrected accounting addressing:

a. the prolonged absence of a functional kitchen sink;

b. the unsafe or unusable shower;

c. the January 2025 DOB violations;

d. Plaintiff's claimed rent abatements;

e. disputed late and returned-item fees;

f. the unavailable fee-free eCheck payment method; and

g. mandatory fees relevant to the lawful ADU housing cost.

Plaintiff did not concede that the ledger's designation of an entry as "rent" controlled its legal character.

The January and February ledger entries show that Defendants continued separately classifying the $2,017 base charge, the $100 amenity charge, trash, water and sewer, service fees, insurance-related charges, and late fees.

**DD. February 2026 Charges and Claimed Balance**

On or about February 1, 2026, Defendants posted another $2,017 monthly base-rent charge.

Defendants also posted another $100 amenity-rent charge and a $10 trash reimbursement.

The ledger included water-and-sewer reimbursement and a utility-service fee for the applicable billing period.

Defendants assessed another late fee of approximately $105.85.

A ledger generated in connection with the February notice displayed an outstanding balance of approximately $24,791 after the February charges and late fee were included.

The balance displayed on the ledger was not identical to the amount Defendants characterized as unpaid "Rent" in the February 6 notice.

Plaintiff alleges that the difference confirms the need for a transaction-by-transaction accounting distinguishing rent from penalties, utilities, reimbursements, amenity charges, insurance charges, and other non-rent entries.

Plaintiff further alleges that the ledger did not credit the substantial abatement she claims for the loss and impairment of essential facilities.

**DE. February 6, 2026 Notice of Past-Due Rent**

On February 6, 2026, The Apartments at CityCenter issued a document entitled: Notice of Past Due Rent/Thirty (30) Day Notice to Pay or Vacate for Nonpayment of Rent/Thirty (30) Day Notice of Intent to File Claim/Reservation of Rights."

The notice was addressed to Plaintiff and "Any and All Occupants" of ADU 220.

The notice identified CCDC Residential Rental LLC as the "Landlord."

The notice stated that Plaintiff was in breach of the Lease because of an alleged failure to pay rent.

The notice claimed that Plaintiff owed $23,073.22.

The notice described that amount as rent allegedly owed "without late fees."

The English-language notice contains a visible stray closing bracket immediately after the phrase "without late fees," reflecting a drafting or formatting defect.

The notice stated that an attached ledger showed rent charges and payments for the period of alleged delinquency.

The notice informed Plaintiff that she could remain in the premises if she paid the entire claimed unpaid-rent balance, together with rent that accrued before payment.

The notice stated that CCDC Residential Rental LLC intended to file a possession claim if the claimed balance remained at least $600 and was not paid within thirty days.

The notice required that all payments be made only by certified check or money order.

That payment restriction differed from the electronic and ordinary-check payment methods Defendants had previously used or accepted during Plaintiff's tenancy.

The notice stated that Plaintiff might be able to enter a written repayment plan and directed her to contact the management office.

The notice identified the Office of the Tenant Advocate and the Landlord Tenant Legal Assistance Network as possible sources of assistance.

The notice further stated that it constituted a proposed termination of Plaintiff's Lease and tenancy.

It acknowledged that the landlord could terminate the tenancy for nonpayment only through a judicial proceeding in which Plaintiff could present defenses.

The notice stated that Plaintiff had ten days to discuss the proposed termination with the landlord.

The notice also stated that a tenant with disabilities might have the right to request reasonable accommodations to participate in a hearing process.

The notice stated that a copy would be sent to the District of Columbia Housing Authority.

The notice reserved the landlord's asserted right to continue accepting payments without waiving a later claim for possession.

The notice was signed in the name of Toni Barber, identified as Assistant General Manager.

Defendants included a Spanish-language version of the notice.

The packet also included materials concerning occupancy rights under the Violence Against Women Act and HUD certification Form 5382.

**DF. The February Notice Did Not Resolve the Disputed Ledger**

The February 6 notice treated $23,073.22 as unpaid rent even though the attached ledger contained numerous separately identified non-base-rent entries.

Those entries included or potentially included:

a. monthly amenity rent;

b. trash reimbursements;

c. water-and-sewer reimbursements;

d. utility-service fees;

e. renter's-insurance or risk-mitigation fees;

f. late fees;

g. returned-payment fees; and

h. prior adjustments, reversals, and credits.

The notice did not provide a month-by-month calculation showing how Defendants derived exactly $23,073.22 in rent exclusive of late fees.

The notice did not identify the amount Defendants attributed to each month of alleged nonpayment.

It did not state which ledger entries Defendants excluded as late fees.

It did not explain whether Defendants treated the $100 monthly amenity charge as rent for possession purposes.

It did not identify the lease paragraph under which the amenity charge or any other additional fee allegedly qualified as rent.

It did not credit any rent abatement for the documented January 2025 loss of heat and plumbing violations.

It did not credit an abatement for the alleged loss of the kitchen sink beginning in 2025.

It did not credit an abatement for the alleged prolonged impairment of the shower, bathtub, bathroom sink, drainage, flooring, pest control, or sanitation.

It did not resolve Plaintiff's prior challenges to payment-system-related late and returned-item fees.

It did not address Plaintiff's April 2025 written request for a disability-related, fee-free checking-account payment method.

It did not explain why Defendants now restricted payment to certified check or money order after Plaintiff had explained that multi-step transfers and paper-payment requirements created disability-related difficulties and added expense.

Plaintiff therefore disputed both the amount and legal characterization of the balance demanded in the notice.

**DG. Disputed Service of the February Notice**

The possession-action packet includes a form titled “Affidavit of Service” concerning the February notice.

The reproduced form appears to select posting at the apartment door as the asserted method of service after unsuccessful efforts to effect personal or substituted service.

The form also appears to indicate that a copy was mailed.

In the copy presently available to Plaintiff, however, the material entries concerning the date and time of the personal-service attempts are blank, illegible, obscured, or not reliably readable.

The mailing date is also not reliably legible in the reproduced form.

The name and signature of the person who allegedly performed service are not clearly ascertainable from the present copy.

A time-stamped posting photograph appears to be included in the packet, but the reproduced date and time are distorted or difficult to read.

Plaintiff alleges that papers were taped or placed at her door and that some papers were loose, detached, or found on the floor.

Plaintiff further alleges that she returned one or more door-posted documents to the concierge.

Plaintiff does not concede that the February notice was served in compliance with every statutory requirement.

The original affidavit, original photograph and metadata, mailing records, employee records, and testimony of the alleged server are necessary to establish:

a. the number of personal-service attempts;

b. the date and time of each attempt;

c. the length of time the server waited;

d. whether Plaintiff was home;

e. the date and manner of posting;

f. whether the papers were securely affixed;

g. the date and address of mailing; and

h. the identity and authority of the server.

Plaintiff reserves all defenses concerning service, due diligence, posting, mailing, and statutory compliance.

Plaintiff alleges that the visibly incomplete or illegible service fields in the filed copy prevent the document, standing alone, from conclusively establishing proper service.

**DH. March 2026 and Continuing Accrual**

Defendants did not file a possession action immediately upon issuance of the February 6 notice.

During March 2026, Defendants continued carrying the claimed arrearage on Plaintiff's account.

Defendants also continued charging for Plaintiff's occupancy and adding monthly account entries.

The presently extracted ledger does not permit every March charge and balance to be reproduced with sufficient confidence.

Plaintiff alleges, upon information and belief, that the March entries followed the existing pattern of:

a. $2,017 in base rent;

b. $100 in amenity rent;

c. trash reimbursement;

d. water-and-sewer reimbursement;

e. a utility-service fee;

f. insurance-related charges where applicable; and

g. a late fee.

Plaintiff does not plead the exact March balance until the original ledger page is reconciled with the electronic transaction history.

Plaintiff remained in ADU 220 during March.

Plaintiff alleges that the material kitchen, bathing, drainage, sanitation, and pest conditions described above remained unresolved or materially impaired.

Plaintiff also remained financially unable to satisfy the full amount demanded while disputing its accuracy and legal collectability.

Defendants did not provide Plaintiff with a written determination resolving her accommodation request, claimed abatements, or disputed charges before proceeding toward litigation.

DI. April 2026 Account and Claimed Increase

Defendants continued the same or substantially similar monthly account practices in April 2026.

On the complaint filed April 17, Defendants alleged that the amount due had increased to $25,053.45.

That amount exceeded the February 6 notice amount by $1,980.23.

The complaint did not provide a narrative calculation explaining how the amount increased from $23,073.22 to $25,053.45.

The increase was less than the stated $2,017 monthly base rent and did not correspond transparently to a full month's base rent plus the recurring additional charges.

Plaintiff alleges that this difference further demonstrates that the claimed balance requires reconciliation rather than acceptance as a self-proving rent figure.

Plaintiff does not concede that the $25,053.45 alleged in the complaint was the amount lawfully due for possession purposes.

**DJ. April 17, 2026 Superior Court Possession Complaint**

**DI. April 2026 Account and Claimed Increase**

On April 17, 2026, at approximately 3:33 p.m., CCDC Residential Rental LLC electronically filed a Verified Complaint for Possession of Real Property in the Superior Court of the District of Columbia, Civil Division, Landlord and Tenant Branch.

The action was assigned Case No. 2026-LTB-004255.

CCDC Residential Rental LLC named Plaintiff under her legal name as the defendant.

Attorney **David Flatau** of Magruder Cook Koutsouftikis & Palanzi appeared as counsel for CCDC Residential Rental LLC.

The complaint identified CCDC Residential Rental LLC as the landlord or owner.

It alleged that CCDC Residential Rental LLC was entitled to possession of ADU 220.

1507. It identified the premises as 875 10th Street NW, Unit 220, also described as "875-220," Washington, D.C. 20001.

The complaint alleged that the Property had Rental Accommodations Division Exemption No. 568827.

It alleged that CCDC Residential Rental LLC possessed Basic Business License No. 500117000048. The complaint stated that the license became active on November 1, 2024, and would expire on October 31, 2026.

The complaint alleged that Plaintiff had failed to pay $25,053.45 in total rent.

It identified the alleged delinquency period as January 2025 through April 2026.

It identified Plaintiff's monthly rent as $2,017.

The complaint did not list a separate amount for fees allegedly defined as rent.

The complaint described the property as not subsidized and exempt from rent control.

Plaintiff's Lease packet, however, contains an ADU Rider identifying the unit as an Affordable Unit subject to an Affordable Housing Covenant.

Plaintiff alleges that the complaint's "not subsidized" characterization and the unit's ADU status require careful distinction and reconciliation.

Plaintiff does not allege that every ADU is necessarily a rent-subsidy unit.

Plaintiff alleges that Defendants could not omit or disregard the unit's affordable-housing restrictions, covenant, rent formula, utility allowances, and mandatory-fee treatment merely by marking the rental as unsubsidized on the court form.

The complaint alleged that Plaintiff had failed to pay after being properly served with a written nonpayment notice.

Plaintiff disputes that allegation for the reasons described above.

The complaint did not request a money judgment in a completed amount.

It requested a judgment for possession and court costs.

It also requested a protective order requiring future rent to be paid into the court registry while the case remained pending.

The complaint represented that no other landlord-and-tenant case was pending against Plaintiff at that time.

**DK. Supplement to the Possession Complaint**

CCDC Residential Rental LLC filed a Supplement to the Verified Complaint.

The Supplement represented that the filing included:

a. the February 6 Notice of Past-Due Rent;

b. the ledger included with that notice;

c. a declaration or affidavit of service;

d. a Basic Business License; and

e. a Rental Accommodations Division registration or exemption record.

The Supplement stated that the STAY DC program had closed on October 28, 2021.

The Supplement asserted that Plaintiff owed more than $600.

The Supplement did not resolve Plaintiff's defenses concerning habitability, rent abatement, accommodation, retaliation, disputed fees, the ADU Covenant, or the accuracy of the ledger.

It also did not convert disputed non-rent charges into recoverable rent merely by attaching the landlord's account statement.

Plaintiff alleges that the filing sought possession based on a balance generated and maintained by Defendants' own electronic systems while material factual and legal disputes remained unresolved.

**DL. Basic Business License Attached to the Complaint**

The complaint packet included a Basic Business License issued to CCDC Residential Rental LLC.

The license identified the premises at 825 10th Street NW, Washington, D.C. 20001.

It identified the license category as residential apartment housing.

It stated that the property contained approximately 458 units.

The license period ran from November 1, 2024, through October 31, 2026.

The license identified CT Corporation System as the registered agent.

The license supported CCDC Residential Rental LLC's claimed connection to the Property during the 2026 possession action.

It did not, by itself, establish that every amount claimed in the ledger was lawful or that all conditions precedent to possession had been satisfied.

**DM. Relationship Between the Possession Action and Plaintiff's Protected Activity**

Before Defendants issued the February notice and filed the April complaint, Plaintiff had:

a. repeatedly requested repairs;

b. reported disability-related needs;

c. requested reasonable accommodations;

d. demanded rent abatements;

e. challenged late and returned-payment fees;

f. challenged the unavailable eCheck payment method;

g. complained of pest, plumbing, heating, drainage, flooring, sanitation, and mold-related conditions;

h. contacted DOB;

i. obtained official Notices of Infraction; and

j. supplied additional records to District enforcement personnel.

The February notice was issued after those protected activities and while Plaintiff alleges that material conditions remained unresolved.

The April possession complaint was filed approximately fourteen months after DOB served the January 2025 Notices of Infraction.

It was filed approximately one year after Plaintiff's April 2025 written accommodation request concerning the payment system.

The complaint sought possession based on alleged nonpayment beginning in January 2025—the same month in which DOB documented the heating and plumbing violations.

Plaintiff alleges that the claimed arrearage period therefore substantially overlaps the period during which she asserts the unit was uninhabitable or materially impaired.

Plaintiff further alleges that the possession action sought the equitable remedy of possession without first providing an accounting for the resulting rent abatements and offsets.

Plaintiff alleges that the timing and circumstances support an inference that the possession activity was retaliatory or interfered with her exercise of protected housing rights.

Plaintiff recognizes that temporal sequence alone does not establish liability.

Plaintiff relies additionally on the alleged unresolved conditions, disputed ledger, payment accommodation history, repeated fees, inaccurate maintenance records, prior termination offer, and Defendants' knowledge of her complaints and disabilities.

**DN. Effect of the April Filing on Plaintiff**

The April 17 filing placed Plaintiff at risk of losing her affordable dwelling unit.

The filing publicly associated Plaintiff's legal name with an eviction proceeding and an alleged debt exceeding $25,000.

Plaintiff feared that the proceeding could impair her ability to obtain replacement housing.

Plaintiff also feared that she and Fluffy could become displaced before she could secure another affordable unit.

Plaintiff was required to devote additional time and limited resources to reviewing the complaint, ledger, notice, lease, DOB records, and available defenses.

Plaintiff alleges that the filing aggravated her anxiety, depression, insomnia, gastrointestinal symptoms, difficulty concentrating, and fear of homelessness.

Plaintiff remained unable to pay for private counsel.

Plaintiff began preparing a response and motion challenging the complaint, service, rent calculation, statutory prerequisites, and entitlement to possession.

No judgment for possession had been entered merely because CCDC Residential Rental LLC filed the complaint.

The court-issued summons expressly stated that Plaintiff did not have to leave the unit unless and until the court ordered her to do so.

**DO. Status as of April 30, 2026**

As of the end of April 2026:

a. CCDC Residential Rental LLC had filed Case No. 2026-LTB-004255;

b. the landlord alleged that Plaintiff owed $25,053.45;

c. Plaintiff disputed the amount and legal character of the balance;

d. Plaintiff disputed proper service of the February notice;

e. the claimed arrearage period overlapped the period of documented and alleged housing defects;

f. Defendants had not agreed to Plaintiff's requested rent abatements;

g. Defendants had not supplied a reconciled ledger separating rent from disputed non-rent charges and offsets;

h. Plaintiff's payment accommodation dispute remained unresolved;

i. Plaintiff alleges that essential kitchen and bathing facilities remained impaired; and

j. Plaintiff remained in ADU 220 with Fluffy because she lacked a financially and medically feasible alternative.

Plaintiff's continued occupancy did not waive her habitability, discrimination, accommodation, retaliation, consumer-protection, contract, tort, or statutory defenses and claims.

Plaintiff did not admit that CCDC Residential Rental LLC was entitled to possession or that the amounts alleged in the February notice and April complaint were accurate.

The filing of the possession action did not adjudicate any disputed fact and did not extinguish Defendants' continuing obligations under the Lease, ADU Rider, Affordable Housing Covenant, FHA, DCHRA, Rental Housing Act, housing regulations, or other applicable law.

**DP. Court-Generated Summons and Initial-Hearing Materials**

After CCDC Residential Rental LLC filed the possession complaint on April 17, 2026, the Superior Court generated a Summons to Appear in Court and an Initial Hearing Notice and Instructions in Case No. 2026-LTB-004255.

The court documents identified the case as CCDC Residential Rental LLC v. Stephanie Richner and identified Plaintiff under her legal name as the tenant-defendant.

The summons identified the subject premises as 875 10th Street NW, Unit 220, also described as "875-220," Washington, D.C. 20001.

The summons stated that CCDC Residential Rental LLC had sued to evict Plaintiff.

The summons further stated that Plaintiff did not have to leave the unit unless and until the Superior Court entered an order requiring her to do so.

The summons stated that the possession complaint should be attached.

It instructed Plaintiff that, if the complaint was not attached, she could obtain a copy from the Landlord and Tenant Clerk's Office or view the case through the Superior Court's online docket.

The summons warned that Plaintiff could be evicted without further hearings if she or her attorney failed to participate in the scheduled initial hearing.

It advised Plaintiff to collect and retain documents relating to the case, including the Lease, payment records, photographs, and other evidence explaining her defenses.

It also stated that Plaintiff could file documents electronically, by mail, in person through the Clerk's Office, or through designated courthouse drop boxes.

**DQ. First-Class-Mail Initial-Hearing Notice**

The court generated a separate first-class-mail notice addressed to Plaintiff at ADU 220.

The mailing displayed United States postage paid through a Washington, D.C. permit.

The notice informed Plaintiff that she had been named in a lawsuit filed in the Superior Court of the District of Columbia.

It warned that a default or judgment could be entered if Plaintiff did not participate.

The notice identified Case No. 2026-LTB-004255 and the caption CCDC Residential Rental LLC v. Stephanie Richner.

The notice scheduled a remote initial hearing for July 7, 2026, at 9:00 a.m.

The notice identified the location as Remote Courtroom B-109.

It supplied a Webex meeting address and Meeting ID 129 127 9276.

It also supplied telephone numbers through which Plaintiff could participate remotely.

The notice stated that the purpose of the initial hearing included establishing a schedule and discussing possible settlement.

The notice warned that a default could be entered and possession awarded if Plaintiff failed to appear when the case was called.

It again stated that Plaintiff did not have to leave her home unless and until the Court ordered her to do so.

The notice identified the Landlord Tenant Legal Assistance Network as a potential source of free legal services for qualifying tenants.

It also identified the Emergency Rental Assistance Program as a possible source of rent assistance.

The notice provided contact information for requesting disability accommodations from the D.C. Courts.

The presently available copy does not display the date on which the court placed the initial-hearing materials in the mail.

Plaintiff therefore does not presently allege that the court mailed the materials on May 7, 2026, or on any other particular date.

The mailing date and delivery date should be established through the envelope, postal markings, docket record, or court mailing records.

**DR. Unresolved Service Issues Concerning the Summons and Complaint**

The court-generated materials contemplated that Plaintiff would receive the summons, complaint, and initial-hearing instructions together.

The present project record contains the summons, complaint, and court notice.

The present project record does not contain a separate return or affidavit establishing when and how the summons and complaint themselves were served on Plaintiff.

In particular, the currently identified records do not establish:

a. whether a process server attempted personal service of the summons and complaint;

b. the date and time of each attempted service;

c. whether service was attempted on another person at the premises;

d. whether the summons and complaint were posted at Plaintiff's door;

e. whether a separate copy was mailed by the party responsible for service;

f. the identity of any process server; or

g. the date on which Plaintiff actually received the complete filing packet.

The fact that the court generated a first-class-mail hearing notice does not, by itself, identify the method by which CCDC Residential Rental LLC contends that the summons and complaint were served.

Plaintiff reserves all defenses concerning service of process, sufficiency of process, notice, due diligence, posting, mailing, and compliance with the applicable Superior Court rules.

Plaintiff further reserves the right to amend these allegations after obtaining the complete docket, service returns, mailing records, and any process-server evidence.

**DS. June 16, 2026 Certified Mailing of an Additional Notice**

On June 16, 2026—approximately two months after filing the possession complaint—attorney David Flatau caused an additional notice packet to be sent to Plaintiff by certified mail.

Flatau later executed an affidavit concerning that mailing under penalty of perjury.

The affidavit identified Flatau as counsel associated with Magruder Cook Koutsouftikis & Palanzi.

The affidavit identified Plaintiff under her legal name and used the address of ADU 220.

The affidavit stated that the June 16 packet included English- and Spanish-language copies of a document or documents collectively described as:

a. a Notice of Past-Due Rent;

b. a Thirty-Day Notice to Pay or Vacate for Nonpayment of Rent;

c. a Thirty-Day Notice of Intent to File Claim;

d. a Reservation of Rights;

e. a Notice of Occupancy Rights under the Violence Against Women Act; and

f. HUD Certification Form 5382.

The affidavit marked certified mail as the asserted method of service.

It did not state that Flatau personally delivered the June 16 packet to Plaintiff.

It did not state that the packet was delivered to another adult member of Plaintiff's household.

It did not state that the packet was posted at Plaintiff's apartment door.

The attached United States Postal Service receipt identifies certified-mail tracking number 9214 7969 0099 9790 1660 8714 98.

The receipt identified postage and fees totaling $10.44.

The receipt was addressed to Plaintiff at 875 10th Street NW, Unit 220, also described as "875-220," Washington, D.C. 20001.

The present file establishes that the item was tendered for certified mailing.

The file does not include a signed return receipt, electronic delivery confirmation, refusal record, or tracking history establishing the date on which Plaintiff received or was offered delivery of the packet.

The currently identified affidavit file also does not reproduce the substantive June 16 notice itself.

It therefore does not disclose:

a. the rent amount demanded in the June 16 notice;

b. the accounting period covered;

c. the ledger allegedly attached;

d. whether the amount differed from the February 6 demand;

e. the proposed termination date;

f. whether it was intended to replace or supplement the February notice; or

g. whether it concerned the already-filed case or a potential later proceeding.

Plaintiff cannot determine from the affidavit alone whether the June 16 mailing contained a newly issued notice or another copy of a prior notice.

Plaintiff therefore reserves all objections concerning the notice's content, amount, timing, service, legal effect, and compliance with statutory prerequisites.

DT. The June 16 Notice Postdated the April 17 Complaint

The possession complaint was filed on April 17, 2026.

The additional certified mailing described in Flatau's affidavit occurred on June 16, 2026.

The June 16 mailing therefore occurred approximately sixty days after CCDC Residential Rental LLC commenced the possession action.

As a matter of chronology, the June 16 mailing could not have been the pre-filing notice that the April 17 complaint alleged had already been properly served.

The complaint instead relied on the February 6, 2026 notice and its accompanying service materials as the purported pre-suit notice.

Plaintiff does not concede that the June 16 mailing cured any defect in the February notice, the February service affidavit, the April complaint, or service of the summons and complaint.

Plaintiff further does not concede that a post-filing notice may retroactively satisfy a condition that was required to exist before the action was commenced.

**DT. The June 16 Notice Postdated the April 17 Complaint**

**DU. June 18, 2026 Praecipe**

On June 18, 2026, at approximately 2:27 p.m., CCDC Residential Rental LLC, through counsel, electronically filed a praecipe in Case No. 2026-LTB-004255.

The praecipe requested that the Clerk place the attached affidavit of service in the court record.

The filing identified the next hearing as July 7, 2026, at 9:00 a.m.

The praecipe was submitted in the name of Magruder Cook Koutsouftikis & Palanzi and signed by Flatau.

The praecipe included a certificate stating that a copy had been sent to Plaintiff by first-class mail at ADU 220.

The handwritten day appearing in the certificate of service is not sufficiently clear in the presently available copy to support a definitive allegation concerning the precise mailing date of the praecipe.

The date appears inconsistent or ambiguous when compared with the June 18 electronic filing stamp.

Plaintiff therefore alleges only that counsel certified first-class mailing of the praecipe and does not presently concede the precise date stated in the handwritten entry.

The praecipe did not amend the April complaint.

It did not provide a revised calculation of the amount allegedly due.

It did not identify any rent abatement or credit for the defective conditions.

It did not address Plaintiff's accommodation requests or disputed payment-system fees.

It did not attach a return of service for the summons and complaint.

Its stated purpose was limited to placing the June 16 notice affidavit into the record.

DV. Continued Dispute Over the Claimed Arrearage

Between May and July 2026, the amount Defendants claimed to be due continued to be disputed.

Plaintiff continued to dispute whether the claimed balance properly separated:

a. base rent;

b. amenity rent;

c. trash reimbursement;

d. water-and-sewer reimbursement;

e. utility-service fees;

f. renter's-insurance or risk-mitigation charges;

g. late fees;

h. returned-item fees;

i. other non-rent charges; and

j. rent subject to abatement or offset.

Plaintiff also continued to dispute whether Defendants had properly accounted for payments, reversals, credits, and returned transactions.

The April possession complaint alleged a balance of $25,053.45 through April 2026.

The present project materials do not include a reliable May, June, or July 2026 ledger showing the exact balance then claimed.

Plaintiff therefore does not allege a particular later balance without the original ledger and transaction history.

Plaintiff alleges that the amount sought in the possession action remained unliquidated and disputed because the parties had not agreed on the lawful rent after accounting for habitability abatements, accommodation-related issues, charges, credits, and offsets.

**DW. Preparation for the July 7 Initial Hearing**

The initial-hearing notice required Plaintiff to participate on July 7, 2026, at 9:00 a.m.

The notice advised that the initial hearing would be conducted remotely unless a party arranged to appear in person.

Plaintiff was required to gather and review the complaint, summons, February notice, service materials, ledger, Lease, ADU Rider, DOB Notices of Infraction, maintenance communications, photographs, payment records, and accommodation requests.

Plaintiff also began preparing a motion challenging CCDC Residential Rental LLC's asserted right to possession.

The issues Plaintiff identified included:

a. failure to state a legally sufficient claim for possession;

b. lack of strict compliance with statutory prerequisites;

c. defective or unproven service;

d. breach of the implied warranty of habitability;

e. entitlement to rent abatement;

f. improper inclusion or treatment of disputed charges;

g. retaliation;

h. failure to provide reasonable accommodations;

i. prior material breach of the Lease;

j. the effect of DOB’s enforcement findings;

k. the accuracy of the ledger; and

l. the legal status of the Property and ADU.

Preparing a defense required Plaintiff to reconstruct a lengthy factual record while acting without retained counsel.

Plaintiff alleges that incomplete portal records, inaccessible maintenance histories, missing tenant documents, and unclear service materials made that preparation more difficult.

Plaintiff also continued experiencing anxiety, depression, insomnia, gastrointestinal symptoms, and fear that she and Fluffy could lose their home.

DX. July 7, 2026 Initial-Hearing Setting

The Superior Court scheduled the case for an initial hearing on July 7, 2026, at 9:00 a.m.

The hearing was assigned to Remote Courtroom B-109.

The court notice warned that a default could be entered against Plaintiff if she failed to participate when the case was called.

It also stated that the initial hearing could be used to establish a schedule and discuss possible settlement.

The notice did not itself decide whether:

a. CCDC Residential Rental LLC had properly served Plaintiff;

b. the February notice was valid;

c. the ledger was accurate;

d. the claimed amount constituted legally recoverable rent;

e. Plaintiff was entitled to rent abatement;

f. Defendants had breached the Lease or housing regulations;

g. the possession action was retaliatory; or

h. CCDC Residential Rental LLC was entitled to possession.

The notice expressly stated that Plaintiff did not have to leave her home unless and until the Court entered an order requiring her to do so.

DY. No Hearing Disposition Established by the Present Record

The currently identified project files establish that the July 7 hearing was scheduled.

They do not contain a July 7 docket entry, minute order, hearing transcript, audio recording, scheduling order, protective order, continuance order, settlement agreement, dismissal, default, or judgment for possession.

The present record therefore does not establish:

a. whether both parties appeared;

b. what arguments were presented;

c. whether the Court addressed service;

d. whether a protective order was requested or entered;

e. whether the matter was continued;

f. whether a trial date or briefing schedule was established;

g. whether the case was dismissed; or

h. whether any judgment was entered.

Plaintiff does not allege a hearing result that is not supported by an order, docket record, transcript, or other reliable evidence.

**DX. July 7, 2026 Initial-Hearing Setting**

**DY. No Hearing Disposition Established by the Present Record**

As of the current project record:

a. CCDC Residential Rental LLC had filed a possession action against Plaintiff;

b. the court had scheduled a July 7 initial hearing;

c. the landlord had relied on a February 6 notice as the asserted pre-filing notice;

d. the February service materials remained disputed;

e. the record did not contain a clear return of service for the summons and complaint;

f. counsel had certified an additional notice mailing on June 16;

g. that additional notice postdated the possession complaint;

h. the substantive June 16 notice was not included in the presently identified file;

i. the lawful rent balance remained disputed;

j. the claimed arrearage overlapped the period of documented and alleged habitability failures; and

k. no final disposition of the possession action was established by the available materials.

Plaintiff's participation in the Superior Court proceeding did not waive her federal or District of Columbia claims.

Plaintiff's continued occupancy did not admit the accuracy of Defendants' ledger or concede that CCDC Residential Rental LLC was entitled to possession.

Plaintiff continued to reserve all defenses, counterclaims, offsets, statutory rights, and claims arising from Defendants' conduct.

The pending threat of possession continued to place Plaintiff and Fluffy at risk of displacement from scarce affordable housing.

Plaintiff alleges that the possession activity compounded the physical, financial, and emotional effects of the preceding housing, accommodation, payment, and recordkeeping disputes.

**DZ. Status Through July 2026**

**VII. CAUSES OF ACTION**

1508. Plaintiff incorporates the factual allegations above only to the extent they are relevant to the particular Count. Each Count is asserted only against a Defendant whose own acts, authority, knowledge, participation, direction, ratification, or legally attributable agency relationship is specifically alleged. Corporate affiliation, investment, branding, or a remote ownership interest, without more, does not establish liability.

1509. The claims below are pleaded in the alternative to the extent permitted by Federal Rule of Civil Procedure 8(d). Plaintiff does not seek duplicative recovery for the same injury.

**COUNT I**

**FAILURE TO MAKE REASONABLE ACCOMMODATIONS IN VIOLATION OF THE FAIR HOUSING ACT**

42 U.S.C. §§ 3604(f)(2), 3604(f)(3)(B)

Against CCDC Residential Rental LLC and the Property-Management Defendant or Defendants Whose Own Conduct Is Alleged in This Count

1510. The Fair Housing Act prohibits discrimination because of disability in the terms, conditions, or privileges of renting a dwelling and in the provision of services or facilities connected with the dwelling. 42 U.S.C. § 3604(f)(2). Discrimination includes a refusal to make reasonable accommodations in rules, policies, practices, or services when the accommodations may be necessary to afford a person with a disability an equal opportunity to use and enjoy a dwelling. Id. § 3604(f)(3)(B).

1511. To prevail, Plaintiff must prove that she is a person with a disability; the responsible Defendant knew or reasonably should have known of the disability; the requested accommodation was necessary to afford an equal opportunity to use and enjoy the dwelling; the requested accommodation was reasonable; and the responsible Defendant refused or constructively denied the request.

1512. Plaintiff is a person with disabilities within the meaning of 42 U.S.C. § 3602(h). Her impairments substantially limit major life activities and major bodily functions, including sleeping, concentrating, caring for herself, and the operation of her digestive and immune systems.

1513. During the application, leasing, and tenancy periods, Plaintiff disclosed that she had disabilities, identified disability-related housing needs, provided information concerning her prescribed emotional-support animal, and repeatedly communicated with management about disability-related barriers affecting maintenance access and rent payment.

1514. CCDC was Plaintiff's landlord. The responsible Property-Management Defendant or Defendants administered the maintenance-access and resident-payment practices challenged in this Count and received or were charged with responding to Plaintiff's requests.

A. Nonemergency Maintenance Scheduling

1515. Plaintiff repeatedly requested that nonemergency maintenance visits to Apartment 220 be scheduled at or after 1:00 p.m. She did not refuse access. She sought a disability-compatible period during which she could be awake, physically able to respond, present to protect medication and personal property, and able to secure her emotional-support animal before personnel entered.

1516. Plaintiff explained that disability-related sleep disruption, fatigue, and prescribed medication made early-morning entry medically burdensome and frequently prevented her from responding safely to morning or inadequately coordinated visits.

1517. The request was specific and limited. It applied to nonemergency work, did not bar emergency entry, did not excuse any lease obligation, and required only advance coordination during an identified portion of the ordinary workday.

1518. Defendants' own communications and scheduling practices showed that afternoon access was practicable. Management scheduled at least one visit after 1:00 p.m., and Plaintiff made herself available, but maintenance did not arrive during the agreed period. Management later attempted access in the morning, outside the requested period.

1519. Plaintiff renewed the request in writing and proposed an alternative arrangement: when essential work genuinely had to occur in the morning, Defendants could provide temporary access to a guest suite or another suitable space while the work was performed.

1520. The responsible Defendants did not grant the requested schedule, provide an equally effective alternative, identify an undue financial or administrative burden, or request reasonably necessary information to evaluate the request. They instead continued morning access attempts, missed agreed afternoon periods, closed work orders, or allowed reported conditions to remain unresolved.

1521. The denial impaired Plaintiff's practical access to maintenance services and contributed to delay in addressing reported heating, plumbing, drainage, shower, appliance, pest, and other conditions. The FHA violation alleged here is the refusal to adjust the maintenance-access practice, not the bare existence of every unrepaired condition.

B. Reliable Fee-Free Checking-Account Payment Method

1522. Defendants used a resident portal to receive rent payments and administer charges. The portal had permitted Plaintiff to pay rent electronically from a personal checking account without a separate transaction charge.

1523. Plaintiff updated her checking-account information and designated the updated account as the default account for recurring rent payments. The system did not consistently process payments from the updated account.

1524. Plaintiff notified management that she relied on the electronic checking-account method because of her disabilities, that the system's failure had contributed to disputed late fees and returned-payment charges, and that alternative methods required additional banking steps, paper checks, additional accounts, or transaction fees.

1525. Plaintiff requested correction of the portal problem, restoration of a reliable fee-free checking-account method, and review of charges attributable to the reported system failure. The request did not seek forgiveness, reduction, or postponement of rent.

1526. Restoring the previously available method, or providing another equally effective fee-free method, would not have fundamentally altered the tenancy. The responsible Defendants did not provide a prompt determination, an equally effective alternative, or a supported undue-burden explanation.

1527. The checking-account option remained unavailable or unreliable while Plaintiff's ledger continued to reflect disputed charges. Plaintiff alleges that the failure to provide an effective payment accommodation impaired her ability to use the rent-payment service on equal terms and caused economic and housing-related injury to the extent shown by the ledger, portal records, bank records, and communications.

1528. By refusing or constructively denying the accommodations alleged above, the responsible Defendants violated 42 U.S.C. §§ 3604(f)(2) and 3604(f)(3)(B). Plaintiff seeks the relief authorized by 42 U.S.C. § 3613, including actual damages, appropriate declaratory and injunctive relief, punitive damages where the governing standard is satisfied, and recoverable fees and costs.

**COUNT II**

**INTERFERENCE, COERCION, AND RETALIATION IN VIOLATION OF THE FAIR HOUSING ACT**

42 U.S.C. § 3617; 24 C.F.R. § 100.400

Against CCDC Residential Rental LLC and Each Defendant Whose Own Conduct Is Alleged in This Count

1529. Section 3617 makes it unlawful to coerce, intimidate, threaten, or interfere with a person in the exercise or enjoyment of, or on account of the person's exercise or enjoyment of, rights protected by the Fair Housing Act.

1530. Plaintiff exercised FHA-protected rights by disclosing disabilities, requesting accommodations, seeking accessible maintenance and payment practices, opposing the alleged failure to accommodate, and seeking equal access to services connected with her dwelling.

1531. The responsible Defendants knew of that protected activity through Plaintiff's written requests, management communications, accommodation communications, and challenges to charges and housing actions allegedly resulting from the denial of accommodations.

1532. After and while Plaintiff pursued those rights, the responsible Defendants allegedly failed to provide effective accommodations, continued or retained disputed charges connected to the inaccessible payment process, reduced or obstructed maintenance services, allowed tenant-facing repair records to become inaccurate or inaccessible, and used or threatened housing consequences, including possession-related action, against Plaintiff.

1533. Several work orders concerning heat, plumbing, drainage, the garbage disposal, shower conditions, and other services were marked completed or cancelled while Plaintiff continued reporting the same conditions. A subsequent District inspection documented several conditions corresponding to requests the maintenance system had treated as completed.

1534. The resident portal later displayed no open or past maintenance requests despite prior work-order emails and request numbers. Plaintiff does not allege, without discovery, who changed the records or why. She alleges that the loss of tenant-facing access impaired her ability to document notice, challenge completion entries, and enforce housing rights.

1535. Plaintiff also alleges that the responsible Defendants continued to rely on disputed charges and account consequences after she identified the payment barrier as a disability-accommodation issue and requested correction.

1536. CCDC later pursued possession based on an account balance that, according to Plaintiff, included disputed amounts and overlapped periods of documented housing-condition and accommodation disputes.

1537. The filing or prosecution of a lawful possession action is not, by itself, an FHA violation. This Count rests on Plaintiff's allegation that the responsible Defendants used charges, service reductions, recordkeeping practices, threats, or possession-related conduct because she exercised FHA rights or in a manner that would deter a reasonable tenant from exercising those rights.

1538. The temporal sequence, the responsible Defendants' knowledge, the continued use of disputed accommodation-related consequences, and the alleged departure from ordinary or promised housing practices support a plausible inference of interference or retaliation. Defendants may offer lawful, nonretaliatory

explanations, but those explanations present factual issues that cannot be resolved by relabeling the alleged conduct as ordinary property management.

1539. As a direct and proximate result, Plaintiff suffered loss of housing services, economic loss, fear of displacement, emotional distress, and other injury to the extent proved. Plaintiff seeks the relief authorized by 42 U.S.C. § 3613.

**COUNT III**

**DISABILITY DISCRIMINATION AND FAILURE TO MAKE REASONABLE ACCOMMODATIONS**

DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. Code §§ 2-1402.21(a)(4), 2-1402.21(d)(2), 2-1402.21(d)(3)(B), 2-1403.16

Against CCDC Residential Rental LLC and the Property-Management Defendant or Defendants Whose Own Conduct Is Alleged in This Count

1540. The District of Columbia Human Rights Act prohibits, wholly or partially for a discriminatory reason based on disability, restricting or refusing facilities, services, repairs, or improvements for a tenant. D.C. Code § 2-1402.21(a)(4).

1541. The DCHRA also prohibits disability discrimination in the terms, conditions, or privileges of rental housing and in the provision of services or facilities connected with a dwelling. Id. § 2-1402.21(d)(2).

1542. Unlawful discrimination includes refusing to make reasonable accommodations in rules, policies, practices, or services when the accommodations may be necessary to afford a person an equal opportunity to use and enjoy a dwelling. Id. § 2-1402.21(d)(3)(B).

1543. Plaintiff repeats the disability, knowledge, request, necessity, reasonableness, refusal, and injury allegations stated in Count I concerning nonemergency maintenance scheduling and a reliable fee-free checking-account payment method.

1544. Those requests sought access to ordinary housing services on usable terms. They did not seek exemption from rent, unrestricted denial of lawful entry, structural alteration, or preferential services unrelated to disability.

1545. The responsible Defendants refused or constructively denied the requested adjustments and did not provide an equally effective alternative or a supported undue-burden explanation.

1546. To the extent a responsible Defendant restricted repairs, maintenance access, rent-payment services, or another facility or service wholly or partially because of Plaintiff's disability or her accommodation requests, that conduct also violated D.C. Code § 2-1402.21(a)(4) and (d)(2).

1547. Plaintiff suffered economic, housing-related, and emotional injury as a direct and proximate result. She seeks damages and other appropriate relief under D.C. Code § 2-1403.16, including declaratory and injunctive relief and recoverable fees and costs.

**COUNT IV**

**COERCION, INTERFERENCE, AND RETALIATION IN VIOLATION OF THE D.C. HUMAN RIGHTS ACT**

D.C. Code §§ 2-1402.61, 2-1403.16

Against CCDC Residential Rental LLC and Each Defendant Whose Own Conduct Is Alleged in This Count

1548. The DCHRA makes it unlawful to coerce, threaten, retaliate against, or interfere with a person in the exercise or enjoyment of rights protected by the Act or because the person exercised or enjoyed those rights. D.C. Code § 2-1402.61(a).

1549. Plaintiff exercised DCHRA rights by disclosing disabilities, requesting reasonable accommodations, opposing the denial or ineffective handling of those accommodations, and seeking equal access to repairs, maintenance, payment services, and continued housing.

1550. The responsible Defendants knew of Plaintiff's protected conduct through her written communications and their own administration of the challenged services, charges, records, and housing actions.

1551. Plaintiff repeats the post-request conduct alleged in Count II, including continued use of disputed accommodation-related charges, alleged reduction or obstruction of services, inaccurate or inaccessible tenant-facing maintenance records, threats or coercive housing consequences, and possession-related conduct.

1552. This Count does not treat every disagreement, fee, repair delay, or lawful court filing as retaliation. It alleges liability only where the evidence shows that a Defendant acted because Plaintiff exercised DCHRA rights or interfered with her exercise of those rights.

1553. The sequence, knowledge, repeated requests, continuing consequences, and alleged use of accommodation-related disputes to increase the risk of losing the dwelling support an inference of retaliatory or interfering purpose.

1554. As a direct and proximate result, Plaintiff suffered economic loss, diminished housing services, emotional distress, fear of displacement, and other injury to the extent proved. She seeks the remedies authorized by D.C. Code § 2-1403.16.

**COUNT V**

RETALIATORY ACTION IN VIOLATION OF THE DISTRICT OF COLUMBIA RENTAL HOUSING ACT

**RETALIATORY ACTION IN VIOLATION OF THE DISTRICT OF COLUMBIA RENTAL HOUSING ACT**

Against CCDC Residential Rental LLC and Each Property-Management Defendant Acting as Its Housing-Management Agent

1555. D.C. Code § 42-3505.02 prohibits a housing provider from taking retaliatory action against a tenant who exercises rights conferred by the Rental Housing Act, a rule or order issued under the Act, or another provision of law.

1556. Retaliatory action may include an action not otherwise permitted by law seeking possession, an unlawful increase in rent or tenant obligations, a decrease in services, undue or avoidable inconvenience, invasion of

privacy, harassment, a reduction in the quality or quantity of services, refusal to honor a lease provision, or another form of threat or coercion.

1557. Plaintiff made repeated written requests for repairs necessary to provide heat, functional plumbing and drainage, a safe shower, stable walking surfaces, pest control, functioning appliances, and sanitary conditions.

1558. Plaintiff sought to enforce rights under her lease and District housing law through written demands, requests for rent abatement and correction of charges, and communications with the District of Columbia Department of Buildings.

1559. A DOB inspector inspected Apartment 220 and documented, among other conditions, the absence of heat, non-draining kitchen and bathroom sinks, an inoperable garbage disposal, and damaged subflooring creating an unstable walking surface. DOB thereafter served Notices of Infraction identifying CCDC as the respondent.

1560. Plaintiff provided additional materials to DOB and continued seeking repairs and enforcement. She also reported a substantial ant infestation and requested professional treatment, cleaning, coordinated access, and temporary lodging if treatment required her to leave the apartment.

1561. CCDC and its responsible agents knew of Plaintiff's protected conduct through direct communications, the lease's notice provisions, management responses, the DOB inspection, and the notices served on CCDC.

1562. After and during that protected activity, maintenance requests were marked completed or cancelled while corresponding conditions allegedly remained; tenant-facing maintenance history became inaccessible; disputed charges and payment consequences continued; and housing services allegedly remained reduced or obstructed.

1563. CCDC later initiated or maintained a possession action based on a disputed account balance. The claimed balance overlapped the period during which Plaintiff had requested repairs, contacted DOB, challenged charges, and sought to enforce lease and housing rights.

1564. Plaintiff alleges that one or more challenged actions occurred within six months after protected repair requests, agency contacts, or efforts to enforce lease rights. To the extent the evidence establishes the timing and statutory predicates, the presumption in D.C. Code § 42-3505.02(b) applies and must be rebutted by clear and convincing evidence.

1565. Plaintiff recognizes that § 42-3505.02 does not transform an otherwise lawful possession action into retaliation merely because protected activity preceded it. Her claim depends on proof that the challenged action was retaliatory, was not otherwise permitted by law, or used unlawful charges, reduced services, coercion, or another prohibited means.

1566. The timing, knowledge, objective inspection findings, disputed completion records, continuing service problems, disputed charges, and possession-related conduct support a plausible inference of retaliation.

1567. As a direct and proximate result, Plaintiff suffered reduced services, economic loss, fear of displacement, emotional distress, and other injury. She seeks declaratory, injunctive, and other relief authorized by applicable law.

**COUNT VI**

**UNFAIR OR DECEPTIVE TRADE PRACTICES**

DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT, D.C. Code §§ 28-3904, 28-3905(k)

Against CCDC Residential Rental LLC and Each Property-Management Defendant That Made, Controlled, or Enforced the Challenged Representation or Charge

1568. Plaintiff leased residential housing and received related maintenance, payment, account-administration, and property-management services for personal and household purposes. She is a consumer within D.C. Code § 28-3901(a)(2).

1569. CCDC and each responsible Property-Management Defendant engaged in the ordinary course of leasing residential housing or supplying services connected with that housing and were merchants with respect to the trade practices alleged in this Count.

1570. The CPPA's private right of action applies to trade practices arising from landlord-tenant relations. D.C. Code § 28-3905(k)(6).

1571. The resident-facing maintenance system represented that identified repairs or services had been completed or cancelled. Plaintiff alleges that several completion representations were materially inaccurate because the same conditions remained and were later documented by DOB or continued to be reported by Plaintiff.

1572. The allegedly inaccurate entries included requests concerning heat, kitchen drainage, the garbage disposal, shower or bathtub conditions, and other apartment components. Plaintiff does not allege that every

status entry was knowingly false; she alleges that the responsible merchant represented services as completed when the available facts support an inference that the represented result had not been supplied.

1573. The tenant-facing portal later displayed no open or past maintenance requests despite prior work-order emails and request numbers generated through the same system. The evidence presently available does not establish whether records were deleted, archived, hidden, transferred, or rendered inaccessible by software configuration. Plaintiff therefore alleges the supported fact: the portal failed to disclose the prior maintenance history to her when she attempted to review it.

1574. Defendants also represented, expressly or by operation of the portal, that Plaintiff could administer recurring rent payments through a designated checking account and that the resulting charges and ledger reflected valid payment events and obligations.

1575. After Plaintiff updated and designated her checking account, the system allegedly failed to process the designated account consistently. Defendants thereafter imposed or retained disputed late fees, returned-payment charges, or related account consequences without providing a clear and accurate explanation resolving the reported system failure.

1576. Plaintiff requested correction of the payment method and review of the resulting charges. The responsible Defendants allegedly continued to state or enforce the ledger balance without adequately disclosing how the disputed charges arose, whether they reflected a portal error, and what fee-free method remained available.

1577. The conduct alleged above, if proved, constitutes one or more violations of D.C. Code § 28-3904(e), (e-1), (f), or (u), including misrepresenting a material fact, representing obligations a transaction did not

lawfully involve, omitting a material fact in a manner tending to mislead, or representing that services were supplied in accordance with a prior representation when they were not.

1578. Plaintiff acted as a consumer in relying on the resident portal, repair-status communications, payment system, and ledger to make housing decisions, coordinate access, determine whether conditions had been repaired, make rent payments, and evaluate charges.

1579. As a result of the challenged practices, Plaintiff alleges actual economic injury, including disputed fees or charges paid or retained, costs of alternative payment methods, loss of the benefit of paid-for housing services, and other measurable loss to the extent established through the lease, ledger, portal audit trails, bank records, and communications.

1580. Plaintiff seeks the remedies available under D.C. Code § 28-3905(k), subject to proof of each violation, causation, injury, and the prohibition against duplicative recovery.

**COUNT VII**

**BREACH OF RESIDENTIAL LEASE**

District of Columbia Law

Against CCDC Residential Rental LLC

1581. Plaintiff and CCDC entered written residential leases governing Plaintiff's occupancy of affordable dwelling units at The Apartments at CityCenter, including Apartment 220. The lease and incorporated addenda constitute enforceable contracts.

1582. The lease identified CCDC as the owner or landlord, granted Plaintiff possession for use as a private residence, required rent and other specified performance from Plaintiff, and imposed obligations concerning maintenance, services, lawful access, notices, account administration, and compliance with applicable District law.

1583. Plaintiff performed her material obligations or was excused from performance to the extent CCDC first materially breached, wrongfully assessed charges, or failed to provide required housing services. Any disputed rent balance must be determined after applying lawful abatements, credits, offsets, and corrections.

1584. CCDC breached express or incorporated lease obligations by failing, after notice and a reasonable opportunity to cure, to provide or maintain required heat, plumbing, drainage, safe and usable bathroom facilities, stable flooring, pest control, functioning components, and other promised housing services.

1585. CCDC further breached to the extent it failed to follow contractual notice and access requirements, failed to administer maintenance services in accordance with its obligations, or imposed and retained charges not authorized by the lease or law.

1586. The lease's assignment of operational tasks to a property manager or contractor did not eliminate CCDC's contractual obligations to Plaintiff.

1587. CCDC's breaches were material because they affected essential residential functions, including heating, bathing, sanitation, food preparation, safe movement within the dwelling, rent payment, and secure occupancy.

1588. Plaintiff provided repeated written notice and opportunities to cure. Government inspection findings and Defendants' own work-order communications corroborate notice as to several conditions.

1589. As a direct and foreseeable result, Plaintiff lost part of the benefit of her bargain and incurred economic loss, diminished use of the dwelling, out-of-pocket expenses, and other contract damages to the extent proved with reasonable certainty.

1590. Plaintiff seeks nonduplicative contract remedies, including compensatory damages, appropriate credits or offsets, nominal damages where applicable, declaratory relief, specific performance or other prospective relief within the Court's equitable authority, and interest and costs as authorized.

**COUNT VIII**

**BREACH OF THE IMPLIED WARRANTY OF HABITABILITY AND RENT ABATEMENT**

District of Columbia Law

Against CCDC Residential Rental LLC

1591. District of Columbia law implies in every residential lease a warranty that the premises will remain safe, sanitary, and fit for human habitation throughout the tenancy. The warranty incorporates applicable housing regulations and cannot be waived by lease language.

1592. The warranty obligated CCDC to maintain Apartment 220 and the services supplied with it in substantial compliance with housing regulations materially affecting health, safety, sanitation, and ordinary residential use.

1593. Plaintiff alleges substantial defects during the tenancy, including lack of heat; non-draining or leaking kitchen and bathroom fixtures; an inoperable garbage disposal; an unstable walking surface caused by damaged subflooring; unsafe shower-temperature conditions; recurring pest or insect conditions; and other plumbing, sanitation, appliance, and maintenance failures described in the factual allegations.

1594. A DOB inspection independently documented several of those conditions and resulted in Notices of Infraction directed to CCDC.

1595. CCDC had actual notice through Plaintiff's written repair requests, emails, work orders, demands, and communications with management. It also received governmental notice through the inspection and enforcement process.

1596. CCDC failed to correct one or more substantial defects within a reasonable time, inadequately repaired them, or represented requests as completed while corresponding conditions allegedly remained.

1597. The defects materially impaired essential residential functions, including heat, sanitation, drainage, safe bathing, safe walking, food preparation, sleep, and the ordinary use and enjoyment of the dwelling.

1598. Plaintiff remained responsible only for the reasonable rental value of the premises in their defective condition. She is entitled to seek an abatement measured by the difference between the rent reserved and the reasonable rental value of Apartment 220 during periods of substantial noncompliance.

1599. The amount and duration of any abatement must be determined from the severity, duration, and effect of each proven condition, the notice and repair history, the rent and ledger, and other competent evidence. Plaintiff does not seek a windfall or duplicative recovery.

1600. Plaintiff also seeks restitution or credit for rent and related charges to the extent permitted by law, declaratory and appropriate prospective relief concerning continuing material conditions, and other nonduplicative remedies.

**COUNT IX**

**NEGLIGENCE**

District of Columbia Law

Against CCDC Residential Rental LLC and Each Property-Management or Maintenance Defendant Whose Own Negligent Undertaking Caused the Alleged Injury

1601. A residential landlord owes tenants a duty to exercise reasonable care in inspecting, maintaining, and repairing areas and components within the landlord's responsibility when the landlord knows or should know of a dangerous condition.

1602. A property manager, maintenance provider, or contractor that undertakes to inspect or repair a condition must exercise reasonable care in performing that undertaking.

1603. Plaintiff repeatedly notified the responsible Defendants of plumbing, drainage, shower-temperature, flooring, pest, heat, and related conditions. DOB findings supplied additional notice of several dangerous defects.

1604. The responsible Defendants breached the applicable duty to the extent they failed to investigate recurring conditions adequately, failed to make competent and lasting repairs, closed requests without correcting the condition, failed to warn Plaintiff of a known danger, or performed repairs in a manner that created or left an unreasonable risk of harm.

1605. Plaintiff alleges that the shower temperature shifted abruptly between excessively hot and cold water after the system had represented the shower request as completed. Excessively hot water contacted her lower legs and feet, causing immediate pain, burning, redness, and chafing. Plaintiff preserved photographs but does not plead an unverified medical classification of the injury.

1606. Plaintiff also alleges property damage or cleanup loss caused by defective plumbing or water conditions, and injury or property loss caused by other dangerous conditions, only to the extent supported by competent evidence establishing the specific condition, Defendant, breach, causation, and amount.

1607. Housing-code provisions and the DOB Notices are relevant to the standard of care and may support negligence based on violation of a safety regulation where the regulation was intended to protect a class including Plaintiff from the type of injury proved.

1608. A regulatory violation does not automatically establish causation or damages. Plaintiff must connect each requested tort recovery to a particular negligent act or omission and prove that the act or omission was a substantial factor in producing a reasonably foreseeable injury.

1609. This Count does not seek tort recovery for the loss of the contractual bargain alone. It seeks damages only for physical injury, personal-property damage, cleanup expense, or another independent tort loss proximately caused by negligence.

1610. As a direct and proximate result, Plaintiff suffered physical pain, property loss, out-of-pocket expenses, and related emotional distress to the extent proved. She seeks compensatory and other nonduplicative relief authorized by law.

**COUNT X**

UNLAWFUL ENTRY AND BREACH OF THE COVENANT OF QUIET ENJOYMENT

**UNLAWFUL ENTRY AND BREACH OF THE COVENANT OF QUIET ENJOYMENT**

Against CCDC Residential Rental LLC and the Property-Management Defendant Responsible for the Challenged Entry or Interference

1611. The lease granted Plaintiff possession of Apartment 220 for use as a private residence. District law implies a covenant of quiet enjoyment protecting a tenant’s possession and permissible residential use against unreasonable interference attributable to the landlord.

1612. Except in an emergency, D.C. Code § 42-3505.51 permits a housing provider to enter an occupied rental unit only for a reasonable purpose, at a reasonable time, and after reasonable notice, ordinarily written notice at least 48 hours before entry unless the tenant agrees in writing to a shorter period.

1613. In or about September 2023, while Plaintiff was inside Apartment 220, she heard a key enter the lock, the lock disengage, the handle move, and the door open. According to Plaintiff, the entrant did not first knock, ring the doorbell, or announce maintenance.

1614. The presently identified record does not contain written notice identifying the date and time of that specific entry or evidence of an emergency requiring entry without ordinary notice.

1615. Plaintiff repeatedly requested repairs and did not claim an absolute right to deny lawful access. Her claim is that the responsible Defendant entered or attempted entry without the notice and reasonable manner required by the statute and lease.

1616. The unexpected entry caused an immediate fear response and impaired the security and privacy associated with the use of a private residence.

1617. Plaintiff also alleges unreasonable interference during a landlord-controlled repair operation following a water event in the bedroom and closet area. Contractors removed baseboards, lifted carpet, left exposed or unfinished materials, and operated several large industrial fans continuously in or near the sleeping area for more than two days, including overnight.

1618. Plaintiff alleges that the responsible Defendants observed or controlled the repair operation but did not offer temporary sleeping space or another reasonable measure to reduce the overnight interference. Necessary repairs do not constitute a breach merely because they create ordinary inconvenience; liability depends on the manner, duration, notice, safety measures, available alternatives, and substantial effect on residential use.

1619. To the extent the responsible Defendants entered in violation of § 42-3505.51, repeatedly made unreasonable demands for entry, or conducted landlord-controlled work in a manner substantially and unreasonably interfering with Plaintiff's possession or residential use, they breached Plaintiff's right to quiet enjoyment.

1620. As a direct and proximate result, Plaintiff suffered loss of privacy and use, emotional distress, electricity expense attributable to landlord-controlled equipment, and other damage to the extent proved. She seeks appropriate damages and injunctive relief under D.C. Code § 42-3505.51 and other nonduplicative relief authorized by law.

## VIII. PRAYER FOR RELIEF

1621. Plaintiff respectfully requests judgment in her favor on each Count proved and against each Defendant shown to be legally responsible.

1622. Plaintiff requests actual and compensatory damages, including proven economic loss, property damage, physical-injury damages, emotional-distress damages where recoverable, loss-of-use damages, and other consequential damages authorized by the governing claim.

1623. Plaintiff requests rent abatement, credits, offsets, restitution, correction of the resident ledger, and review or reversal of charges to the extent authorized and proved.

1624. Plaintiff requests statutory or enhanced damages under the CPPA, punitive damages under the FHA, DCHRA, CPPA, or common law only against a Defendant whose conduct and state of mind satisfy the applicable standard, and no duplicative recovery.

1625. Plaintiff requests declaratory relief identifying the rights and obligations proved in this action.

1626. Plaintiff requests temporary and permanent injunctive relief, as appropriate, requiring an effective reasonable-accommodation process; disability-compatible nonemergency maintenance scheduling; an effective fee-free rent-payment method; correction of continuing material housing conditions; lawful notice and procedures for nonemergency entry; preservation of relevant records; and cessation of discriminatory, retaliatory, deceptive, or otherwise unlawful practices proved at trial.

1627. Plaintiff requests prejudgment and post-judgment interest and reasonable attorney's fees and costs only to the extent authorized by statute, contract, rule, or other applicable law.

1628. Plaintiff requests such other legal or equitable relief as the Court deems just and proper.

**IX. DEMAND FOR TRIAL**

1629. Plaintiff requests a bench trial on all issues triable to the Court and does not demand a jury at this time. Plaintiff preserves any right to amend this demand as permitted by the Federal Rules of Civil Procedure.

**X. SIGNATURE**

Respectfully submitted,

JANE DOE, Pro Se

[Address or approved alternative contact information]

875 10th St. NW, Washington, DC 20001

[Telephone]

913-593-9041

[Email]

stephmrichner@gmail.com

Dated: 08/04/2026